UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRANK HARGROVE, JR. and RICHARD WHITE,
for themselves and others similarly-situated, and
INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE,
AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA (UAW),

                                           Case No. 2:10-cv-10946

        Plaintiffs,                     Class Action

v.                                    U.S. District Judge Arthur J. Tarnow

EAGLEPICHER CORPORATION also known as
EP MANAGEMENT CORPORATION and as
EAGLEPICHER MANAGEMENT COMPANY,

        Defendant.
_____/

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND PERMANENT INJUNCTION**

**BRIEF IN SUPPORT**

**CERTIFICATE OF SERVICE**

Stuart M. Israel (P15359)
Legghio & Israel, P.C.
306 S. Washington Ave., Suite 600
Royal Oak, MI 48067
(248) 398-5900
israel@legghioisrael.com

Attorneys for Class Representatives and UAW

Michael F. Saggau (P35326)
  Associate General Counsel
International Union, UAW
8000 E. Jefferson Ave.
Detroit, MI 48214
(313) 926-5216
msaggau@uaw.net

Attorney for UAW

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
## AND PERMANENT INJUNCTION

Plaintiffs Frank Hargrove Jr. and Richard White, for themselves and the proposed class of similarly-situated retirees and the retirees' spouses, surviving spouses, and other eligible family members, and plaintiff UAW, pursuant to Fed. R. Civ. P. 56 and the Court's equity powers, ask the Court to grant summary judgment in their favor, to declare EaglePicher to be in breach of collective bargaining agreement and in violation of ERISA, and to issue its permanent injunction: **(1)** restraining EaglePicher from imposing retirement healthcare premium costs on class members; **(2)** barring EaglePicher from discontinuing company-funding of retirement healthcare; **(3)** directing EaglePicher to restore the *status quo ante* by reinstating and permanently maintaining the healthcare benefits unilaterally reduced by EaglePicher on January 1, 2010; and **(4)** directing EaglePicher to "make whole" all class members for expenses incurred due to EaglePicher's breaches of collective bargaining agreement and statutory obligations.

Plaintiffs requested EaglePicher's concurrence in the relief sought in this motion on October 26, 2010, March 18, 2011, and other dates. Concurrence was denied, necessitating this motion.

This motion is supported by the attached brief and exhibits.

|  |  |
|---|---|
| | s/Stuart M. Israel |
| Michael F. Saggau (P35326) | Stuart M. Israel (P15359) |
|   Associate General Counsel | Legghio & Israel, P.C. |
| International Union, UAW | 306 S. Washington Ave., Suite 600 |
| 8000 E. Jefferson Ave. | Royal Oak, MI 48067 |
| Detroit, MI 48214 | (248) 398-5900 |
| (313) 926-5216 | israel@legghioisrael.com |
| msaggau@uaw.net | |
| | Attorney for Class Representatives and UAW |
| **Attorney for UAW** | |
| April 21, 2011 | |

**BRIEF IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND PERMANENT INJUNCTION**

**TABLE OF CONTENTS**

LOCAL RULE 7.1 STATEMENT OF ISSUE.............................................................. ii

LOCAL RULE 7.1 STATEMENT OF APPROPRIATE AUTHORITIES.................................. iii

TABLE OF AUTHORITIES ................................................................................v

SUMMARY OF THE CASE..................................................................................1

      1.    The parties..................................................................................1
      2.    The lawsuit.................................................................................1
      3.    EaglePicher's admissions................................................................1
      4.    EaglePicher's healthcare promises .....................................................2
      5.    EaglePicher's reduction of healthcare coverage ....................................2
      6.    EaglePicher's planned termination of healthcare funding .........................3
      7.    This motion ................................................................................3

ARGUMENT ....................................................................................................4

      I.      THE LAW GOVERNING COLLECTIVELY-BARGAINED
            RETIREMENT HEALTHCARE.........................................................4

      II.    EAGLEPICHER'S COLLECTIVELY-BARGAINED RETIREMENT
            HEALTHCARE PROMISES ...........................................................6

            A.    The Collective Bargaining Agreements....................................6
            B.    EaglePicher's Admissions In Words and Deeds.........................8

      III.   EAGLEPICHER'S BREACHES.........................................................9

            A.    Reduced Benefits .............................................................10
            B.    The Planned Imposition of Premium Costs ..............................13

CONCLUSION...................................................................................................13

## LOCAL RULE 7.1 STATEMENT OF ISSUE

**<u>Where</u>** collective bargaining agreements ("CBAs") promise that EaglePicher will provide "full" retirement healthcare benefits "for life" at "no premium cost to the employee, upon retirement," and that EaglePicher "will pay the full cost" of healthcare for "retired employees" and "for the surviving spouse of a retired employee" and

**<u>Where</u>** EaglePicher provided promised benefits "for more than twenty years," but unilaterally reduced healthcare benefits on January 1, 2010 and announced its plan to impose healthcare premium costs on retirees and their family members and surviving spouses and, after 2014, to discontinue all company-funding of retirement healthcare benefits,

**<u>Whether</u>** this Court should grant summary judgment for plaintiffs, declare EaglePicher in breach of CBA and in violation of ERISA, and issue its permanent injunction **(1)** restraining EaglePicher from imposing retirement healthcare premium costs on retirees and their family members and surviving spouses; **(2)** barring EaglePicher from discontinuing full company-funding of promised retirement healthcare; **(3)** directing EaglePicher to restore the *status quo ante* by reinstating and permanently maintaining the lifetime healthcare benefits unilaterally reduced by EaglePicher on January 1, 2010; and **(4)** directing EaglePicher to "make whole" class members for expenses incurred due to EaglePicher's breaches of CBA and ERISA obligations.

## LOCAL RULE 7.1 STATEMENT OF APPROPRIATE AUTHORITIES

1.    Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

   **Fed. R. Civ. P. 56(a).**

2.    Collectively-bargained promises of lifetime retirement healthcare are enforceable under Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. §185.

   ***UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479-1480 (6th Cir. 1983),** *cert. denied* **465 U.S. 1007 (1984)**

   ***Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571, 579 (6th Cir. 2006),** *cert. denied* **549 U.S. 1019 (2006)**

   ***Cole v. ArvinMeritor*, *Inc.*, 549 F.3d 1064, 1069-1070 (6th Cir. 2008)**

3.    Collectively-bargained retirement healthcare promises are also "welfare benefit plans" under the Employee Retirement Income Security Act (ERISA); broken retirement healthcare promises are contract breaches under LMRA Section 301 and are "also a violation of ERISA."

   ***Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1298 (6th Cir. 1991)**

   ***Maurer v. Joy Technologies, Inc.*, 212 F.3d 907, 914 (6th Cir. 2000)**

   ***Schreiber v. Philips Display Components Co.*, 580 F.3d 355, 363 (6th Cir. 2009)**

4.    The core issues in an action to enforce an employer's collectively-bargained retirement healthcare promises are "whether the retirement health care benefits vested for life" and whether they are to be "fully funded" by the employer.

   ***Yolton v. El Paso Tennessee Pipeline Co.,* 435 F.3d 571, 574, 584 (6th Cir. 2006),** *cert. denied* **549 U.S. 1019 (2006)**

5.    The scope and duration of collectively-bargained retiree healthcare promises depend on the contracting parties' intent, determined using "the basic rules of contract interpretation" and, if necessary, using "extrinsic" evidence to resolve ambiguities.

   ***UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479-1480 (6th Cir. 1983),** *cert. denied* **465 U.S. 1007 (1984)**

   ***Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571, 579 (6th Cir. 2006),** *cert. denied* **549 U.S. 1019 (2006)**

   ***Cole v. ArvinMeritor*, *Inc.*, 549 F.3d 1064, 1069-1070 (6th Cir. 2008)**

6.      Once vested, promised retirement healthcare benefits may not be unilaterally altered without retiree consent.

*Allied Chemical Workers v. PPG Co.*, **404 U.S. 157, 182 n.20 (1971)**

*Yolton v. El Paso Tennessee Pipeline Co*.**, 435 F.3d 571, 579 (6th Cir. 2006),** *cert. denied* **549 U.S. 1019 (2006)**

*Schreiber v. Philips Display Components Co.*, **580 F.3d 355, 363 (6th Cir. 2009)**

# TABLE OF AUTHORITIES

## CASES

*Allied Chemical Workers v. PPG Co.*, 404 U.S. 157 (1971) .......................................................... 5

*Armistead v. Vernitron Corp.*, 944 F.2d 1287 (6th Cir. 1991) .................................................. 4

*Cole v. ArvinMeritor, Inc.*, 516 F.Supp.2d 850 (E.D. Mich. 2005) ................................................ 9

*Cole v. ArvinMeritor, Inc.*, 549 F.3d 1064 (6th Cir. 2008) ........................................................ 5

*Golden v. Kelsey-Hayes Co.*, 73 F.3d 648 (6th Cir. 1996) ...................................................... 5, 12

*Golden v. Kelsey-Hayes Co.*, 845 F.Supp. 410 (E.D. Mich. 1994) ............................................. 12

*Golden v. Kelsey-Hayes Co.*, 954 F.Supp. 1173 (E.D. Mich. 1997) ............................................ 9

*Maurer v. Joy Tech., Inc.*, 212 F.3d 907 (6th Cir. 2000) ......................................................... 4

*McCoy v. Meridian Automotive Systems, Inc.*, 390 F.3d 417 (6th Cir. 2004) ................................ 5

*Reese v. CNH America LLC*, 574 F.3d 315, *reh. denied*, 583 F.3d 955 (6th Cir. 2009) ............ 4, 5

*Schreiber v. Philips Display Components Co.*, 580 F.3d 355 (6th Cir. 2009) ............................ 4, 5

*Steelworkers v. Textron, Inc.*, 836 F.2d 6 (1st Cir. 1987) ...................................................... 12

*UAW v. Loral Corp.*, 107 F.3d 11 (6th Cir. 1997) (table), 1997 WL 49077 (Ex. 14) ................... 6

*UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), *cert. denied* 465 U.S. 1007 (1984) ....................................................................................................... 4, 5, 6

*Winnett v. Caterpillar, Inc.*, 553 F.3d 1000 (6th Cir. 2009) ..................................................... 5, 9

*Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571 (6th Cir. 2006), *cert. denied* 549 U.S. 1019 (2006) ................................................................................ 4, 5, 6, 7

## STATUTES

28 U.S.C. §1746 ......................................................................................................................... 1

Employee Retirement Income Security Act (ERISA) Section 502(a), 29 U.S.C. §1132(a) ........... 1

Labor Management Relations Act (LMRA) Section 301, 29 U.S.C. §185 .......................... 1, 4, 5

## SUMMARY OF THE CASE

1.    __The parties__.  Plaintiffs Frank Hargrove Jr. and Richard White are retirees and former employees of defendant EaglePicher Corporation.  They worked at EaglePicher's now-closed Wolverine Gasket plant in Inkster, Michigan where they were members of a collective bargaining unit represented by plaintiff International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW).  EaglePicher and UAW were parties to collective bargaining agreements ("CBAs") promising retirement healthcare benefits.  (Ans. ¶¶2, 8-13, 39-41).[1]

2.    __The lawsuit__.  The lawsuit challenges EaglePicher's unilateral reduction of collectively-bargained retirement healthcare benefits, planned imposition of premium costs on retirees and their family members and surviving spouses, and intended eventual cancellation of all company-paid retirement healthcare.  Plaintiffs Hargrove and White sue for themselves and a similarly-situated class of approximately 22 retirees, family members, and surviving spouses, for CBA breach under Section 301 of the Labor-Management Relations Act (LMRA), 29 U.S.C. §185, and under Section 502(a) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §1132(a).  Plaintiff UAW sues for CBA breach under LMRA Section 301.  (Ans. ¶6).

3.    __EaglePicher's admissions.__  EaglePicher admits it is:

…obligated by collective bargaining agreements to provide retiree healthcare benefits to certain retired EaglePicher employees who, while employed, were members of the UAW-represented collective bargaining unit at the Wolverine Gasket plant in Inkster, Michigan and to spouses and surviving spouses and other eligible family members of those retired employees.  (Ans. ¶13).

---

[1] Citations.  Citations to EaglePicher's answer (Docket 9) are shown as "Ans. ¶__." Citations to documents included as exhibits to this brief are shown as "Ex. __ at __." Citations to declarations, made pursuant to 28 U.S.C. §1746, also included as exhibits, show the declarant's name and cited paragraph, e.g., "Kaminski decl. ¶__."

EaglePicher admits, too, that it is the "sponsor" and "administrator" of an ERISA-regulated, collectively-bargained "employee welfare benefit plan" that it operates to "provide healthcare benefits for UAW-represented retirees, including the individual plaintiffs and others similarly-situated and their spouses and surviving spouses and other eligible family members." (Ans. ¶¶8-9, 12-13, 39-41).

4. **EaglePicher's healthcare promises**. In various CBAs, including the last CBA in effect at the time of the 2003 closing of the Wolverine Gasket plant, EaglePicher promised in Appendix "F" that employees with 20 or more years of service as of August 1, 1993 "will receive full medical benefits for life under the guideline of the current retiree medical benefit plan, at no premium cost to the employee, upon retirement." See the August 1, 2002-July 31, 2005 CBA, Appendix "F." (Ex. 5 at 61-62). Appendix "F" is in the 1993-1996, 1996-1999, 1999-2002, and 2002-2005 CBAs between UAW and EaglePicher. (Ex. 2-5). Earlier CBAs contain broader promises. See e.g., the 1984-1990 CBA which promises that EaglePicher "will pay the full cost" of healthcare "for retired employees" and "for the surviving spouse of a retired employee," defining "retirees" as "those persons who have retired since December 1, 1961, and at the time of retirement are 55 years of age or more and have more than ten (10) years of service with the Company." (Ex. 1 at 41-42).

5. **EaglePicher's reduction of healthcare coverage**. EaglePicher provided retirees, including plaintiffs Hargrove and White and other class members, with the promised healthcare from their various retirement dates until January 1, 2010. (Ans. ¶41; Hargrove decl. ¶3; Kaminski decl. ¶9; Perkins decl. ¶2; Perry decl. ¶2). On September 29 and October 1, 2009, EaglePicher wrote to "EaglePicher Retirees with Medical Coverage" announcing "changes to the health coverage you have been receiving as an eligible EaglePicher retiree." (Ex. 10 and 11;

Kaminski decl. ¶¶10-11).   On January 1, 2010, EaglePicher unilaterally reduced benefits and imposed greater expense on covered persons.   For example, through December 31, 2009 retirees paid $2 per-prescription co-payments for generic and some brand drugs.   Under the unilaterally-imposed 2010 plan for retirees and family members 65 and over, covered individuals must pay 15%, 25%, or 35% of prescription costs up to $4,550 annually, after which they are required to pay 5% co-payments for most prescriptions, without limit.   (Ex. 10-11; Kaminski decl. ¶¶12-13).

6.   **EaglePicher's planned termination of healthcare funding**.   EaglePicher announced, too, that it planned "to begin charging for retiree health coverage" beginning on January 1, 2011.   EaglePicher announced that this "cost-sharing" would be implemented in "phases."   Retirees and covered family members would be obligated to pay 20% of premium costs in 2011, 40% in 2012, 60% in 2013, 80% in 2014, and "100% of the cost of coverage in 2015 and thereafter."   (Ex. 10-11; Kaminski decl. ¶10).   EaglePicher notified retirees in November 2010, however, that they "will not be required to contribute towards the premium cost for 2011." (Ex. 12 and 13).

7.   **This motion**.   Plaintiffs ask the Court to grant summary judgment in their favor, to declare EaglePicher in breach of CBA and in violation of ERISA, and to issue its permanent injunction **(1)** restraining EaglePicher from imposing premium costs; **(2)** barring EaglePicher from discontinuing full company funding of retirement healthcare; **(3)** directing EaglePicher to restore the *status quo ante* by reinstating and permanently maintaining the lifetime healthcare benefits unilaterally reduced by EaglePicher on January 1, 2010; and **(4)** directing EaglePicher to "make whole" class members for expenses incurred due to EaglePicher's CBA and ERISA violations.

**ARGUMENT**

I.   **THE LAW GOVERNING COLLECTIVELY-BARGAINED RETIREMENT HEALTHCARE**

Collectively-bargained retirement healthcare promises are enforceable under LMRA Section 301. *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), *cert. denied* 465 U.S. 1007 (1984) and *Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571 (6th Cir. 2006), *cert. denied* 549 U.S. 1019 (2006). The core issues are "whether the retirement health care benefits vested for life" and whether they are to be "fully funded" by the employer. *Yolton*, 435 F.3d at 574.

Collectively-bargained retirement healthcare promises are also "welfare benefit plans," so broken CBA promises enforceable under LMRA are also enforceable under ERISA. *Schreiber v. Philips Display Components Co.*, 580 F.3d 355, 363 (6th Cir. 2009) citing *Maurer v. Joy Tech., Inc.*, 212 F.3d 907, 914 (6th Cir. 2000) (the LMRA claim "determines the outcome of the ERISA claim because '[i]f the parties intended to vest benefits and the agreement establishing this is breached, there is an ERISA violation as well as a LMRA violation'") and *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1298 (6th Cir. 1991) (broken retirement healthcare promises are CBA breaches and also "a violation of ERISA").

In addressing collectively-bargained retirement healthcare promises, the courts apply "traditional rules for contractual interpretation." *Yard-Man*, 716 F.2d at 1479. See *Reese v. CNH America LLC*, 574 F.3d 315, 321, *reh. denied*, 583 F.3d 955 (6th Cir. 2009) ("ordinary principles of contract interpretation"). The rules are set out in *Yard-Man*. The "court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent." Where "ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance." The court may consider the contractual "context" and "interpret each provision in question as part of the integrated whole" and

4

"consistently with the entire document and the relative positions and purposes of the parties."  If CBA analysis does not resolve ambiguities, the court may consider "extrinsic" evidence of the contracting parties' intent.  716 F.2d at 1479-1480.  Accord: *Cole v. ArvinMeritor, Inc.*, 549 F.3d 1064, 1069-1070 (6th Cir. 2008); *Yolton* 435 F.3d at 579; *McCoy v. Meridian Automotive Systems, Inc.*, 390 F.3d 417, 422 (6th Cir. 2004); and *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 654-655 (6th Cir. 1996).

Where retirement healthcare promises are collectively-bargained, there is an inference that the contracting parties intended lifetime healthcare; the inference applies if the court "can find either 'explicit contractual language or extrinsic evidence indicating' an intent to vest benefits."  *Reese*, 574 F.3d at 321, citing *Yolton*, 435 F.3d at 580 and *Yard-Man*, 716 F.2d at 1482.  *Reese* affirmed that "to the extent we put a thumb on the scales in this setting, it favors vesting" and that the *Yard-Man* inference provides "a nudge in favor of vesting in close cases." 574 F.3d at 321.

Once vested, promised retirement healthcare benefits may not be unilaterally altered.  See *Allied Chemical Workers v. PPG Co.*, 404 U.S. 157, 182 n.20 (1971) ("[u]nder established contract principles, vested retirement rights may not be altered without the pensioner's consent"; a retiree has "a federal remedy" under LMRA Section 301 "for breach of contract if his benefits were unilaterally changed"); *Yolton*, 435 F.3d at 578 (citation omitted) (once healthcare benefits are vested, "the employer's unilateral modification or reduction of those benefits constitutes a LMRA violation"); *Schreiber*, 580 F.3d at 364 (quoting *Yolton*, "If the parties vested health benefits, an 'employer's unilateral modification or reduction of those benefits'" is an LMRA violation); *Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1009, n.5 (6th Cir. 2009) ("once benefits vest, an employer's unilateral modification or reduction of benefits constitutes a Section 301

violation" and "an ERISA violation as well."); *UAW v. Loral Corp.*, 107 F.3d 11 (6th Cir. 1997) (table), 1997 WL 49077 (Ex. 14) at *3 (once vested, retiree healthcare benefits cannot be reduced "unilaterally by the employer or the courts"); *Yard-Man*, 716 F.2d at 1482, n.8 (union and employer "may not…bargain away retiree benefits which have already vested").

## II.     EAGLEPICHER'S COLLECTIVELY-BARGAINED RETIREMENT HEALTHCARE PROMISES

EaglePicher's promises of "full medical benefits for life" at "no premium cost to the employee, upon retirement" for retired employees and their eligible family members and surviving spouses are demonstrated by the governing CBAs **(Section A)** and by EaglePicher's words and deeds over "more than twenty years" **(Section B)**.

### A.     The Collective Bargaining Agreements

EaglePicher's contractual obligations are set out, among other places, in Appendix "F" of the 2002-2005 CBA, the last CBA governing the UAW-represented collective bargaining unit at the Wolverine Gasket plant before the plant closed in 2003.  In pertinent part, Appendix "F" provides (Ex. 5 at 62, emphasis added):

> Seniority employee[s] with an [sic] minimum of twenty (20) years of service as of August 1, 1993 will receive full medical benefits *for life* under the guideline of the current retiree medical benefit plan, *at no premium cost to the employee, upon retirement*.

As noted, the 1993-1996, 1996-1999, and 1999-2002 CBAs contain the same promises and earlier CBAs contain broader "will pay the full cost" promises.  See Ex. 1-4.  Also as noted, the core issues in retirement healthcare cases are "whether the retirement health care benefits vested for life" and whether they are to be "fully funded" by the employer.  *Yolton*, 435 F.3d at 574. Here, the CBA language answers both questions in the affirmative and, in addition, prescribes the scope of promised healthcare.

**First**, Appendix "F" promises, for employees with 20 or more years of service as of August 1, 1993, that "upon retirement" EaglePicher will provide "full" healthcare benefits "for life." (Ex. 2 at 61; 3 at 61; 4 at 61; and 5 at 62).  Earlier language promises healthcare until "the death of the retired employee" for "retired employees" who "have retired since December 1, 1961" at or over age 55 with 10 or more years of service and for "the surviving spouse of a retired employee."  (Ex. 1 at 41-42).  The CBAs definitively promise lifetime retirement healthcare.

**Second**, Appendix "F" promises healthcare benefits "at no premium cost to the employee, upon retirement."  (Ex. 2 at 61; 3 at 61; 4 at 61; and 5 at 62).  Earlier language promises that EaglePicher "will pay the full cost" of retirement healthcare "for retired employees" and "for the surviving spouse of a retired employee."  (Ex. 1 at 41-42).  This language definitively promises, in *Yolton*'s term, that retirement healthcare is to be "fully funded" by EaglePicher.

**Third**, Appendix "F" promises the "full medical benefits" provided by the "current retiree medical benefit plan," i.e., the family coverage that had been in effect for retired UAW-represented employees "for more than twenty years" before January 1, 2010 when EaglePicher made the unilateral reductions that prompted this lawsuit.  (See Ex. 10-11; Ex. 5 at 62).

**Fourth**, EaglePicher *admits* **(1)** that it is "obligated by collective bargaining agreements to provide retiree healthcare benefits to certain retired EaglePicher employees who, while employed, were members of the UAW-represented collective bargaining unit at the Wolverine Gasket plant in Inkster, Michigan and to spouses and surviving spouses and other eligible family members of those retired employees" and **(2)** that it is the "sponsor" and "administrator" of the ERISA-regulated collectively-bargained "employee welfare benefit plan" that it "created" and

7

operates to "provide healthcare benefits for UAW-represented retirees, including the individual plaintiffs and others similarly-situated and their spouses and surviving spouses and other eligible family members."  (Ans. ¶¶8-9, 12-13, 39-41).

**In short**, the CBAs promise "full medical benefits for life," at the level in effect at the time of the last CBA and at the level in effect "for more than twenty years," provided at "no premium cost to" the retired employees and their dependents and surviving spouses.  Next, we show that EaglePicher's course of conduct for more than two decades confirms these promises of lifetime company-paid retirement healthcare.

### B.     EaglePicher's Admissions In Words and Deeds

In addition to the CBAs, EaglePicher's decades-long course of conduct—company words and deeds—confirms EaglePicher's obligations to provide lifetime employer-paid retirement healthcare.

**First**, EaglePicher provided retirement healthcare "without any changes to benefits" for "more than twenty years" through December 31, 2009, "at no premium cost" to the retirees and their dependents and surviving spouses.  (Ex. 10-11; Ex. 5 at 62).

**Second**, EaglePicher acknowledged the CBA promises over the years, during collective bargaining and in meetings between plant management and soon-to-be-retired employees. Retiree and former union negotiator Ralph Kaminski describes the explicit promises made by EaglePicher negotiators in 1993 when Appendix "F" first was negotiated.  (Kaminski decl. ¶¶2-7).  Retiree Frank Hargrove Jr. describes the explicit promises made by EaglePicher managers in late 2003 on the eve of the plant closing.  (Hargrove decl. ¶¶3-4).  Retirees Theda Perkins and Joyce Perry describe the explicit promises made by a plant personnel manager as they were about to retire, one in 1997 and the other in 1998.  (Perkins decl. ¶2; Perry decl. ¶2).

8

**In short**, EaglePicher's conduct confirms that EaglePicher promised family medical benefits for all UAW-represented employees who retired and satisfied "Rule of 65" criteria before the 1993 CBA and for all who retired during the 1993 CBA and later with 20 or more years of service as of August 1, 1993, and EaglePicher kept those promises until January 1, 2010. See *Cole v. ArvinMeritor, Inc.*, 516 F.Supp.2d 850, 861-864, 874 (E.D. Mich. 2005) ("oral 'lifetime' statements" from company officials and the fact that for decades—"until recently"— the company "provided fully-paid retiree health coverage" confirm collectively-bargained lifetime retirement healthcare promises); *Golden v. Kelsey-Hayes Co.*, 954 F.Supp. 1173, 1188 (E.D. Mich. 1997) (collectively-bargained lifetime retirement healthcare promises confirmed by "course of conduct" and "extrinsic" evidence).

-------------------------------------

**In sum**, the CBAs and EaglePicher's conduct and admissions over the years demonstrate that plaintiffs were promised company-paid lifetime retirement healthcare.  Next, we show that EaglePicher broke its promises and breached its obligations under the CBAs, Section 301, and ERISA.

## III.    EAGLEPICHER'S BREACHES

On January 1, 2010, EaglePicher changed the promised healthcare that it had provided "for more than twenty years."  These changes were unilateral; they were not approved by the retirees.  As shown in Argument I, once vested, retirement healthcare benefits cannot lawfully be diminished by the employer without consent from the retirees and, absent such consent, reduction of the promised benefits "constitutes a Section 301 violation" and "an ERISA violation as well."  *Winnett*, 353 F.3d at 1009, n.5.

Next, we show that EaglePicher's wrongful changes in retirement healthcare fall into two categories.  First, EaglePicher wrongfully reduced benefits.  **(Section A)**.  Second, EaglePicher

wrongfully plans to impose increasing premium costs on retirees and, ultimately, end all company payments and place all premium costs on retirees.  **(Section B)**.

A.      **Reduced Benefits**

The benefits unilaterally implemented by EaglePicher on January 1, 2010 are inferior to those in effect until December 31, 2009.  The new benefits shift costs and risk to retirees.  Any reduction of promised benefits is a CBA breach and a violation of Section 301 and ERISA, but EaglePicher's wrongful reductions are particularly injurious.

Class member Ralph Kaminski provides a case in point.  He was born in 1935.  He began working at EaglePicher's Wolverine Gasket plant in 1956.  He retired effective January 1, 2001. Mr. Kaminski earned lifetime retirement healthcare with his 44-plus years of labor.  Mr. Kaminski and his wife, Jeanette Kaminski, got retirement healthcare fully-paid by EaglePicher at the promised level from the time Mr. Kaminski retired until EaglePicher unilaterally reduced benefits on January 1, 2010.  The pre-2010 plan for 65-and-over retirees and family members was administered by CIGNA; the reduced plan, implemented on January 1, 2010, is operated by Aetna.  The reduced plan created a financial burden for the Kaminskis.  (Kaminski decl. ¶¶1, 8, 11-15).

Both Mr. and Mrs. Kaminski are diabetic.  They both have heart conditions.  Mr. Kaminski has asthma.  Between them they typically fill 19 regular prescriptions each month. They also fill additional prescriptions as needed.  Before EaglePicher reduced coverage in 2010, the Kaminskis paid $2 per-prescription co-payments, totaling about $38 a month.  Since EaglePicher's reduction, the Kaminskis must pay percentages (15%, 25%, or 35%) of prescription costs.  Mr. Kaminski estimates he and Mrs. Kaminski now pay at least $500 more each month than they had been paying before EaglePicher reduced coverage.  In addition, the Kaminskis must now pay 10% of the cost of medical services that were fully covered before

January 1, 2010.  Absent reinstatement of the old plan, the Kaminskis likely will pay almost $5,000 out-of-pocket for prescription drugs annually, thousands more than they paid before EaglePicher's reduction.  In addition, other medical services co-payments required under the new plan may add hundreds or thousands more to their annual expenses.  (Kaminski decl. ¶¶12-15).

EaglePicher's changes have created a financial burden for the Kaminskis.  They are on a fixed income.  Mrs. Kaminski worked at Sears, but has no pension.  She gets $695 monthly from Social Security.  Mr. Kaminski gets a $707.03 monthly pension from EaglePicher and $1,511 monthly from Social Security.  Their combined monthly income is $2,913.03.  Their approximately $500 monthly prescription drug costs consume more than 17% of the Kaminskis' monthly gross income.  Due to these increased costs, along with additional costs for medical services no longer fully covered, and the specter of the EaglePicher plan to shift all premium costs to retirees and family members, the Kaminskis fear economic disaster unless EaglePicher's breaches are rectified.  (Kaminski decl. ¶¶10-16).

Other EaglePicher retirees are in similar difficult circumstances.  For example:

**Theda F. Perkins** retired in 1998 at 65.  She has a fixed income of $2,136.54 monthly, consisting of her EaglePicher pension and Social Security.  She regularly takes five prescription medications.  One, which used to cost her $2 monthly, now costs her $42 monthly.  She has refrained from filling some prescriptions, and has cut back on seeing doctors, because, under the current coverage, she cannot afford the expense.  (Perkins decl. ¶¶1, 3-4).

**Joyce M. Perry** retired in 1997 at 62.  She has a fixed income of $1,871.44 monthly, consisting of her EaglePicher pension, another small pension, survivor portions of her deceased husband's pensions, and Social Security.  She regularly takes five prescription medications.  Two of her prescriptions, which used to cost her $4 monthly, now, as there are no generic substitutes, cost her $71.05 monthly.  She also has incurred additional medical co-payment expenses due to the coverage reduction and the addition of co-payments and expects more expense.  (Perry decl. ¶¶1,3-6).

**Frank Hargrove Jr.** had 39 years service and began to receive healthcare fully paid by EaglePicher when the plant closed in 2003.  As he was under 65 on January 1, 2010, EaglePicher placed him in a reduced CIGNA plan.  Since the reduction he has been paying about $75 a month for regular prescriptions that formerly cost him about $12 a month.  Now that he is 65, he will be in EaglePicher's AETNA 65-and-over plan and will be subject to percentage co-payments which will increase his medication expense even more.  He is on a fixed income totaling $1,994.40 monthly from his EaglePicher pension and Social Security.  (Hargrove decl. ¶¶1-2, 5-7). [2]

<u>In short</u>, the changes in prescription drug and medical services coverage unilaterally implemented by EaglePicher have resulted in reduced and inferior coverage, breaching EaglePicher's promise to provide the "full medical benefits" in effect for "more than twenty years."  We ask that the Court declare EaglePicher to be in breach of CBA and in violation of ERISA and direct that EaglePicher restore the *status quo ante* and reinstate and permanently maintain the pre-2010 healthcare benefits, to give union the benefit of its bargain and the retirees the fully-paid retirement healthcare that were promised and that they earned with decades of their labor.

---

[2]  "Numerous courts have found that reductions in retiree insurance coverage constitute irreparable harm" in preliminary injunction analysis, and that "even relatively small increases" in retirees' expenses cause "extreme hardship."  *Golden v. Kelsey-Hayes Co.*, 845 F.Supp. 410, 415-416 (E.D. Mich. 1994), citing, *inter alia*, *Steelworkers v. Textron, Inc.*, 836 F.2d 6 (1st Cir. 1987).  *Textron* recognized "general facts that either are commonly believed or which courts have specifically held sufficient to show irreparable harm" 836 F.2d at 8:

> (1) most retired union members are not rich, (2) most live on fixed incomes, (3) many will get sick and need medical care, (4) medical care is expensive,… (6) some retired workers may find it difficult to obtain medical insurance on their own while others can pay for it only out of money that they need for other necessities of life….We should then conclude that retired workers would likely suffer emotional distress, concern about potential financial disaster, and possibly deprivation of life's necessities (in order to keep up in insurance payments).

*Golden* found that irreparable harm "would befall" retirees if "the modifications to plaintiff's health benefits continued."  845 F.Supp. at 415-416.  The Sixth Circuit affirmed, noting that the district court relied on decisions, including *Textron*, holding that "retirees, primarily because of their fixed income, are unable to absorb even relatively small increases in their expenses without extreme hardship."  73 F.3d at 657.

B.      **The Planned Imposition of Premium Costs**

EaglePicher plans "to begin charging for retiree health coverage."  It announced that charges to retirees would be implemented in "phases" beginning in 2011 and that retirees would have to pay "100% of the cost of coverage in 2015 and thereafter."  (Ex. 10-11).  As noted, in November 2010, EaglePicher wrote to retirees that they would "not be required to contribute towards the premium cost for 2011."  (Ex. 12-13).  Still, EaglePicher has not withdrawn its plan to phase in premiums, or disclaimed its plan to discontinue all company funding, or acknowledged its obligations to fully-pay premium costs for the lifetimes of retirees and their eligible family members.  EaglePicher's plan to impose premium costs and discontinue funding retirement healthcare is also a breach of the CBA promises and in violation of the LMRA and ERISA.  We ask the Court **(1)** to declare that EaglePicher is obligated—in the words of Appendix "F"—to provide "full medical benefits for life…at no premium cost to the employee, upon retirement" and **(2)** to permanently enjoin EaglePicher from imposing, and threatening to impose, premium costs on retirees and their covered family members.

## CONCLUSION

As shown, EaglePicher's contractual obligations and breaches of those obligations are demonstrated by undisputed and conclusive evidence.  Based on that evidence, pursuant to Rule 56 and the Court's equity powers, plaintiffs are entitled to summary judgment, to the Court's declaration that EaglePicher is in breach of CBA and in violation of ERISA, and to the Court's permanent injunction **(1)** restraining EaglePicher from imposing retirement healthcare costs on class members; **(2)** barring EaglePicher from discontinuing full company funding of retirement healthcare; **(3)** directing EaglePicher to restore the *status quo ante* by reinstating and permanently maintaining the healthcare benefits in effect prior to EaglePicher's January 1, 2010 reductions; and **(4)** directing EaglePicher to immediately "make whole" all class members for

13

expenses incurred due to the unilateral reduction in healthcare benefits implemented by EaglePicher and to EaglePicher's contractual and statutory breaches.

s/Stuart M. Israel
Stuart M. Israel (P15359)
Legghio & Israel, P.C.
306 S. Washington Ave., Suite 600
Royal Oak, MI 48067
(248) 398-5900
israel@legghioisrael.com

Attorneys for Class Representatives and UAW

Michael F. Saggau (P35326)
  Associate General Counsel
International Union, UAW
8000 E. Jefferson Ave.
Detroit, MI 48214
(313) 926-5216
msaggau@uaw.net

Attorney for UAW

Date: April 21, 2011

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2011, I caused the foregoing paper to be electronically filed with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Howard E. Kochell
Barnes & Thornburg LLP
11 South Meridian Street
Indianapolis, IN 46204-3535
(317) 231-7276
howard.kochell@btlaw.com

Jeffrey G. Muth
171 Monroe Avenue NW, Ste 1000
Grand Rapids, Michigan 49503
(616) 742-3930
jmuth@btlaw.com

Parties may access this filing through the Court's system.

s/Stuart M. Israel
Stuart M. Israel