UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| FRANK HARGROVE, JR. and RICHARD WHITE, for themselves and others similarly-situated, and INTERNATIONAL UNION, UNITED AUTOBOMILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERCAN (UAW), | ) ) ) ) ) ) | Case No.: 2:10-cv-10946 Class Action |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| EAGLEPICHER CORPORATION, also known as EP MANAGEMENT CORPORATION and as EAGLEPICHER MANAGEMENT COMPANY, | ) ) ) ) | |
| Defendant. | ) ) | |

**DEFENDANT'S RESPONSE BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

### RULE 7.1 STATEMENT OF ISSUES

The issue before the Court is whether Defendant EaglePicher Corporation ("EaglePicher") acted reasonably when it modified its retiree health insurance plan in 2010. That plan was established in the early 1990s and its plan design was antiquated by the time EaglePicher modified it. EaglePicher only sought to modify the plan because it was engaging in a companywide migration of its healthcare plans from a traditional single self-funded plan for all its operating divisions to separate fully insured plans for its individual divisions. During this process, EaglePicher learned that its third-party administrator would no longer provide its administrative services for the Plaintiffs' plan because of its miniscule size. These facts forced EaglePicher to find alternatives to the then-existing plan. While the Plaintiffs focus on a single feature of their new plan – the co-pays for prescription drugs – the plans EaglePicher ultimately

1

chose to put in place provide several benefits that are not even available under their prior plan. Resolving whether EaglePicher acted reasonably in putting these new plans in place require a sifting of facts and circumstances in which the Plaintiffs do not begin to engage.

Instead, the Plaintiffs argue a completely different case that does not exist. First, the Plaintiffs rely on Sixth Circuit case law preventing employers from *terminating* vested benefits under a retiree health insurance plan. That is not the case before the Court, as Defendant EaglePicher Corporation ("EaglePicher") has instead only *modified* the Plaintiffs' retiree benefits when faced with circumstances out of its control. The Sixth Circuit has made clear that *modifications* of vested retiree benefits violates neither ERISA nor the LMRA so long as they are "reasonable." The Plaintiffs do not even begin to address the reasonableness of EaglePicher's modification of the plan and cannot obtain summary judgment under the fact-based inquiry required by the reasonableness standard.

Second, the Plaintiffs ask the Court to rule that EaglePicher cannot modify the plan so as to require the Plaintiffs to share in premium costs. But EaglePicher has told the Plaintiffs that no such change will be made and it is undisputed that this modification has not and will not occur. That question is not ripe for adjudication and the Plaintiffs' claims based on it should be dismissed.

### RULE 7.1 STATEMENT OF MOST RELEVANT AUTHORITIES

The most relevant authority for the present motion is *Reese v. CNH America LLC*, 574 F.3d 315 (6th Cir. 2009). The Plaintiffs contend that an employer cannot modify vested health benefits. However, the Sixth Circuit in *Reese* explained that the act of vesting alone does not prevent "reasonable" modifications of retiree health benefits. *Id.* The Court explained that: "It is one thing to say that this kind of language, when tied to eligibility for a pension plan, prevents an

employer from *terminating* the benefits – which we have held here.  It is quite another to say that an employer may not *alter* the benefits in anyway, particularly when the parties have a history of doing just that and when common experience suggests that health-care plans invariably change over time, if not from year-to-year." *Id.* (emphasis in original).  *Reese* ultimately held that even "vested" health benefits can be subject to reasonable modification. *Id.* at 327.

## STATEMENT OF FACTS NOT IN DISPUTE

This case involves the health benefits of persons who retired from a Wolverine Gasket plant in Inkster, Michigan.  Hoctor Dec. ¶ 20. EaglePicher (and its predecessor in interest) owned and operated the plant, which employed workers who were members of a UAW-represented collective bargaining unit.  Hoctor Dec. ¶ 20.

The Wolverine Gasket plant closed in 2003.  Hoctor Dec. ¶ 20.  At the time of the plant closure, there was a collective bargaining agreement in place that provided that employees with 20 or more years of service as of August 1, 1993 "will receive full medical benefits for life under the guideline of the current retiree medical benefit plan, at no premium cost to the employee, upon retirement."  This language was found in similar agreements dating to 1993.  The collective bargaining agreements did not contain detailed schedules as to what benefits would be provided. *See* Plaintiffs' Ex. 2, 1993 CBA at 37-38; Plaintiffs' Ex. 5, 2002 CBA at 36.  Instead, they outline the nature of the parties' agreement and then required EaglePicher to obtain a plan with benefits "substantially" similar to those described broadly in the agreements. *See id.* ("Section I. The parties hereto have negotiated and put into effect a Group Life, Accident and Sickness Insurance Program, which consists of substantially and the following benefits.").

The Plaintiffs are 22 retirees and/or beneficiaries who are covered under the plan established by EaglePicher under the terms of the collective bargaining agreements.  For many years prior to January 1, 2010, EaglePicher maintained a self-funded medical plan that covered

all its employees and all retiree plans, including the Plaintiffs' plan. Hoctor Dec. ¶ 3.   The

collective bargaining agreements incorporated into their terms the language of this plan.

Plaintiffs' Ex. 2, 1993 CBA at 39  ("All of the various provisions, limitations and agreements

contained in the policy and in connection with the aforesaid benefits are made a part of this

Agreement as though set forth in detail herein").  In turn, the plan explicitly recognizes that it is

subject to amendment and modification:

> The Employer as Plan Sponsor reserves the right to, at any time, change or
> terminate benefits under the plan, to change or terminate the eligibility of classes
> of employees to be covered by the Plan, to amend or eliminate any other plan
> term or condition, and to terminate the whole plan or any part of it. The procedure
> by which benefits may be changed or terminated, by the which the eligibility of
> classes of employees may be changed or terminated, or by which part of all of the
> Plan may be terminated, is contained in the Employer's Plan Document, which is
> available for inspection and copying from the Plan Administrator designated by
> the Employer. No consent of any participant is required to terminate, modify,
> amend or change the Plan.

*See* Hoctor Dec. Ex. A at 39.

Beginning in 2003, the company's self-funded plan was administered by CIGNA as a

Third-Party Administrator.   Hoctor Dec. ¶ 3. CIGNA adjudicated claims and made claim

payments, but the claims were funded 100% by EaglePicher.  *Id.*

The design of the self-funded plan was an old fashioned Base/Major medical plan design

which has not been offered in the health insurance marketplace for many years. Hoctor Dec. ¶ 6.

Because of changes in the market for health insurance and restructuring of divisions within the

company, in 2009 EaglePicher began to convert the company's single self-funded health plan for

all its divisions to separate fully insured plans for each corporate division, as opposed to offering

a single self-funded insurance plan that covered all company divisions. *Id.* ¶ 7.

Once EaglePicher moved away from a single self-funded plan covering all its employees

to separate fully insured plans for each separate division in 2010, CIGNA confirmed that it could

not and would not administer the self-funded plan just for the retiree group at issue in this case

on a standalone basis. Hoctor Dec. ¶ 8. At that time, the retiree group at issue in this lawsuit numbered only 26 or so participants. *Id*. The self-funded plan for these participants involved too few members to justify CIGNA's continued third-party administration of the plan. *Id*. On October 19, 2010, CIGNA, informed EaglePicher that the plan was not sustainable for such a small group of participants and would be dropped. *Id*. at Ex. B.

All these changed circumstances caused EaglePicher to go into the market and try to find a suitable replacement to administer the retiree health plan for the plaintiff group of retirees. Hoctor Dec. ¶ 9.

EaglePicher worked with its insurance broker to determine whether another third-party administrator could replace CIGNA to administer the self-funded plan for the small retiree group in this case. Hoctor Dec. ¶ 10. No Third-Party Administrator expressed an ability or desire to do so. *Id*. Unlike CIGNA, which had administered the old self-funded plan design for the company as a whole for years and therefore had the systems in place to administer that old plan design, no other Third-Party Administrator could administer such an old plan design, and none was willing to incur the cost and effort to develop those systems for such a small group of retirees. *Id*.

On September 29, 2009 and October 1, 2009, EaglePicher wrote to the affected parties and announced changes in their retiree healthcare benefits. Hoctor Dec. ¶ 11. The announced changes principally involved two issues. *Id*.

*First*, EaglePicher announced that, effective and commencing on January 1, 2011 (a plan year later), EaglePicher would implement a phase-in of premium contributions to the retirees and covered family members. Under the phase-in, the retirees and covered family members would pay 20% of premium costs in 2011, 40% in 2012, 60% in 2013, 80% in 2014 and 100% of the premium cost of coverage in 2015 and thereafter. Hoctor Dec. ¶ 12.

However, EaglePicher chose not to not implement the premium cost phase-in that was set for January 1, 2011. Instead, in a letter dated November 15, 2010, EaglePicher informed covered persons that no premium cost phase-in would be made to the plan.   Hoctor Dec. ¶ 13 and Ex. C. That premium cost phase-in announced in 2009 has not occurred and is no longer part of EaglePicher's plan for addressing the retiree healthcare issues for the plaintiff group.   Hoctor Dec. ¶13.  This was confirmed again in a Medicare mandated benefits summary sent to covered persons last month, on November 15, 2011. *Id.*

*Second*, as part of the 2009 announcements, effective and commencing on January 1, 2010 for the plaintiff retiree group, EaglePicher replaced the once-company-wide self-funded healthcare plan with the "Aetna Advantage Plan," for the plaintiff retiree group.  Hoctor Dec. ¶ 14. The Aetna plan is what is known as a "Medicare Advantage Plan design." *Id*.  A Medicare Advantage Plan is a fully insured private fee for service plan.  It is a Medicare replacement plan, not a Medicare supplement.  Claims go directly to the insurer (Aetna) and it pays as primary obligor, not Medicare. *Id.*

In moving for summary judgment, the Plaintiffs focus on one feature of the Aetna Advantage Plan.   The Plaintiffs contend that the prior self-funded plan had a $2.00 per-prescription co-payment for most prescription drugs.   Under the Aetna Advantage Plan, a "formulary" prescription benefit was offered under which covered persons paid a co-pay of 15%, 25%, or 35% of prescription costs, depending upon the prescription. Hoctor Dec. ¶ 15.

The old self-funded plan first and foremost was designed to provide benefits for existing employees and was not particularly designed or tailored for retirees who were Medicare eligible. Hoctor Dec. ¶ 16.  The old self-funded plan and the Aetna Advantage plan are so different in concept as to how the two plan designs do or do not coordinate with Medicare that a true comparison of benefits between the two plans is difficult, if not impossible.   *Id.*  Both have

6

advantages over the other depending upon the unique healthcare needs of a particular participant. *Id.* For example, the Aetna Advantage Plan provides coverage for physician office visits and in-office services, whereas the old self-funded design did not; the Aetna Advantage Plan provides coverage for durable medical equipment (mobility units, breathing equipment, blood sugar equipment, and the like) whereas the old self-funded plan did not; and the Aetna Advantage Plan provides Preventative Care services coverage at 100%, whereas the old self-funded plan provided no coverage at all; and the Aetna Advantage Plan provides coverage for hearing aid reimbursement, whereas the old self-funded plan did not. *Id.* Whether one plan provides better benefits than the other depends on the unique healthcare circumstances of each participant. *Id.*

The federal government partially funds Medicare Advantage Plans and, with that, they are highly and strictly regulated by the Centers for Medicare and Medicaid Services ("CMS"). Hoctor Dec. ¶ 14. Subsequent to adopting the Aetna Advantage Plan, the marketplace for health insurance – especially Medicare Advantage plans – went into a state of significant uncertainty due to proposed provisions in the federal healthcare reform legislation and regulations. Hoctor Dec. ¶ 17. EaglePicher therefore began to look at alternatives to the Aetna Advantage Plan and engaged the services and expertise of Justin Goodwin of AmWINS Group Benefits to assist in the search for a replacement of the Aetna Advantage Plan. *Id.* Mr. Goodwin found and recommended a plan that is a Medicare Supplement plan design, not a Medicare Advantage plan design. *Id.* This distinction means that Medicare provides primary coverage and an insurer provides secondary coverage. *Id.* The plan recommended by Mr. Goodwin of AmWINS is a fully insured Medicare Supplement plan underwritten by United American Insurance Company (the "AmWINS Plan.") *Id.* The AmWINS plan will become effective on January 1, 2012, the start of the new plan year. *Id.*

For prescription drug coverage, the AmWINS Plan will replace the percentage formulary co-pay model of the Aetna Advantage Plan with a fixed $7 co-pay for a 30-day retail prescription and a $7 co-pay for a 90-day mail-order prescription, regardless of whether the prescription is brand or generic. Hoctor Dec. ¶ 18.

In many material respects the Medicare Supplement plan design offered by the AmWINS Plan effective January 1, 2011 provides superior benefits to the plaintiff group than did the old plan design of the self-funded plan. Hoctor Dec. ¶ 19. Particularly with regard to Medicare Part B care, the AmWINS Plan provides a number of coverages that simply were not provided at all under the old self-funded design. *Id.* For example, the older self-funded design provided no coverage at all for any participant costs incurred that Medicare did not pay for physician office visits, out patient mental health services, or durable medical equipment (i.e. mobility units breathing equipment, blood sugar machines, and the like). *Id.* The AmWINS Plan provides supplemental coverage for these costs not paid in full by Medicare *Id.*

The collective bargaining agreements under which the Plaintiffs seek benefits were negotiated with the UAW. Hoctor Dec. ¶ 20. EaglePicher's most recent collective bargaining agreement negotiated with the UAW was for a Wolverine facility in Virginia. *Id.* That contract does not include a provision for retiree health benefits at all. *Id.*

ARGUMENT

I. **The Plaintiffs Misstate The Law In Contending That Their Health Benefits Are Not Subject To Reasonable Modifications.**

The Plaintiffs' theory of this case is that any modification of vested health benefits results in a violation of ERISA and the LMRA. Citing *UAW v. Yard-Man, Inc.,* 716 F.2d 1476 (6th Cir. 1983) and *Yolton v. El Paso Tennessee Pipeline Co.,* 435 F.3d 571 (6th Cir. 2006), the Plaintiffs claim that a plan sponsor is helpless in the face of changed market conditions or other forces out of its control. Instead, the employer must maintain the vested retiree benefit plan in identical

form and shape without change to a single jot or tittle.  In the Plaintiffs' "gotcha" system, they

need only to find one variance between the original plan and the Aetna Advantage Plan (or the

AmWINS Plan soon to be in effect) to prevail on summary judgment.

This is not the law in the Sixth Circuit.  It is simply not true that vested retiree healthcare

benefits are sacrosanct and may never be altered.  The Sixth Circuit expressly rejected that

argument in *Reese v. CNH America LLC*, 574 F.3d 315 (6th Cir. 2009).  In *Reese*, as here, the

plaintiffs were retirees who claimed that they had a vested right to retirement healthcare benefits

under a collective bargaining agreement. *Id.* at 321. The Sixth Circuit agreed, but did not stop

the inquiry there.  While the Plaintiffs contend that vesting makes the benefits inalterable in any

respect, the *Reese* case explains that there is an additional question: "What does vesting mean in

this context?" *Id.* at 324.   The Sixth Circuit explained that the act of vesting alone does not

prevent "reasonable" modifications of retiree health benefits. *Id.*  The Court explained that:

> It is one thing to say that this kind of language, when tied to eligibility for a
> pension plan, prevents an employer from *terminating* the benefits – which we
> have held here.  It is quite another to say that an employer may not *alter* the
> benefits in anyway, particularly when the parties have a history of doing just that
> and when common experience suggests that health-care plans invariably change
> over time, if not from year-to-year.

*Id.* (emphasis in original).

*Reese* ultimately held if retiree health benefits are "vested," an employer "cannot

terminate all health-care benefits for retirees, [but] it may reasonably alter them." *Id.* at 327.

The Sixth Circuit therefore reversed the district court's summary judgment and remanded the

case for a factual determination as to whether the employer's modifications to the retiree health

plan were "reasonable." *Id.*[1]

---

[1] The Plaintiffs seek to buttress their claims regarding "vesting" by providing affidavits regarding oral statements about the benefits.  The Plaintiffs miss the point with this extrinsic evidence, as it focuses solely on the question of vesting.  It does not, however, address the question of potential modifications to the plan and whether the proposed modifications are

Nothing in the collective bargaining agreements here indicates that the parties intended to preclude modifications (as opposed to termination) of the Plaintiffs' benefits.  The controlling language of the collective bargaining agreements shows that the precise benefits offered remained fluid and were subject to modification.  The critical language states in part that eligible retirees and their dependents "will receive full medical benefits for life under the guideline of the *current* retiree medical benefit plan."  The Plaintiffs ignore that the only benefits they are guaranteed are those available under the "current" plan.

The choice of this word "current" is ambiguous at best.  The Plaintiffs contend that it must mean the benefits that were "current" as of the effective date of the original 1993 collective bargaining agreement.  "Current" could just as likely mean when a particular employee decided to retire, which would suggest that the plan could be modified up to that point and the retiree would only have a right to the as-modified plan.  Similarly, the dictionary definition of "current" is "[b]elonging to the *present* time." American Heritage Dictionary (2000) (emphasis).  Words in a collective bargaining should be given their plain and ordinary meaning, which includes the meaning given by dictionaries. *See Roeder v. American Postal Workers Union, AFL-CIO*, 180 F.3d 733(6th Cir. 1999); *see also General Truck Drivers, Chauffeurs, Warehousemen & Helpers,*

---

reasonable.  In any event, the Plaintiffs have not shown that any provisions of the collective bargaining agreement or the plan are ambiguous as to the modification of the benefits such that extrinsic evidence would be warranted. *Various Markets, Inc. v. Chase Manhattan Bank, N.A.*, 908 F. Supp. 459 (E.D. Mich. 1995) ("Where there is clear and unambiguous language in an agreement, the intent of the parties is to be determined from those terms, without reference to extrinsic evidence.").  Moreover, the Plaintiffs' reliance on oral statements fails because "the LMRA and ERISA require employer contributions to trust funds on behalf of employees to be pursuant to detailed written agreements specifying the employer's duty to contribute." *Michigan Elec. Employees Pension Fund v. Encompass Elec. & Data, Inc.*, 556 F.Supp.2d 746, 763-64 (W.D. Mich. 2008) *See McHugh v. Teamsters Pension Trust Fund*, 638 F.Supp. 1036 (E.D.Pa.1986) ("Fund trustees not bound by alleged oral understandings between union and management; employee benefit plan agreements, by law, must be written[,] and oral modifications or supplementations are invalid) (citing ERISA, 29 U.S.C. § 1102(a)(1), and LMRA 29 U.S.C. § 186(c)(5)(B)); *Straub v. Western Union Tel. Co.,* 851 F.2d 1262 (10th Cir.1988) (ERISA precludes oral modification).

10

*Local No. 957 v. Dayton Newspapers, Inc.*, 190 F.3d 434 (6th Cir. 1999) (using dictionary to construe terms of collective bargaining agreement); *Dobbs, Inc. v. Local No. 614, Int'l Bhd. of Teamsters*, 813 F.2d 85, 86 (6th Cir. 1987) (same).  If the agreement requires the parties to look at the "present time," the agreements mean the plan as it exists at any given moment, a reading that clearly allows for modifications.

Moreover, had the parties intended to lock in the benefits precisely as they existed in 1993, any number of different formulations would have more clearly expressed that intent.  If the benefits were sacrosanct and not subject to modification, the parties could have referred to the 1993 plan, the 1993 collective bargaining agreement or even the year 1993.  Instead, they chose the word "current," which itself indicates that the retirees would be allowed the benefits available under the presently existing plan regardless of earlier modifications.  At a minimum, the use of "current" despite numerous clearer alternatives raises an ambiguity and a factual issue that cannot be resolved on summary judgment.

The collective bargaining agreement itself provides further proof that the parties did not intend a static benefit plan but recognized that it could be modified over time.  Instead of providing a detailed description of benefits, the collective bargaining agreements broadly outline the desired benefits and say that EaglePicher's obligations extend only so far as to provide "substantially" the benefits cursorily described in the agreements. *See* Plaintiffs' Ex. 2, 1993 CBA at 37-38; Plaintiffs' Ex. 5, 2002 CBA at 36.  Providing "substantially" the same benefits is a far cry from the Plaintiffs' claim that EaglePicher must provide precisely the same benefits at the risk of violating ERISA or the LMRA.

The fluid nature of the benefits is also supported by the terms of the plan itself. For the years prior to the 2010 modifications, the retiree healthcare plan contained a reservation of rights clause expressly stating that EaglePicher could modify or amend the plan:

The Employer as Plan Sponsor reserves the right to, at any time, *change* or terminate benefits under the plan, to *change* or terminate the eligibility of classes of employees to be covered by the Plan, *to amend* or eliminate *any other plan term or condition*, and to terminate the whole plan or any part of it. . . . No consent of any participant is required to terminate, *modify, amend or change the Plan*.

*See* Hoctor Dec. Ex. A at 39. (emphasis added). The collective bargaining agreements then incorporate the plan into the terms of the collective bargaining agreement itself. *See* Plaintiffs' Ex. 2, 1993 CBA at 39; 2002 CBA at 40 ("All of the various provisions, limitations and agreements contained in the policy and in connection with the aforesaid benefits are made a part of this Agreement as though set forth in detail herein."). As such, the collective bargaining agreement itself allows EaglePicher to "modify, amend or change the Plan." Neither the Plaintiffs nor the UAW opposed this language or filed a grievance, a posture wholly inconsistent with their current litigation position that EaglePicher never had the right to modify the benefits in any way.

The Plaintiffs cite *Reese* in passing for the undisputed fact that retiree healthcare benefits can "vest" in certain circumstances. *See* Brief at 4 and 5. The Plaintiffs fail to tell the Court of the actual holding of the case and treat the modification of the plan as an all-or-nothing issue under ERISA or the FMLRA. Nothing about the collective bargaining agreements precludes the modification of the plan and *Reese* expressly allows it in these circumstances. The Plaintiffs' "all-or-nothing" approach is a strawman that the Court should simply ignore by denying summary judgment.[2]

---

[2] *Reese* ultimately remanded the case back to the district court for factual findings on the issue of reasonableness. On remand, the district court found that the modification there was unreasonable because language in the plan prohibited modification of the particular benefit at issue. *See Reese v. CNH Global N.V.*, 2011 WL 824585, *10 (E.D. Mich. March 3, 2011) (noting that the collective bargaining agreement at issue expressly said that the "eligibility rules established and set forth in this Shutdown Agreement shall not be altered by any subsequent agreements in future negotiations"). The Plaintiffs have not identified in the collective bargaining agreements at issue here any similar language prohibiting modifications. Indeed, the

**II.      Taken In The Light Most Favorable To EaglePicher, The Facts Show That The Modification Of The Plan Is Reasonable Under *Reese*.**

Because they ignore the teachings of *Reese,* the Plaintiffs offer no evidence to show that any particular modification to the plan was unreasonable.  The Plaintiffs focus primarily on their claim that EaglePicher modified their prescription drug benefit.  They therefore present a parade of horribles that they believe will result from their sharing of costs of prescription drugs.  The Plaintiffs ultimately bear the burden of proof on this issue, and their failure to present any evidence under the controlling standard set out in *Reese* dooms their motion for summary judgment. *See Clark v. Walgreen Co.*, 424 Fed. Appx. 467, 471 (6th Cir. 2011) ("At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record which demonstrate the absence of any genuine issue of material fact.").

Even if the Plaintiffs had addressed the issue, they would not be entitled to a summary judgment holding that the plan modifications were unreasonable.  The reasonableness standard set out in *Reese* provides that "the CBA – unless it says otherwise – should be construed to permit modifications to benefits plans that are 'reasonably commensurate' with the benefits provided in the 1998 CBA, 'reasonable in light of changes in health care' and roughly consistent with the kinds of benefits provided to current employees." *Reese*, 574 F.3d at 326 (citing *Zielinski v. Pabst Brewing Co., 463* F.3d 615, 619, 620 (7th Cir. 2006)). All of these considerations need to be reviewed to determine if the modification is itself "reasonable." *Id.* "Such reasonableness determinations pose questions of fact which defy summary judgment if there is a dispute." *NBC Capital Markets Group, Inc. v. First Bank,* 25 Fed.Appx. 363, 366 (6th Cir. 2002).  Here, the record shows that there is more than a sufficient basis for the plan

---

language of the plans – which were incorporated into the collective bargaining agreements themselves – expressly give EaglePicher "the right to, at any time, change or terminate benefits under the plan, to change or terminate the eligibility of classes of employees to be covered by the Plan, to amend or eliminate any other plan term or condition." 2007 Plan Document at page 39.

modifications and the Plaintiffs are not entitled to a summary judgment that EaglePicher violated ERISA or the LMRA as a matter of law.

The considerations set out in *Reese* all weigh in favor of finding that the modifications to the Plan are reasonable.  The Plaintiffs want the Court to look at the prescription drug issue in isolation and determine whether the change in that feature of the plan violates ERISA or the LMRA.  But *Reese* requires the Plaintiffs to show that the change to the plan as a whole is unreasonable.  As in *Reese*, the changes here were motivated by significant changes in the health care market that were outside of EaglePicher's control.  Indeed, CIGNA, the Third-Party Administrator, itself told EaglePicher it would no longer provide its services to the plan, thereby necessitating a change.  Hoctor Dec. ¶¶ 8 and 9.  The new plans – whether the AETNA Advantage Plan or the AmWINS plan – include new additional benefits that were not available to the Plaintiffs under the old self-funded plan.  For example, both the Aetna Advantage Plan and the AmWINS Plan soon to be in place provide coverage for physician office visits, out-patient mental health services, and durable medical equipment (i.e. mobility units breathing equipment, blood sugar machines and the like).  Hoctor Dec. ¶¶ 16, 19.  None of these were covered by the prior self-funded plan.  *Id.*

Moreover, even looking just at the prescription drug issue, the record shows that the Plaintiffs have always shared in some of the costs of prescription drugs.  Their plan prior to the modifications expressly stated that they were required to meet their co-pays.  *See* Hoctor Dec. Ex. A at 22 ("Coverage for Prescription Drugs and Related Supplies purchased at a Pharmacy is subject to the Copayment or Coinsurance shown iu the Schedule, after you have satisfied your Prescription Drug Deductible, if applicable.").  The question at issue is not whether the Plaintiffs will be asked for the first time to share the cost of prescriptions.  Instead, it is the inherently fact-

based question of what share in those costs the Plaintiffs should bear and whether EaglePicher's modifications to the plan set a reasonable amount.

This reasonableness inquiry asks the Court to wade through the three plans at issue and weigh the merits of the costs imposed to the Plaintiffs under each of them. For instance, the original pre-2010 plan included a $2 co-pay for prescription drugs. The AETNA Plan currently in effect contains a "formulary" prescription benefit that requires a co-pay of 15%, 25%, or 35% of prescription costs, depending upon the prescription. Hoctor Dec. ¶ 15. Formularies are "lists of drugs approved by a governing body . . . for use in care rendered in a given institution or through a particular health plan." *On Being a Physician In The Electronic Age: Peering Into The Mists At Point-&-Click Medicine*, 46 St. Louis U. L.J. 111, 133 (2010). They have become a widespread and common feature for managing prescription costs. *See id.*; *see also Ironworkers Local Union 67 v. Astrazeneca Pharmaceuticals, LP*, 634 F.3d 1352, 1366 (11th Cir. 2011) (same). By contrast, the AmWINS Plan that will go into effect as of January 1, 2012 has a third system that sets a $7 co-pay. The Plaintiffs must show that modifying the plan to jump from a $2 co-pay in 1993 to a $7 co-pay in 2012 is unreasonable given the changed circumstances that forced the plan to change. To sift through these alternatives, the Court would need to weigh in the balance facts such as the changes in the healthcare market since 1993 and how the various changes under the three plans relate to the overall cost of the insurance. The Plaintiffs offer no facts or argument on these issues and do not show why the prescription costs are an "unreasonable" amount for the Plaintiffs to share, much less to show that it is unreasonable as a matter of law.

Similarly, the reasonableness inquiry would look at the context in which the decision to modify the plan was made, including the rising costs of health insurance and benefits provided to similarly situated employees. For instance, *Reese* concerned a switch from a traditional PPO

plan to a more modern HMO system. *See id.* The Court recognized that changes in the health care marketplace meant that many plans had moved to HMOs, which in turn buttressed the reasonableness of the modification at issue in that case. *Id.* at 326.

Here, the Plaintiffs claim that EaglePicher "unilaterally" changed the plan. Plaintiffs' Br. at 1. That statement ignores the context in which the decision was made. EaglePicher was forced into a change by the fact that CIGNA informed EaglePicher on October 19, 2010 that it would no longer administer the plan. At that point, the Inkster plant had already been closed. There was no bargaining unit to which EaglePicher could turn to bargain for a replacement. Indeed, its most recent negotiations with the UAW resulted in a contract that provided *no* retiree benefits. It is certainly a stretch for the Plaintiffs to claim a $7 co-pay is unreasonable when current employees will receive *no* retiree benefits at all.

Finally, the Plaintiffs ignore that prescription drugs are not even a vested benefit under the collective bargaining agreements. The collective bargaining agreements themselves make no mention of prescription drug benefits. The term is not used anywhere in the agreements. Indeed, the only "vesting" language the Plaintiffs identify is a provision stating that they "will receive full medical benefits for life under the guideline of the current retiree medical benefit plan, at no premium cost to the employee, upon retirement." While this language refers to "medical benefits" it says nothing about a prescription drug benefit, which is a different type of insurance that is typically addressed separate from major medical insurance. For instance, the federal Medicare program has separate provisions for medical treatment and for prescription drug benefits. Medicare Part A includes hospitalization; Medicare Part B is "medical insurance" that "covers medically-necessary services like doctors' services, outpatient care, home health services, and other medical services;" and Medicare Part D is a separate provision for

prescription    drugs.    *See*    http://www.medicare.gov/navigation/medicare-basics/medicare-benefits/medicare-benefits-overview.aspx.

The plan here applies the same distinctions and treats "medical insurance" as something different from the prescription drug benefit.   Medical benefits are provided under a schedule addressed to "major medical" or "Base Plan Benefits."  *See* Hoctor Dec. Ex. A at 11.   The prescription drug benefit is in a different, self-contained section and under a separate schedule for "Prescription Drug Benefits."  *See id.* at 20.   At a minimum, there is an ambiguity as to whether a prescription drug benefit was included in the "medical benefits" to which any vesting would apply here.   If there was no vesting, the benefit could be terminated, much less modified. This ambiguity raises a factual issue that prevents the Plaintiffs from being entitled to summary judgment.

## II.     EaglePicher Has Not Modified The Premium Language In The CBA And The Plaintiffs' Claims Are Not Ripe.

Finally, the Plaintiffs contend that EaglePicher violated ERISA and the LMRA because EaglePicher at one point stated that it would phase-in a program to have the Plaintiffs share in the premiums for health coverage.   This claim is simply not supported by the facts.   While EaglePicher indicated in 2009 that it intended to phase-in some minimal cost-sharing, that is not the current reality for the plan.   On November 15, 2010, EaglePicher sent the Plaintiff retirees covered by the CBA a letter clearly stating that it would not require the Plaintiffs to share in premium costs.  Hoctor Dec. ¶ 13 and Ex. C  This was confirmed again in a Medicare mandated benefits summary sent to covered persons last month, on November 15, 2011. *Id.*   There is no dispute EaglePicher did not require retirees to pay premiums in 2011 and will not in 2012, yet the Plaintiffs have not withdrawn their summary judgment motion on this ground.

The factual predicate for the Plaintiffs' claim as to premiums no longer exists.   The Plaintiffs cannot state a current claim that EaglePicher is requiring them to share in premiums.

There is simply no judiciable dispute about the premium-sharing issue. At best, the Plaintiffs seek to plunge the Court into the abstract question of whether EaglePicher *would* violate ERISA or the LMRA if, at some indeterminate point in the future, it chose to reverse course and require the Plaintiffs to share in premium costs. That question is not ripe and not before the Court. "The Supreme Court has stated that the basic rationale of the ripeness doctrine 'is to prevent the courts, through premature adjudication from entangling themselves in abstract disagreements.'" *United Steelworkers of America v. Cyclops Corp.*, 860 F.2d 189, 194 (6th Cir. 1988) (quoting *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580 (1985)).[3]  Refusing to hear unripe cases prevents the courts from being drug into abstract disputes that might never come to fruition (as is the case here) based on undeveloped factual records (again the case here). *See id.*; *see also Brown v. Ferro Corp.*, 763 F.2d 798, 801 (6th Cir.1985).   As Wright & Miller & Cooper explain:

> Ripeness doctrine serves the same general purposes as other branches of justiciability theory. The central perception is that courts should not render decisions absent a genuine need to resolve a real dispute. Unnecessary decisions dissipate judicial energies better conserved for litigants who have a real need for official assistance. . . . Perhaps more important, decisions involve law making. Courts worry that unnecessary lawmaking should be avoided, both as a matter of defining the proper role of the judiciary in society and as a matter of reducing the risk that premature litigation will lead to ill-advised adjudication.

13A *Federal Practice & Procedure,* § 3532.1, at p. 114.

Here, there is no dispute as to the fact that the Plaintiffs have not been required to share in the costs of the premiums for the plan.  The Plaintiffs seek to draw the Court into an abstract debate as to whether the plan could ever be modified to require them to share in premiums.  The

---

[3] In *Cyclops*, the Sixth Circuit declined to litigate a question as to whether a pension was underfunded because no pension benefits had actually been denied. *Cyclops Corp.*, 860 F.2d at 194.  Similarly, the Plaintiffs claim about premium-sharing is not ripe because none of the Plaintiffs have in fact been required to share premiums.

circumstances of how such a modification would be made are not before the Court and there is

no factual record on which the Court could rule.

## CONCLUSION

The Plaintiffs' "all-or-nothing" approach misapplies the governing Sixth Circuit caselaw.

EaglePicher can and has reasonably modified the plan at issue.  At a minimum there is an issue

of fact on that point.  Moreover, the Plaintiffs' claims regarding sharing of premiums are not ripe

and ask only a hypothetical, abstract question.  For all of these reasons, the Court should deny

the Plaintiffs' motion for summary judgment.

/s/Howard E. Kochell
Howard E. Kochell (5516-49)
Barnes & Thornburg LLP
11 South Meridian Street
Indianapolis, IN  46204
(317) 236-1313
Fax:  (317) 231-7433

/s/ Jeffrey G. Muth
Jeffrey G. Muth (P65041)
Barnes & Thornburg LLP
171 Monroe Avenue, NW, Suite 1000
Grand Rapids, MI 49503
(606) 742-3930

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon counsel of record

on the 5th day of December, 2011, by the Court's electronic service:

Stuart M. Israel
Legghio & Israel, P.C.
306 South Washington, Suite 600
Royal Oak, MI  48067

/s/Jeffrey G. Muth

INDS01 1307984v2

## DECLARATION OF TERI M. HOCTOR

Under the penalties of perjury, I, Teri M. Hoctor, affirm that the following representations are true to the best of my knowledge, information and belief:

1. I am at least twenty-one (21) years of age and mentally competent to make this declaration.

2. I serve as the Director of Employee Benefits for Wolverine Advanced Materials, LLC, a former subsidiary of EaglePicher Corporation a/k/a EP Management Corporation and as EaglePicher Management Company (collectively, "EP"), and am familiar with the healthcare benefits offered to employees of EP over the years.

3. For many years EP maintained a self funded medical plan that covered all its employees and all retiree plans. Since 2003, that self-funded plan was administered by CIGNA, as Third Party Administrator, meaning that CIGNA adjudicated claims and made the claim payments, but the claims were funded 100% by EP.

4. A copy of the plan as of 2007 is attached hereto as Exhibit A. The terms of the plan largely remained the same during the term of its existence.

5. I am familiar with the retiree benefit plan at issue in this case in my role as Director of Employee Benefits.

6. The design of the self-funded plan was an old fashioned Base/Major medical plan design which has not been offered in the health insurance marketplace for many years. CIGNA was able to administer it on a self-funded basis, but no insurer I talked to in recent years would underwrite it on a fully insured basis.

7. Because of changes in the market for health insurance and restructuring of divisions within the company, beginning in 2009 EP began converting the company's single self-funded health plan for all its divisions to separate fully insured plans for each operating division, as opposed to offering a single self-funded insurance plan that covered all company divisions.



EXHIBIT

1

8.    Once EP moved away from a single self-funded plan covering all its divisions to separate fully insured plans for each separate division in 2010, CIGNA confirmed that it could not and would not administer the self-funded plan just for the retiree group at issue in this case on a standalone basis. At that time, the retiree group at issue in this lawsuit numbered only 26 or so participants. The self-funded plan for these participants involved too few members to justify CIGNA's continued Third Party Administration of the plan. A true and accurate copy of a letter from CIGNA communicating that fact is attached hereto as Exhibit B.

9.    All these changed circumstances caused EP to go into the market and try to find a suitable replacement of CIGNA to administer the retiree health plan for the plaintiff group of retirees.

10.    I communicated with EP's insurance broker to determine whether another Third Party Administrator or insurer could replace CIGNA to administer the self-funded plan for the retiree group in this case. No Third Party Administrator or insurer expressed an ability or desire to do so. Unlike CIGNA, which had administered the old self-funded plan design for the company as a whole for years and therefore had the systems in place to administer that old plan design, no other Third Party Administrator or insurer had systems in place to administer such an old plan design, and none was willing to incur the cost and effort to develop those systems for such a small group of retirees.

11.    On September 29, 2009 and October 1, 2009, EP wrote to the plaintiff group of retirees and announced changes in their retiree healthcare benefits. The announced changes principally involved two issues.

12.    First, these announcements included that, effective and commencing on January 1, 2011 (a plan year later), EP would implement a phase-in of premium contributions to the retirees and covered family members. Under the phase-in, the retirees and covered family members would pay 20% of premium costs in 2011, 40% in 2012, 60% in 2013, 80% in 2014 and 100% of the premium cost of coverage in 2015 and thereafter.

2

13.     However, EP subsequently chose not to implement the premium cost phase-in that was set to begin January 1, 2011. Instead, in a letter dated November 15, 2010 EP informed covered persons that no premium cost phase-in would be made to their plan. A true and accurate copy of that letter is attached as Exhibit C. That premium cost phase-in announced in 2009 has not occurred and is no longer part of EP's plan for addressing the retiree healthcare issues for the plaintiff group. This was confirmed again in a benefits summary sent to covered persons on October 15, 2011. This summary followed the mandated Medicare Part D creditable coverage notice mailing.

14.     Second, as part of the 2009 announcements, effective and commencing on January 1, 2010 for the plaintiff retiree group, EP replaced the once-company-wide self-funded healthcare plan with the "Aetna Advantage Plan," for the plaintiff retiree group. The Aetna plan is what is known as a "Medicare Advantage Plan design." A Medicare Advantage Plan is a fully insured private fee for service plan. It is a Medicare replacement plan, not a Medicare supplement. Claims go directly to the insurer (Aetna) and it pays as primary obligor, not Medicare. The federal government partially funds Medicare Advantage Plans and, with that, they are highly and strictly regulated by the Centers for Medicare and Medicaid Services ("CMS").

15.     Under the Aetna Advantage Plan, a "formulary" prescription drug benefit was offered under which covered persons paid a co-pay of 15%, 25%, or 35% of prescription costs, depending upon the prescription.

16.     The old self-funded plan first and foremost was designed to provide benefits for existing employees and was not particularly designed or tailored for retirees who were Medicare eligible. The old self-funded plan and the Aetna Advantage plan are so different in concept as to how the two plan designs do or do not coordinate with Medicare that a true comparison of benefits between the two plans is difficult, if not impossible. Both have advantages over the other depending upon the unique healthcare needs of a particular participant. For example, the

Aetna Advantage Plan provides coverage for physician office visits and in-office services, whereas the old self-funded design did not; the Aetna Advantage Plan provides coverage for durable medical equipment (mobility units, breathing equipment, blood sugar equipment, and the like) whereas the old self-funded plan did not; and the Aetna Advantage Plan provides Preventative Care services coverage at 100%, whereas the old self-funded plan provided no coverage at all; and the Aetna Advantage Plan provides coverage for hearing aid reimbursement, whereas the old self-funded plan did not. Whether one plan provides better benefits than the other depends on the unique healthcare circumstances of each participant.

17.     Subsequently I learned that the marketplace for health insurance – especially the Medicare Advantage Plans – was in a state of significant uncertainty due to proposed provisions in the federal healthcare reform legislation and regulations. EP therefore began to look at alternatives to the Aetna Advantage Plan and engaged the services and expertise of Justin Goodwin of AmWINS Group Benefits to assist in the search for a replacement of the Aetna Advantage Plan. Justin Goodwin found and recommended a plan that is a Medicare Supplement plan design, not a Medicare Advantage plan design. This distinction means that Medicare provides primary coverage and an insurer provides secondary coverage. The plan recommended by Justin Goodwin of AmWINS is a fully insured Medicare Supplement plan underwritten by United American Insurance Company (the "AmWINS Plan.") The AmWINS plan will become effective on January 1, 2012, the start of the new plan year.

18.     For prescription drug coverage, the AmWINS Plan will replace the percentage formulary co-pay model of the Aetna Advantage Plan with a fixed $7 co-pay for a 30-day retail prescription and a $7 co-pay for a 90-day mail-order prescription, regardless of whether the prescription is brand or generic.

19.     In many material respects the Medicare Supplement plan design offered by the AmWINS Plan effective January 1, 2012 provides superior benefits to the plaintiff group than did the old plan design of the self-funded plan. Particularly with regard to Medicare Part B care,

4

the AmWINS Plan provides a number of coverages that simply were not provided at all under the old self-funded design. For example, the older self-funded design provided no coverage at all for any participant costs incurred that Medicare did not pay for physician office visits, out patient mental health services, or durable medical equipment (i.e. mobility units breathing equipment, blood sugar machines, and the like). The AmWINS Plan provides supplemental coverages for these costs not paid in full by Medicare

20.     I am familiar with our most recent contract negotiations with the UAW, the union that represented employees at EP's Inkster, Michigan plant prior to its closing in 2003, and that negotiated the collective bargaining agreement that provided for the retiree healthcare benefits at issue in this case. The most recent UAW collective bargaining agreement negotiated with Wolverine was for a facility in Virginia. That most recently bargained contract does not include a provision for retiree health benefits at all.

21.     I have first-hand knowledge of the facts stated in this declaration unless otherwise indicated. If called as a witness I can testify to my knowledge.

Pursuant to 28 U.S.C. §1746, I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Teri M. Hoctor

INDS02 1196585v1

# EaglePicher Corporation

BASE PLAN BENEFITS
(*Wolverine Union Hrly Retirees*)

**EFFECTIVE DATE: January 1, 2007**

ASO26
3192768

This document printed in December, 2006 takes the place of any documents previously issued to you which described your benefits.

Printed in U.S.A.


EXHIBIT
A
PENGAD 800-631-6989

# Table of Contents

Important Information .................................................................................................................5

Special Plan Provisions ...............................................................................................................8

    Case Management .....................................................................................................................8

How To File Your Claim .............................................................................................................8

Accident and Health Provisions ..................................................................................................9

Eligibility – Effective Date .........................................................................................................9

    Employee Insurance ..................................................................................................................9
    Dependent Insurance .................................................................................................................9

Base Plan Benefits ....................................................................................................................11

    The Schedule .........................................................................................................................11
    Surgical Benefits ....................................................................................................................18
    Anesthesia Benefits ................................................................................................................18
    Assistant Surgeon Benefits .....................................................................................................18
    Doctors Attendance Benefits (In-Hospital) ..............................................................................19
    Laboratory And X-Ray Examination Benefits ...........................................................................19
    Radiotherapy Benefits ............................................................................................................19

Prescription Drug Benefits .......................................................................................................20

    The Schedule .........................................................................................................................20
    Covered Expenses ..................................................................................................................22
    Limitations ............................................................................................................................22
    Your Payments .......................................................................................................................22
    Exclusions .............................................................................................................................22
    Reimbursement/Filing a Claim ................................................................................................23

Exclusions, Expenses Not Covered and General Limitations .....................................................23

Coordination of Benefits ...........................................................................................................25

Medicare Eligibles ....................................................................................................................28

Right of Reimbursement ...........................................................................................................28

Payment of Benefits ..................................................................................................................28

Termination of Insurance ..........................................................................................................29

    Employees .............................................................................................................................29
    Dependents ............................................................................................................................29

Federal Requirements ...............................................................................................................29

    Notice of Provider Directory/Networks ....................................................................................29
    Qualified Medical Child Support Order (QMCSO) ....................................................................29
    Special Enrollment Rights Under the Health Insurance Portability & Accountability Act (HIPAA) .........................30
    Eligibility for Coverage for Adopted Children ..........................................................................31
    Federal Tax Implications for Dependent Coverage .....................................................................31

Coverage for Maternity Hospital Stay ...............................................................................................31
Women's Health and Cancer Rights Act (WHCRA)..........................................................................31
Group Plan Coverage Instead of Medicaid.........................................................................................32
Obtaining a Certificate of Creditable Coverage Under This Plan......................................................32
Claim Determination Procedures Under ERISA ................................................................................32
When You Have a Complaint or an Appeal .......................................................................................33
Arbitration ..........................................................................................................................................35
COBRA Continuation Rights Under Federal Law .............................................................................35
ERISA Required Information .............................................................................................................39

**Definitions** ...........................................................................................................................................**40**

## Important Information

THIS IS NOT AN INSURED BENEFIT PLAN. THE BENEFITS DESCRIBED IN THIS BOOKLET OR ANY RIDER ATTACHED HERETO ARE SELF-INSURED BY EAGLEPICHER CORPORATION WHICH IS RESPONSIBLE FOR THEIR PAYMENT. CONNECTICUT GENERAL PROVIDES CLAIM ADMINISTRATION SERVICES TO THE PLAN, BUT CONNECTICUT GENERAL DOES NOT INSURE THE BENEFITS DESCRIBED.

THIS DOCUMENT MAY USE WORDS THAT DESCRIBE A PLAN INSURED BY CONNECTICUT GENERAL. BECAUSE THE PLAN IS NOT INSURED BY CONNECTICUT GENERAL, ALL REFERENCES TO INSURANCE SHALL BE READ TO INDICATE THAT THE PLAN IS SELF-INSURED. FOR EXAMPLE, REFERENCES TO "CG," "INSURANCE COMPANY," AND "POLICYHOLDER" SHALL BE DEEMED TO MEAN YOUR "EMPLOYER" AND "POLICY" TO MEAN "PLAN" AND "INSURED" TO MEAN "COVERED" AND "INSURANCE" SHALL BE DEEMED TO MEAN "COVERAGE."

ASO1

### Explanation of Terms

You will find terms starting with capital letters throughout your certificate. To help you understand your benefits, most of these terms are defined in the Definitions section of your certificate.

### The Schedule

The Schedule is a brief outline of your maximum benefits which may be payable under your insurance. For a full description of each benefit, refer to the appropriate section listed in the Table of Contents.



**CIGNA HealthCare**

## Special Plan Provisions

### Case Management

Case Management is a service provided through a Review Organization, which assists individuals with treatment needs that extend beyond the acute care setting. The goal of Case Management is to ensure that patients receive appropriate care in the most effective setting possible whether at home, as an outpatient, or an inpatient in a Hospital or specialized facility. Should the need for Case Management arise, a Case Management professional will work closely with the patient, his or her family and the attending Physician to determine appropriate treatment options which will best meet the patient's needs and keep costs manageable. The Case Manager will help coordinate the treatment program and arrange for necessary resources. Case Managers are also available to answer questions and provide ongoing support for the family in times of medical crisis.

Case Managers are Registered Nurses (RNs) and other credentialed health care professionals, each trained in a clinical specialty area such as trauma, high risk pregnancy and neonates, oncology, mental health, rehabilitation or general medicine and surgery. A Case Manager trained in the appropriate clinical specialty area will be assigned to you or your Dependent. In addition, Case Managers are supported by a panel of Physician advisors who offer guidance on up-to-date treatment programs and medical technology. While the Case Manager recommends alternate treatment programs and helps coordinate needed resources, the patient's attending Physician remains responsible for the actual medical care.

1.  You, your dependent or an attending Physician can request Case Management services by calling the toll-free number shown on your ID card during normal business hours, Monday through Friday. In addition, your employer, a claim office or a utilization review program (see the PAC/CSR section of your certificate) may refer an individual for Case Management.

2.  The Review Organization assesses each case to determine whether Case Management is appropriate.

3.  You or your Dependent is contacted by an assigned Case Manager who explains in detail how the program works. Participation in the program is voluntary - no penalty or benefit reduction is imposed if you do not wish to participate in Case Management.

FPCM6

4.  Following an initial assessment, the Case Manager works

with you, your family and Physician to determine the needs of the patient and to identify what alternate treatment programs are available (for example, in-home medical care in lieu of an extended Hospital convalescence). You are not penalized if the alternate treatment program is not followed.

5.  The Case Manager arranges for alternate treatment services and supplies, as needed (for example, nursing services or a Hospital bed and other Durable Medical Equipment for the home).

6.  The Case Manager also acts as a liaison between the insurer, the patient, his or her family and Physician as needed (for example, by helping you to understand a complex medical diagnosis or treatment plan).

7.  Once the alternate treatment program is in place, the Case Manager continues to manage the case to ensure the treatment program remains appropriate to the patient's needs.

While participation in Case Management is strictly voluntary, Case Management professionals can offer quality, cost-effective treatment alternatives, as well as provide assistance in obtaining needed medical resources and ongoing family support in a time of need.

FPCM2

### Additional Programs

We may, from time to time, offer or arrange for various entities to offer discounts, benefits, or other consideration to our members for the purpose of promoting the general health and well being of our members. We may also arrange for the reimbursement of all or a portion of the cost of services provided by other parties to the Policyholder. Contact us for details regarding any such arrangements.

GM6000 NOT160

## How To File Your Claim

The prompt filing of any required claim form will result in faster payment of your claim.

You may get the required claim forms from your Benefit Plan Administrator. All fully completed claim forms and bills should be sent directly to your servicing CG Claim Office.

Depending on your Group Insurance Plan benefits, file your claim forms as described below.

### Hospital Confinement

If possible, get your Group Medical Insurance claim form before you are admitted to the Hospital. This form will make your admission easier and any cash deposit usually required



**CIGNA** HealthCare

will be waived.

If you have a Benefit Identification Card, present it at the admission office at the time of your admission. The card tells the Hospital to send its bills directly to CG.

**Doctor's Bills and Other Medical Expenses**

The first Medical Claim should be filed as soon as you have incurred covered expenses. Itemized copies of your bills should be sent with the claim form. If you have any additional bills after the first treatment, file them periodically.

**CLAIM REMINDERS**

- BE SURE TO USE YOUR MEMBER ID AND ACCOUNT NUMBER WHEN YOU FILE CG'S CLAIM FORMS, OR WHEN YOU CALL YOUR CG CLAIM OFFICE.

  YOUR MEMBER ID IS THE ID SHOWN ON YOUR BENEFIT IDENTIFICATION CARD.

  YOUR ACCOUNT NUMBER IS THE 7-DIGIT POLICY NUMBER SHOWN ON YOUR BENEFIT IDENTIFICATION CARD.

- PROMPT FILING OF ANY REQUIRED CLAIM FORMS RESULTS IN FASTER PAYMENT OF YOUR CLAIMS.

**WARNING:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit is guilty of a crime and may be subject to fines and confinement in prison.

GM6000 CI 3CLA9V41

## Accident and Health Provisions

**Notice of Claim**

Written notice of claim must be given to CG within 30 days after the occurrence or start of the loss on which claim is based. If notice is not given in that time, the claim will not be invalidated or reduced if it is shown that written notice was given as soon as was reasonably possible.

**Claim Forms**

When CG receives the notice of claim, it will give to the claimant, or to the Employer for the claimant, the claim forms which it uses for filing proof of loss. If the claimant does not receive these claim forms within 15 days after CG receives notice of claim, he will be considered to meet the proof of loss requirements if he submits written proof of loss within 90 days after the date of loss. This proof must describe the occurrence, character and extent of the loss for which claim is made.

**Proof of Loss**

Written proof of loss must be given to CG within 90 days after the date of the loss for which claim is made. If written proof of loss is not given in that time, the claim will not be invalidated

or reduced if it is shown that written proof of loss was given as soon as was reasonably possible.

**Physical Examination**

The Employer, at its own expense, will have the right to examine any person for whom claim is pending as often as it may reasonably require.

GM6000 P 1
CLA50

## Eligibility – Effective Date

**Eligibility for Employee Insurance**

You will become eligible for insurance on the date you retire if you are in a Class of Eligible Employees.

**Eligibility for Dependent Insurance**

You will become eligible for Dependent insurance on the later of:

- the day you become eligible for yourself; or
- the day you acquire your first Dependent.

**Classes of Eligible Employees**

Each retired Employee as reported to the insurance company by your former Employer.

GM6000 EL 2V-32
EL16 M

### Employee Insurance

This plan is offered to you as a retired Employee. To be insured, you will have to pay part of the cost.

**Effective Date of Your Insurance**

You will become insured on the date you elect the insurance by signing a written agreement with the Policyholder to make the required contribution, but no earlier than the date you become eligible. To be insured for these benefits, you must elect the insurance for yourself no later than 30 days after your retirement.

GM6000 EF 1
EL17V82 M

### Dependent Insurance

For your Dependents to be insured, you will have to pay part of the cost of Dependent Insurance.

**Effective Date of Dependent Insurance**

Insurance for your Dependents will become effective on the date you elect it by signing a written agreement with the



**CIGNA HealthCare**

Policyholder to make the required contribution, but no earlier than the day you become eligible for Dependent Insurance. All of your Dependents as defined will be included.

For your Dependents to be insured for these benefits, you must elect the Dependent insurance for yourself no later than 30 days after you become eligible.

Your Dependents will be insured only if you are insured.

**Exception for Newborns**

Any Dependent child born while you are insured for Medical Insurance will become insured for Medical Insurance on the date of his birth if you elect Dependent Medical Insurance no later than 31 days after his birth. If you do not elect to insure your newborn child within such 31 days, no benefits for expenses incurred will be payable for that child.

GM6000 EF 2
ELI11V44 M



**CIGNA HealthCare**

| Base Plan Benefits |
|---|
| **The Schedule** |

**For You and Your Dependents**

To receive Major Medical Benefits, you and your Dependents must pay a portion of the Covered Expenses. That portion is the Deductible and Coinsurance.

Daily Limits shown for Major Medical Benefits are Covered Expense allowances to which coinsurance is generally applied. The amounts that this plan will pay may differ. Please refer to the Major Medical section of The Schedule and the Major Medical Benefits text in this certificate for a complete explanation of your benefits.

**Coinsurance (Major Medical)**
The term Coinsurance means the percentage of charges for Covered Expenses that an insured person is required to pay under the plan.

**Deductibles (Major Medical)**
Deductibles are expenses to be paid by you or your Dependent. Deductible amounts separate from and are in addition to any Coinsurance. Once the Deductible maximum in The Schedule has been reached you and your family need not satisfy any further medical deductible for the rest of that year.

**Maximum Reimbursable Charge**
Unless otherwise noted, services are paid based on the Maximum Reimbursable Charge. For this plan, the Maximum Reimbursable Charge is calculated at the 90th percentile of all charges made by providers of such service or supply in the geographic area.

**Multiple Surgical Reduction**

Multiple surgeries performed during one operating session result in payment reduction of 50% to the surgery of lesser charge. The most expensive procedure is paid as any other surgery.



**CIGNA HealthCare**

---

**Assistant Surgeon and Co-Surgeon Charges**

**Assistant Surgeon**
The maximum amount payable will be limited to charges made by an assistant surgeon that do not exceed 20 percent of the surgeon's allowable charge. (For purposes of this limitation, allowable charge means the amount payable to the surgeon prior to any reductions due to coinsurance or deductible amounts.)

**Co-Surgeon**
The maximum amount payable will be limited to charges made by co-surgeons that do not exceed 20 percent of the surgeon's allowable charge plus 20 percent. (For purposes of this limitation, allowable charge means the amount payable to the surgeons prior to any reductions due to coinsurance or deductible amounts.)



**CIGNA HealthCare**

| BENEFIT HIGHLIGHTS | BASE PLAN |
|---|---|
| **Lifetime Maximum** | Not Applicable |
| **Coinsurance Levels** | 100% |
| **Inpatient Hospital - Facility Services** <br><br> Base Plan Calendar Year Maximum: 365 days | |
|     Semi-Private Room and Board | 100% average semi-private room rate |
|     Private Room | 100% average semi-private room rate |
|     Special Care Units (ICU/CCU) | 100% ICU/CCU daily room rate |
|     Necessary Services and Supplies (Hospital Extras Maximum) | Unlimited (coverage moves to MM expense when room & board coverage moves to Major Medical) |
| **Outpatient Facility Services** <br><br>     Operating Room, Recovery Room, Procedures Room and Treatment Room | No charge |
| **Inpatient Hospital Physician's Visits/Consultations** | No charge up to 365 days |
| **Inpatient Hospital Professional Services** <br>     Surgeon <br>     Radiologist <br>     Pathologist <br>     Anesthesiologist | No charge |
| **Outpatient Professional Services** <br>     Surgeon <br>     Radiologist <br>     Pathologist <br>     Anesthesiologist | No charge |



**CIGNA HealthCare**

| BENEFIT HIGHLIGHTS | BASE PLAN |
|---|---|
| **Emergency and Urgent Care Services** | |
| Physician's Office Visit | No charge |
| Hospital Emergency Room | No charge |
| Outpatient Professional services (radiology, pathology and ER Physician) | No charge |
| Urgent Care Facility  or Outpatient Facility | No charge |
| X-ray and/or Lab performed at the Emergency Room/Urgent Care Facility (billed by the facility as part of the ER/UC visit | No charge |
| Independent x-ray and/or Lab Facility in conjunction with an ER visit | No charge |
| Advanced Radiological Imaging (i.e. MRIs, MRAs, CAT Scans, PET Scans etc.) | No charge |
| **Inpatient Services at Other Health Care Facilities**<br>Includes Skilled Nursing Facility, Rehabilitation Hospital and Sub-Acute Facilities<br><br>Calendar Year Maximum:<br>365 days combined | 100% average semi-private room rate |



**CIGNA HealthCare**

| BENEFIT HIGHLIGHTS | BASE PLAN |
|---|---|
| **Laboratory and Radiology Services (includes pre-admission testing)** | |
| Physician's Office | No charge |
| Outpatient Hospital Facility | No charge |
| Independent X-ray and/or Lab Facility | No charge |
| Diagnostic X-ray and Lab | No charge |
| Base Plan Diagnostic Lab and X-ray combined Calendar Year Maximum | Unlimited |
| **Advanced Radiological Imaging (i.e. MRIs, MRAs, CAT Scans and PET Scans)** | |
| Inpatient Facility | No charge |
| Outpatient Facility | No charge |
| Physician's Office | No charge |
| **Outpatient Short-Term Rehabilitative Therapy and Chiropractic Services**<br><br>Calendar Year Maximum: Unlimited days for all therapies combined<br><br>Includes:<br>Cardiac Rehab<br>Physical Therapy<br>Speech Therapy<br>Occupational Therapy<br>Chiropractic Therapy (includes Chiropractors) | No charge |
| **Home Health Care**<br><br>Calendar Year Maximum:<br>Unlimited days<br>(includes outpatient private nursing when approved as medically necessary) | No charge |



**CIGNA HealthCare**

| BENEFIT HIGHLIGHTS | BASE PLAN |
|---|---|
| **Hospice** | |
| Inpatient Services | 100% average semi-private room rate |
| Outpatient Services (same coinsurance level as Home Health Care) | No charge |
| **Maternity Care Services** | |
| Initial Visit to Confirm Pregnancy | Not Applicable |
| All subsequent Prenatal Visits, Postnatal Visits and Physician's Delivery Charges | Not Applicable |
| Delivery - Facility (Inpatient Hospital, Birthing Center) | 100% average semi-private room rate |
| **Organ Transplant** Includes all medically appropriate, non-experimental transplants | |
| Inpatient Facility | 100% average semi-private room rate |
| Inpatient Physician's Services | No charge up to 365 days |
| Outpatient Physician's Services | No charge |
| Lifetime Travel Maximum: $10,000 per transplant (Only available for Lifesource Facilities) | |



**CIGNA HealthCare**

| BENEFIT HIGHLIGHTS | BASE PLAN |
|---|---|
| **Treatment Resulting From Life Threatening Emergencies** | |
| Medical treatment required as a result of an emergency, such as a suicide attempt, will be considered a medical expense until the medical condition is stabilized and will not count toward any plan limits that are shown in the Schedule for mental health and substance abuse services including in-hospital services.  Once the medical condition is stabilized, whether the treatment will be characterized as either a medical expense or a mental health/substance abuse expense will be determined by the utilization review Physician in accordance with the applicable mixed services claim guidelines. | |
| **Mental Health**<br><br>**Inpatient**<br><br>Acute:  based on ratio of 1:1<br>Partial:  based on a ratio of 2:1<br>Residential:  based on a ratio of 2:1 | No charge |
| **Substance Abuse**<br><br>**Inpatient**<br><br>Maximum Amount: $15,000<br><br>Lifetime Maximum Amount: $30,000<br><br>Acute detox:  requires 24 hour nursing; based on a ratio of 1:1<br>Acute Inpatient Rehab:  requires 24 hour nursing; based on a ratio of 1:1<br>Partial:  based on a ratio of 2:1<br>Residential:  based on a ratio of 2:1 | No charge |



**CIGNA** HealthCare

# Base Plan Benefits

## HOSPITAL BENEFITS

### For You And Your Dependents

If you or any one of your Dependents, as a result of an Injury or a Sickness, is Confined in a Hospital while insured for these benefits, CG will pay for the expenses incurred for charges made by the Hospital for Bed and Board and for Necessary Services and Supplies up to the maximum amounts indicated below.

### Maximum Amounts

The maximum amount payable for Bed and Board for each day of Hospital Confinement will be the amount charged by the Hospital up to the Maximum Daily Rate for Bed and Board shown in The Schedule. In no event will the total amount payable for Bed and Board for any period of Hospital Confinement exceed the Hospital Maximum for Bed and Board shown in The Schedule.

The maximum amount payable for Necessary Services and Supplies for any period of Hospital Confinement will be the Hospital Maximum for Necessary Services and Supplies shown in The Schedule.

To determine the maximum amount payable, successive periods of Hospital Confinement for the same Injury or for the same or a related Sickness will be deemed one period of Hospital Confinement unless such periods are separated by an interval of at least 6 months or, for you, by your return to Active Service for at least one day.

### Limitations

No payment will be made for charges made for special monitor-ing devices used in intensive care or cardiac care units.

Other Limitations are shown in the "General Limitations" section.

GM6000 HO1
GM6000 HO2
HOS1

## Surgical Benefits

### For You And Your Dependents

If you or any one of your Dependents, as a result of an Injury or a Sickness, undergoes a Surgical Procedure while insured for these benefits, CG will pay for the surgical fee incurred for the Surgical Procedure performed and for the post-operative care for that Procedure. The maximum amount payable for the expenses so incurred for any one Surgical Procedure will be the Surgical Maximum shown in The Schedule.

### Limitations

No payment will be made for surgical fees incurred for any procedures on the teeth or periodontium, except:

- excision of epulis;
- excision of unerupted impacted tooth, including removal of alveolar bone and sectioning of tooth;
- removal of residual root (when performed by a dentist other than the one who extracted the tooth);
- intraoral drainage of acute alveolar abscess with cellulitis;
- alveolectomy;
- gingivectomy, for gingivitis or periodontitis.

Other Limitations are shown in the "General Limitations" section.

GM6000 SU4
SUR3

## Anesthesia Benefits

### For You And Your Dependents

If a Physician administers an anesthetic to you or any one of your Dependents, for a Surgical Procedure for which benefits are payable under the "Surgical Benefits" section, CG will pay for the expenses incurred for the Physician's fee for administering the anesthetic. The maximum amount payable for the expenses so incurred in connection with any one Surgical Procedure will be the Anesthesia Maximum shown in The Schedule.

### Limitations

No payment will be made for:

- fees charged by a Physician who performs or assists in the Surgical Procedure;
- fees charged by a Physician who is employed by the hospital where the Surgical Procedure is performed.

Other Limitations are shown in the "General Limitations" section.

GM6000 AN4
ANE3

## Assistant Surgeon Benefits

### For You And Your Dependents

If you or any one of your Dependents, as a result of an Injury or a Sickness, undergoes a Surgical Procedure while insured for these benefits, and if the services of an assistant surgeon are used in performing that Procedure, CG will pay for the expenses incurred for such services. The maximum amount payable for the expenses so incurred for any one Surgical



**CIGNA HealthCare**

Procedure will be the Assistant Surgeons Maximum shown in The Schedule.

**Limitations**

Limitations are shown in the "General Limitations" section.

GM6000 AS1V-1
ASU2

## Doctors Attendance Benefits (In-Hospital)

**For You And Your Dependents**

If you or any one of your Dependents is visited by a Physician for treatment of an Injury or a Sickness during a period of Hospital Confinement which starts while such person is insured for these benefits, CG will pay for the fees charged by the Physician for these visits. The maximum amount payable for such visits will be the Doctors Attendance Maximum shown in The Schedule. Payment will be made for no more than one visit per day. In no event will payment be made in any one period of Hospital Confinement for a visit made after the Maximum Number of Days shown in The Schedule.

**Limitations**

No payment will be made:

- for visits made on or after the day a Surgical Procedure is performed if: (a) Surgical Benefits are provided for that Procedure; and (b) the visit is made by any Physician who performed or assisted in the Procedure;
- for or in connection with examinations for prescription or fitting of eyeglasses or hearing aids;
- for or in connection with treatment of the teeth or periodontium unless the visit is made to treat an Injury received while insured;
- for drugs, dressings or medicines.

Other Limitations are shown in the "General Limitations" section.

GM6000 DA1V-1
DAT2

## Laboratory And X-Ray Examination Benefits

**For You And Your Dependents**

If you or any one of your Dependents, while not Confined in a Hospital and while insured for these benefits, has a laboratory or X-ray examination recommended by a Physician

- to diagnose an Injury received while so insured, or
- to diagnose a Sickness,

CG will pay for the expenses incurred for that examination. The maximum amount payable for the expenses so incurred will be the Diagnostic Maximum shown in The Schedule.

**Limitations**

No payment will be made for expenses incurred:

- for examinations for prescription or fitting of eyeglasses or hearing aids;
- for or in connection with treatment of the teeth or periodontium unless the examination is made to diagnose an Injury received while insured.

Other Limitations are shown in the "General Limitations" section.

GM6000 LX2V-1
LAX4

## Radiotherapy Benefits

**For You and Your Dependents**

If you or any one of your Dependents, while not Confined in a Hospital and while insured for these benefits, receives a radiation treatment as a result of an Injury or a Sickness, CG will pay for the expenses incurred for the treatment received. The maximum amount payable for the expenses so incurred will be the Radiotherapy Maximum shown in The Schedule.

**Limitations**

No payment will be made for expenses incurred:

- for any treatment that is not recommended by a Physician;
- to diagnose an Injury or a Sickness.

Other Limitations are shown in the "General Limitations" section.

GM6000 RA1V-1
RAD2

19


**CIGNA HealthCare**

---

## Prescription Drug Benefits
### The Schedule

**For You and Your Dependents**

This plan provides Prescription Drug benefits for Prescription Drugs and Related Supplies provided by Pharmacies as shown in this Schedule.  To receive Prescription Drug Benefits, you and your Dependents may be required to pay a portion of the Covered Expenses for Prescription Drugs and Related Supplies for each 30-day supply at a retail pharmacy or each 90-day supply at a mail order pharmacy.  That portion is the Copayment or Coinsurance.

**Copayments**

Copayments are expenses to be paid by you or your Dependent for covered Prescription Drugs and Related Supplies. Copayments are in addition to any Coinsurance.

---



**CIGNA HealthCare**

| BENEFIT HIGHLIGHTS | PARTICIPATING PHARMACY | Non-PARTICIPATING PHARMACY |
|---|---|---|
| **Prescription Drugs**<br><br>Generic* drugs on the Prescription Drug List | No charge after $2 per prescription order or refill | In-network coverage only |
| * Designated as per generally-accepted industry sources and adopted by CG | | |



**CIGNA** HealthCare

## Prescription Drug Benefits
**For You and Your Dependents**

### Covered Expenses

If you or any one of your Dependents, while insured for Prescription Drug Benefits, incurs expenses for charges made by a Pharmacy for Medically Necessary Prescription Drugs or Related Supplies ordered by a Physician, CG will provide coverage for those expenses as shown in The Schedule. Coverage also includes Medically Necessary Prescription Drugs and Related Supplies dispensed for a prescription issued to you or your Dependents by a licensed dentist for the prevention of infection or pain in conjunction with a dental procedure.

When you or a Dependent is issued a prescription for Medically Necessary Prescription Drugs or Related Supplies as part of the rendering of Emergency Services and that prescription cannot reasonably be filled by a Participating Pharmacy, the prescription will be covered by CG, as if filled by a Participating Pharmacy.

### Limitations

Each Prescription Order or refill shall be limited as follows:

- up to a consecutive 30-day supply, at a retail Pharmacy, unless limited by the drug manufacturer's packaging; or
- to a dosage and/or dispensing limit as determined by the P&T Committee.

Coverage for Prescription Drugs and Related Supplies is limited to "generic" drugs unless a generic alternative does not exist or substitution is not permitted by state law.

GM6000 PHARM91
GM6000 PHARM85 PHARM102

In the event that you or your Physician insists on: (a) a more expensive "brand-name" drug where a "generic" drug would otherwise have been dispensed, you will be financially responsible for the amount by which the cost of the "brand-name" drug exceeds the cost of the "generic" drug, plus the required Copayment identified in the Schedule.

Coverage for certain Prescription Drugs and Related Supplies requires your Physician to obtain authorization prior to prescribing. Prior authorization may include, for example, a step therapy determination. Step therapy determines the specific usage progression of therapeutically equivalent drug products or supplies appropriate for treatment of a specific condition. If your Physician wishes to request coverage for Prescription Drugs or Related Supplies for which prior authorization is required, your Physician may call or complete the appropriate prior authorization form and fax it to CG to request prior authorization for coverage of the Prescription Drugs or Related Supplies. Your Physician should make this request before writing the prescription.

If the request is approved, your Physician will receive confirmation. The authorization will be processed in our claim system to allow you to have coverage for those Prescription Drugs or Related Supplies. The length of the authorization will depend on the diagnosis and Prescription Drugs or Related Supplies. When your Physician advises you that coverage for the Prescription Drugs or Related Supplies has been approved, you should contact the Pharmacy to fill the prescription(s).

If the request is denied, your Physician and you will be notified that coverage for the Prescription Drugs or Related Supplies is not authorized.

If you disagree with a coverage decision, you may appeal that decision in accordance with the provisions of the Policy, by submitting a written request stating why the Prescription Drugs or Related Supplies should be covered.

If you have questions about a specific prior authorization request, you should call Member Services at the toll-free number on the ID card.

Prescription Drugs that represent an advance over available therapy according to the FDA will be reviewed by the P&T Committee within six months after FDA approval. Prescription Drugs that appear to have therapeutic qualities similar to those of an already marketed drug according to the FDA, will not be reviewed by the P&T Committee for at least six months after FDA approval. In the case of compelling clinical data, an ad hoc group will be formed to make an interim decision on the merits of a Prescription Drug.

### Your Payments

Coverage for Prescription Drugs and Related Supplies purchased at a Pharmacy is subject to the Copayment or Coinsurance shown in the Schedule, after you have satisfied your Prescription Drug Deductible, if applicable. Please refer to the Schedule for any required Copayments, Coinsurance, Deductibles or Maximums if applicable.

When a treatment regimen contains more than one type of Prescription Drug which are packaged together for your, or your Dependent's convenience, a Copayment will apply to each Prescription Drug.

GM6000 PHARM92 PHARM124V3
GM6000 PHARM93
GM6000 PHARM87

### Exclusions

No payment will be made for the following expenses:

---



**CIGNA** HealthCare

- drugs available over the counter that do not require a prescription by federal or state law;
- any drug that is a pharmaceutical alternative to an over-the-counter drug other than insulin;
- a drug class in which at least one of the drugs is available over the counter and the drugs in the class are deemed to be therapeutically equivalent as determined by the P&T Committee;
- injectable infertility drugs and any injectable drugs that require Physician supervision and are not typically considered self-administered drugs. The following are examples of Physician supervised drugs: Injectables used to treat hemophilia and RSV (respiratory syncytial virus), chemotherapy injectables and endocrine and metabolic agents.
- any drugs that are experimental or investigational as described under the Medical "Exclusions" section of your certificate;
- Food and Drug Administration (FDA) approved drugs used for purposes other than those approved by the FDA unless the drug is recognized for the treatment of the particular indication in one of the standard reference compendia (The United States Pharmacopeia Drug Information, The American Medical Association Drug Evaluations; or The American Hospital Formulary Service Drug Information) or in medical literature. Medical literature means scientific studies published in a peer-reviewed national professional medical journal;
- prescription and nonprescription supplies (such as ostomy supplies), devices, and appliances other than Related Supplies;
- implantable contraceptive products;
- any fertility drug;
- drugs used for the treatment of sexual dysfunction, including, but not limited to erectile dysfunction, delayed ejaculation, anorgasmy, and decreased libido;
- dietary supplements, and fluoride products;
- drugs used for cosmetic purposes such as drugs used to reduce wrinkles, drugs to promote hair growth as well as drugs used to control perspiration and fade cream products;
- diet pills or appetite suppressants (anorectics);
- prescription smoking cessation products;
- immunization agents, biological products for allergy immunization, biological sera, blood, blood plasma and other blood products or fractions and medications used for travel prophylaxis;
- replacement of Prescription Drugs and Related Supplies due to loss or theft;
- drugs used to enhance athletic performance;

- drugs which are to be taken by or administered to you while you are a patient in a licensed Hospital, Skilled Nursing Facility, rest home or similar institution which operates on its premises or allows to be operated on its premises a facility for dispensing pharmaceuticals;
- prescriptions more than one year from the original date of issue.

Other limitations are shown in the Medical "Exclusions" section.

GM6000 PHARM88 PHARM104V16
GM6000 PHARM89
GM6000 PHARM105

## Reimbursement/Filing a Claim

When you or your Dependents purchase your Prescription Drugs or Related Supplies through a retail Participating Pharmacy, you pay any applicable Copayment, Coinsurance or Deductible shown in the Schedule at the time of purchase. You do not need to file a claim form.

See your Employer's Benefit Plan Administrator to obtain the appropriate claim form.

GM6000 PHARM94 V17

## Exclusions, Expenses Not Covered and General Limitations

Additional coverage limitations determined by plan or provider type are shown in the Schedule. Payment for the following is specifically excluded from this plan:

- expenses for supplies, care, treatment, or surgery that are not Medically Necessary.
- to the extent that you or any one of your Dependents is in any way paid or entitled to payment for those expenses by or through a public program, other than Medicaid.
- to the extent that payment is unlawful where the person resides when the expenses are incurred.
- charges made by a Hospital owned or operated by or which provides care or performs services for, the United States Government, if such charges are directly related to a military-service-connected Injury or Sickness.
- for or in connection with an Injury or Sickness which is due to war, declared or undeclared.
- charges which you are not obligated to pay or for which you are not billed or for which you would not have been billed except that they were covered under this plan.
- assistance in the activities of daily living, including but not limited to eating, bathing, dressing or other Custodial



**CIGNA HealthCare**

Services or self-care activities, homemaker services and services primarily for rest, domiciliary or convalescent care.

- for or in connection with experimental, investigational or unproven services.

Experimental, investigational and unproven services are medical, surgical, diagnostic, psychiatric, substance abuse or other health care technologies, supplies, treatments, procedures, drug therapies or devices that are determined by the utilization review Physician to be:

- not demonstrated, through existing peer-reviewed, evidence-based, scientific literature to be safe and effective for treating or diagnosing the condition or sickness for which its use is proposed;
- not approved by the U.S. Food and Drug Administration (FDA) or other appropriate regulatory agency to be lawfully marketed for the proposed use;
- the subject of review or approval by an Institutional Review Board for the proposed use except as provided in the "Clinical Trials" section of this plan; or
- the subject of an ongoing phase I, II or III clinical trial, except as provided in the "Clinical Trials" section of this plan.

- regardless of clinical indication for macromastia or gynecomastia surgeries; surgical treatment of varicose veins; rhinoplasty; blepharoplasty; redundant skin surgery; removal of skin tags; acupressure; craniosacral/cranial therapy; dance therapy; movement therapy; applied kinesiology; rolfing; prolotherapy; and extracorporeal shock wave lithotripsy (ESWL) for musculoskeletal and orthopedic conditions.
- surgical or nonsurgical treatment of TMJ dysfunction.
- for or in connection with treatment of the teeth or periodontium unless such expenses are incurred for: (a) charges made for a continuous course of dental treatment started within six months of an Injury to sound natural teeth; (b) charges made by a Hospital for Bed and Board or Necessary Services and Supplies; (c) charges made by a Free-Standing Surgical Facility or the outpatient department of a Hospital in connection with surgery
- for medical and surgical services intended primarily for the treatment or control of obesity, which are not Medically Necessary. Excluded services include, but are not limited to, weight reduction procedures designed to restrict your ability to assimilate food, such as gastric bypass, gastric balloons, jaw wiring, stomach stapling and jejunal bypass.
- unless otherwise covered in this plan, for reports, evaluations, physical examinations, or hospitalization not required for health reasons including, but not limited to, employment, insurance or government licenses, and court-ordered, forensic or custodial evaluations.

- court-ordered treatment or hospitalization, unless such treatment is prescribed by a Physician and listed as covered in this plan.
- infertility services including infertility drugs, surgical or medical treatment programs for infertility, including in vitro fertilization, gamete intrafallopian transfer (GIFT), zygote intrafallopian transfer (ZIFT), variations of these procedures, and any costs associated with the collection, washing, preparation or storage of sperm for artificial insemination (including donor fees). Cryopreservation of donor sperm and eggs are also excluded from coverage.
- reversal of male and female voluntary sterilization procedures.
- transsexual surgery including medical or psychological counseling and hormonal therapy in preparation for, or subsequent to, any such surgery.
- any services or supplies for the treatment of male or female sexual dysfunction such as, but not limited to, treatment of erectile dysfunction (including penile implants), anorgasmy, and premature ejaculation.
- medical and Hospital care and costs for the infant child of a Dependent, unless this infant child is otherwise eligible under this plan.
- nonmedical counseling or ancillary services, including but not limited to Custodial Services, education, training, vocational rehabilitation, behavioral training, biofeedback, neurofeedback, hypnosis, sleep therapy, employment counseling, back school, return to work services, work hardening programs, driving safety, and services, training, educational therapy or other nonmedical ancillary services for learning disabilities, developmental delays, autism or mental retardation.
- therapy or treatment intended primarily to improve or maintain general physical condition or for the purpose of enhancing job, school, athletic or recreational performance, including but not limited to routine, long term, or maintenance care which is provided after the resolution of the acute medical problem and when significant therapeutic improvement is not expected.
- consumable medical supplies other than ostomy supplies and urinary catheters. Excluded supplies include, but are not limited to bandages and other disposable medical supplies, skin preparations and test strips, except as specified in the "Home Health Services" or "Breast Reconstruction and Breast Prostheses" sections of this plan.
- private Hospital rooms and/or private duty nursing except as provided under the **Home Health Services** provision.
- personal or comfort items such as personal care kits provided on admission to a Hospital, television, telephone, newborn infant photographs, complimentary meals, birth announcements, and other articles which are not for the specific treatment of an Injury or Sickness.
- artificial aids including, but not limited to, corrective orthopedic shoes, arch supports, elastic stockings, garter belts, corsets, dentures and wigs.


**CIGNA HealthCare**

- hearing aids, including but not limited to semi-implantable hearing devices, audiant bone conductors and Bone Anchored Hearing Aids (BAHAs). A hearing aid is any device that amplifies sound.
- aids or devices that assist with nonverbal communications, including but not limited to communication boards, prerecorded speech devices, laptop computers, desktop computers, Personal Digital Assistants (PDAs), Braille typewriters, visual alert systems for the deaf and memory books.
- medical benefits for eyeglasses, contact lenses or examinations for prescription or fitting thereof, except that Covered Expenses will include the purchase of the first pair of eyeglasses, lenses, frames or contact lenses that follows keratoconus or cataract surgery.
- charges made for or in connection with routine refractions, eye exercises and for surgical treatment for the correction of a refractive error, including radial keratotomy, when eyeglasses or contact lenses may be worn.
- treatment by acupuncture.
- all noninjectable prescription drugs, injectable prescription drugs that do not require Physician supervision and are typically considered self-administered drugs, nonprescription drugs, and investigational and experimental drugs, except as provided in this plan.
- routine foot care, including the paring and removing of corns and calluses or trimming of nails. However, services associated with foot care for diabetes and peripheral vascular disease are covered when Medically Necessary.
- membership costs or fees associated with health clubs, weight loss programs and smoking cessation programs.
- genetic screening or pre-implantations genetic screening. General population-based genetic screening is a testing method performed in the absence of any symptoms or any significant, proven risk factors for genetically linked inheritable disease.
- dental implants for any condition.
- fees associated with the collection or donation of blood or blood products, except for autologous donation in anticipation of scheduled services where in the utilization review Physician's opinion the likelihood of excess blood loss is such that transfusion is an expected adjunct to surgery.
- blood administration for the purpose of general improvement in physical condition.
- cost of biologicals that are immunizations or medications for the purpose of travel, or to protect against occupational hazards and risks.
- cosmetics, dietary supplements and health and beauty aids.

- nutritional supplements and formulae except for infant formula needed for the treatment of inborn errors of metabolism.
- medical treatment for a person age 65 or older, who is covered under this plan as a retiree, or their Dependent, when payment is denied by the Medicare plan because treatment was received from a nonparticipating provider.
- medical treatment when payment is denied by a Primary Plan because treatment was received from a nonparticipating provider.
- for or in connection with an Injury or Sickness arising out of, or in the course of, any employment for wage or profit.
- telephone, e-mail, and Internet consultations, and telemedicine.
- massage therapy.
- for charges which would not have been made if the person had no insurance.
- to the extent that they are more than Maximum Reimbursable Charges.
- expenses incurred outside the United States or Canada, unless you or your Dependent is a U.S. or Canadian resident and the charges are incurred while traveling on business or for pleasure.
- charges made by any covered provider who is a member of your family or your Dependent's family.
- to the extent of the exclusions imposed by any certification requirement shown in this plan.

GM6000 05BPT14 V143
GM6000 05BPT105
GM6000 06BNR2V2
GM6000 06BNR2V75

## Coordination of Benefits

This section applies if you or any one of your Dependents is covered under more than one Plan and determines how benefits payable from all such Plans will be coordinated. You should file all claims with each Plan.

**Definitions**
For the purposes of this section, the following terms have the meanings set forth below:

**Plan**
Any of the following that provides benefits or services for medical care or treatment:

(1) Group insurance and/or group-type coverage, whether insured or self-insured which neither can be purchased by the general public, nor is individually underwritten, including closed panel coverage.

(2) Coverage under Medicare and other governmental



**CIGNA HealthCare**

benefits as permitted by law, excepting Medicaid and Medicare supplement policies.

(3) Medical benefits coverage of group, group-type, and individual automobile contracts.

Each Plan or part of a Plan which has the right to coordinate benefits will be considered a separate Plan.

**Closed Panel Plan**

A Plan that provides medical or dental benefits primarily in the form of services through a panel of employed or contracted providers, and that limits or excludes benefits provided by providers outside of the panel, except in the case of emergency or if referred by a provider within the panel.

**Primary Plan**

The Plan that determines and provides or pays benefits without taking into consideration the existence of any other Plan.

**Secondary Plan**

A Plan that determines, and may reduce its benefits after taking into consideration, the benefits provided or paid by the Primary Plan. A Secondary Plan may also recover from the Primary Plan the Reasonable Cash Value of any services it provided to you.

GM6000 COB11

**Allowable Expense**

A necessary, reasonable and customary service or expense, including deductibles, coinsurance or copayments, that is covered in full or in part by any Plan covering you. When a Plan provides benefits in the form of services, the Reasonable Cash Value of each service is the Allowable Expense and is a paid benefit.

Examples of expenses or services that are not Allowable Expenses include, but are not limited to the following:

- An expense or service or a portion of an expense or service that is not covered by any of the Plans is not an Allowable Expense.

- If you are confined to a private Hospital room and no Plan provides coverage for more than a semiprivate room, the difference in cost between a private and semiprivate room is not an Allowable Expense.

- If you are covered by two or more Plans that provide services or supplies on the basis of reasonable and customary fees, any amount in excess of the highest reasonable and customary fee is not an Allowable Expense.

- If you are covered by one Plan that provides services or supplies on the basis of reasonable and customary fees and one Plan that provides services and supplies on the basis of negotiated fees, the Primary Plan's fee arrangement shall be the Allowable Expense.

- If your benefits are reduced under the Primary Plan (through the imposition of a higher copayment amount, higher coinsurance percentage, a deductible and/or a penalty) because you did not comply with Plan provisions or because you did not use a preferred provider, the amount of the reduction is not an Allowable Expense. Such Plan provisions include second surgical opinions and precertification of admissions or services.

**Claim Determination Period**

A calendar year, but does not include any part of a year during which you are not covered under this policy or any date before this section or any similar provision takes effect.

GM6000 COB12

**Reasonable Cash Value**

An amount which a duly licensed provider of health care services usually charges patients and which is within the range of fees usually charged for the same service by other health care providers located within the immediate geographic area where the health care service is rendered under similar or comparable circumstances.

**Order of Benefit Determination Rules**

A Plan that does not have a coordination of benefits rule consistent with this section shall always be the Primary Plan. If the Plan does have a coordination of benefits rule consistent with this section, the first of the following rules that applies to the situation is the one to use:

(1) The Plan that covers you as an enrollee or an employee shall be the Primary Plan and the Plan that covers you as a Dependent shall be the Secondary Plan;

(2) If you are a Dependent child whose parents are not divorced or legally separated, the Primary Plan shall be the Plan which covers the parent whose birthday falls first in the calendar year as an enrollee or employee;

(3) If you are the Dependent of divorced or separated parents, benefits for the Dependent shall be determined in the following order:

   (a) first, if a court decree states that one parent is responsible for the child's healthcare expenses or health coverage and the Plan for that parent has actual knowledge of the terms of the order, but only from the time of actual knowledge;

   (b) then, the Plan of the parent with custody of the child;



**CIGNA HealthCare**

(c) then, the Plan of the spouse of the parent with custody of the child;

(d) then, the Plan of the parent not having custody of the child, and

(e) finally, the Plan of the spouse of the parent not having custody of the child.

GM6000 COB13

(4) The Plan that covers you as an active employee (or as that employee's Dependent) shall be the Primary Plan and the Plan that covers you as laid-off or retired employee (or as that employee's Dependent) shall be the secondary Plan. If the other Plan does not have a similar provision and, as a result, the Plans cannot agree on the order of benefit determination, this paragraph shall not apply.

(5) The Plan that covers you under a right of continuation which is provided by federal or state law shall be the Secondary Plan and the Plan that covers you as an active employee or retiree (or as that employee's Dependent) shall be the Primary Plan. If the other Plan does not have a similar provision and, as a result, the Plans cannot agree on the order of benefit determination, this paragraph shall not apply.

(6) If one of the Plans that covers you is issued out of the state whose laws govern this Policy, and determines the order of benefits based upon the gender of a parent, and as a result, the Plans do not agree on the order of benefit determination, the Plan with the gender rules shall determine the order of benefits.

If none of the above rules determines the order of benefits, the Plan that has covered you for the longer period of time shall be primary.

When coordinating benefits with Medicare, this Plan will be the Secondary Plan and determine benefits after Medicare, where permitted by the Social Security Act of 1965, as amended. However, when more than one Plan is secondary to Medicare, the benefit determination rules identified above, will be used to determine how benefits will be coordinated.

**Effect on the Benefits of This Plan**

If this Plan is the Secondary Plan, this Plan may reduce benefits so that the total benefits paid by all Plans during a Claim Determination Period are not more than 100% of the total of all Allowable Expenses.

The difference between the amount that this Plan would have paid if this Plan had been the Primary Plan, and the benefit payments that this Plan had actually paid as the Secondary Plan, will be recorded as a benefit reserve for you. CG will use this benefit reserve to pay any Allowable Expense not otherwise paid during the Claim Determination Period.

GM6000 COB14

As each claim is submitted, CG will determine the following:

(1) CG's obligation to provide services and supplies under this policy;

(2) whether a benefit reserve has been recorded for you; and

(3) whether there are any unpaid Allowable Expenses during the Claims Determination Period.

If there is a benefit reserve, CG will use the benefit reserve recorded for you to pay up to 100% of the total of all Allowable Expenses. At the end of the Claim Determination Period, your benefit reserve will return to zero and a new benefit reserve will be calculated for each new Claim Determination Period.

**Recovery of Excess Benefits**

If CG pays charges for benefits that should have been paid by the Primary Plan, or if CG pays charges in excess of those for which we are obligated to provide under the Policy, CG will have the right to recover the actual payment made or the Reasonable Cash Value of any services.

CG will have sole discretion to seek such recovery from any person to, or for whom, or with respect to whom, such services were provided or such payments made by any insurance company, healthcare plan or other organization. If we request, you must execute and deliver to us such instruments and documents as we determine are necessary to secure the right of recovery.

**Right to Receive and Release Information**

CG, without consent or notice to you, may obtain information from and release information to any other Plan with respect to you in order to coordinate your benefits pursuant to this section. You must provide us with any information we request in order to coordinate your benefits pursuant to this section. This request may occur in connection with a submitted claim; if so, you will be advised that the "other coverage" information, (including an Explanation of Benefits paid under the Primary Plan) is required before the claim will be processed for payment. If no response is received within 90 days of the request, the claim will be denied. If the requested information is subsequently received, the claim will be processed.

GM6000 COB15

27



**CIGNA** HealthCare

## Medicare Eligibles

CG will pay as the Secondary Plan as permitted by the Social Security Act of 1965 as amended for the following:

a) a former Employee who is eligible for Medicare and whose insurance is continued for any reason as provided in this plan;

b) a former Employee's Dependent, or a former Dependent Spouse, who is eligible for Medicare and whose insurance is continued for any reason as provided in this plan;

c) a retired Employee, or retired Employee's Dependent who is eligible for Medicare due to End Stage Renal Disease after that person has been eligible for Medicare for 30 months;

GM6000 MEL23 V4 M

CG will assume the amount payable under:

- Part A of Medicare for a person who is eligible for that Part without premium payment, but has not applied, to be the amount he would receive if he had applied.
- Part B of Medicare for a person who is entitled to be enrolled in that Part, but is not, to be the amount he would receive if he were enrolled.
- Part B of Medicare for a person who has entered into a private contract with a provider, to be the amount he would receive in the absence of such private contract.

A person is considered eligible for Medicare on the earliest date any coverage under Medicare could become effective for him.

This reduction will not apply to any former Employee and his Dependent unless he is listed under (a) through (c) above.

GM6000 MEL45V2 M

## Right of Reimbursement

The Policy does not cover:

1. Expenses for which another party may be responsible as a result of liability for causing or contributing to the injury or illness of you or your Dependent(s).

2. Expenses to the extent they are covered under the terms of any automobile medical, automobile no fault, uninsured or underinsured motorist, workers' compensation, government insurance, other than Medicaid, or similar type of insurance or coverage when insurance coverage provides benefits on behalf of you or your Dependent(s).

If you or a Dependent incur health care Expenses as described in (1) and (2) above, Connecticut General shall automatically have a lien upon the proceeds of any recovery by you or your Dependent(s) from such party to the extent of any benefits provided to you or your Dependent(s) by the Policy. You or your Dependent(s) or their representative shall execute such documents as may be required to secure Connecticut General's rights. Connecticut General shall be reimbursed the lesser of:

the amount actually paid by CG [or the HealthPlan] under the Policy; or

an amount actually received from the third party;

at the time that the third party's liability is determined and satisfied; whether by settlement, judgment, arbitration or otherwise.

GM6000 CCP1 CCL1V4

## Payment of Benefits

**To Whom Payable**

All Medical Benefits are payable to you. However, at the option of CG, all or any part of them may be paid directly to the person or institution on whose charge claim is based.

Medical Benefits are not assignable unless agreed to by CG. CG may, at its option, make payment to you for the cost of any Covered Expenses received by you or your Dependent from a Non-Participating Provider even if benefits have been assigned. When benefits are paid to you or your Dependent, you or your Dependent is responsible for reimbursing the Provider. If any person to whom benefits are payable is a minor or, in the opinion of CG, is not able to give a valid receipt for any payment due him, such payment will be made to his legal guardian. If no request for payment has been made by his legal guardian, CG may, at its option, make payment to the person or institution appearing to have assumed his custody and support.

If you die while any of these benefits remain unpaid, CG may choose to make direct payment to any of your following living



**CIGNA HealthCare**

relatives: spouse, mother, father, child or children, brothers or sisters; or to the executors or administrators of your estate.

Payment as described above will release CG from all liability to the extent of any payment made.

**Time of Payment**

Benefits will be paid by CG when it receives due proof of loss.

**Recovery of Overpayment**

When an overpayment has been made by CG, CG will have the right at any time to: (a) recover that overpayment from the person to whom or on whose behalf it was made; or (b) offset the amount of that overpayment from a future claim payment.

**Calculation of Covered Expenses**

CG, in its discretion, will calculate Covered Expenses following evaluation and validation of all provider billings in accordance with:

- the methodologies in the most recent edition of the Current Procedural terminology.
- the methodologies as reported by generally recognized professionals or publications.

GM6000 TRM366

## Termination of Insurance

### Employees

Your insurance will cease on the earliest date below:

- the date you cease to be in a Class of Eligible Employees or cease to qualify for the insurance.
- the last day for which you have made any required contribution for the insurance.
- the date the policy is canceled.

Any continuation of insurance must be based on a plan which precludes individual selection.

GM6000 TRM15V44 M

### Dependents

Your insurance for all of your Dependents will cease on the earliest date below:

- the date your insurance ceases.
- the date you cease to be eligible for Dependent Insurance.
- the last day for which you have made any required contribution for the insurance.
- the date Dependent Insurance is canceled.

The insurance for any one of your Dependents will cease on

the date that Dependent no longer qualifies as a Dependent.

GM6000 TRM62

## Federal Requirements

The following pages explain your rights and responsibilities under federal laws and regulations. Some states may have similar requirements. If a similar provision appears elsewhere in this booklet, the provision which provides the better benefit will apply.

FDRL1

## Notice of Provider Directory/Networks

**Notice Regarding Pharmacy Directories and Pharmacy Networks**

If your Plan utilizes a network of Pharmacies, you will automatically and without charge, receive a separate listing of Participating Pharmacies.

You may also have access to a list of Providers who participate in the network by visiting www.cigna.com; mycigna.com or by calling the toll-free telephone number on your ID card.

Your Participating Pharmacy network consists of a group of local Participating Pharmacies employed by or contracted with CIGNA HealthCare.

FDRL32

## Qualified Medical Child Support Order (QMCSO)

**A.  Eligibility for Coverage Under a QMCSO**

If a Qualified Medical Child Support Order (QMCSO) is issued for your child, that child will be eligible for coverage as required by the order and you will not be considered a Late Entrant for Dependent Insurance.

You must notify your Employer and elect coverage for that child, and yourself if you are not already enrolled, within 31 days of the QMCSO being issued.

**B.  Qualified Medical Child Support Order Defined**

A Qualified Medical Child Support Order is a judgment, decree or order (including approval of a settlement agreement) or administrative notice, which is issued pursuant to a state domestic relations law (including a community property law), or to an administrative process, which provides for child support or provides for health benefit coverage to such child and relates to benefits under the group health plan, and satisfies all of the following:



**CIGNA HealthCare**

1. the order recognizes or creates a child's right to receive group health benefits for which a participant or beneficiary is eligible;

2. the order specifies your name and last known address, and the child's name and last known address, except that the name and address of an official of a state or political subdivision may be substituted for the child's mailing address;

3. the order provides a description of the coverage to be provided, or the manner in which the type of coverage is to be determined;

4. the order states the period to which it applies; and

5. if the order is a National Medical Support Notice completed in accordance with the Child Support Performance and Incentive Act of 1998, such Notice meets the requirements above.

The QMCSO may not require the health insurance policy to provide coverage for any type or form of benefit or option not otherwise provided under the policy, except that an order may require a plan to comply with State laws regarding health care coverage.

**C.  Payment of Benefits**

Any payment of benefits in reimbursement for Covered Expenses paid by the child, or the child's custodial parent or legal guardian, shall be made to the child, the child's custodial parent or legal guardian, or a state official whose name and address have been substituted for the name and address of the child.

FDRL2

## Special Enrollment Rights Under the Health Insurance Portability & Accountability Act (HIPAA)

If you or your eligible Dependent(s) experience a special enrollment event as described below, you or your eligible Dependent(s) may be entitled to enroll in the Plan outside of a designated enrollment period upon the occurrence of one of the special enrollment events listed below. If you are already enrolled in the Plan, you may request enrollment for you and your eligible Dependent(s) under a different option offered by the Employer for which you are currently eligible. If you are not already enrolled in the Plan, you must request special enrollment for yourself in addition to your eligible Dependent(s). You and all of your eligible Dependent(s) must be covered under the same option. The special enrollment events include:

- **Acquiring a new Dependent.** If you acquire a new Dependent(s) through marriage, birth, adoption or

placement for adoption, you may request special enrollment for any of the following combinations of individuals if not already enrolled in the Plan: Employee only; spouse only; Employee and spouse; Dependent child(ren) only; Employee and Dependent child(ren); Employee, spouse and Dependent child(ren). Enrollment of Dependent children is limited to the newborn or adopted children or children who became Dependent children of the Employee due to marriage. Dependent children who were already Dependents of the Employee but not currently enrolled in the Plan are not entitled to special enrollment.

- **Loss of eligibility for other coverage (excluding continuation coverage).** If coverage was declined under this Plan due to coverage under another plan, and eligibility for the other coverage is lost, you and all of your eligible Dependent(s) may request special enrollment in this Plan. If required by the Plan, when enrollment in this Plan was previously declined, it must have been declined in writing with a statement that the reason for declining enrollment was due to other health coverage. This provision applies to loss of eligibility as a result of any of the following:

  - divorce or legal separation;

  - cessation of Dependent status (such as reaching the limiting age);

  - death of the Employee;

  - termination of employment;

  - reduction in work hours to below the minimum required for eligibility;

  - you or your Dependent(s) no longer reside, live or work in the other plan's network service area and no other coverage is available under the other plan;

  - you or your Dependent(s) incur a claim which meets or exceeds the lifetime maximum limit that is applicable to all benefits offered under the other plan; or

  - the other plan no longer offers any benefits to a class of similarly situated individuals.

- **Termination of employer contributions (excluding continuation coverage).** If a current or former employer ceases all contributions toward the Employee's or Dependent's other coverage, special enrollment may be requested in this Plan for you and all of your eligible Dependent(s).

- **Exhaustion of COBRA or other continuation coverage.** Special enrollment may be requested in this Plan for you and all of your eligible Dependent(s) upon exhaustion of COBRA or other continuation coverage. If you or your Dependent(s) elect COBRA or other continuation coverage following loss of coverage under another plan, the COBRA or other continuation coverage must be exhausted before any special enrollment rights exist under this Plan. An



**CIGNA** HealthCare

individual is considered to have exhausted COBRA or other continuation coverage only if such coverage ceases: (a) due to failure of the employer or other responsible entity to remit premiums on a timely basis; (b) when the person no longer resides or works in the other plan's service area and there is no other COBRA or continuation coverage available under the plan; or (c) when the individual incurs a claim that would meet or exceed a lifetime maximum limit on all benefits and there is no other COBRA or other continuation coverage available to the individual. This does not include termination of an employer's limited period of contributions toward COBRA or other continuation coverage as provided under any severance or other agreement.

FDRL3

Special enrollment must be requested within 30 days after the occurrence of the special enrollment event. If the special enrollment event is the birth or adoption of a Dependent child, coverage will be effective immediately on the date of birth, adoption or placement for adoption. Coverage with regard to any other special enrollment event will be effective on the first day of the calendar month following receipt of the request for special enrollment.

Individuals who enroll in the Plan due to a special enrollment event will not be considered Late Entrants. Any Pre-existing Condition limitation will be applied upon enrollment, reduced by prior Creditable Coverage, but will not be extended as for a Late Entrant.

Domestic Partners and their children (if not legal children of the Employee) are not eligible for special enrollment.

FDRL4

## Eligibility for Coverage for Adopted Children

Any child under the age of 18 who is adopted by you, including a child who is placed with you for adoption, will be eligible for Dependent Insurance upon the date of placement with you. A child will be considered placed for adoption when you become legally obligated to support that child, totally or partially, prior to that child's adoption.

If a child placed for adoption is not adopted, all health coverage ceases when the placement ends, and will not be continued.

The provisions in the "Exception for Newborns" section of this document that describe requirements for enrollment and effective date of insurance will also apply to an adopted child or a child placed with you for adoption.

FDRL6

## Federal Tax Implications for Dependent Coverage

Premium payments for Dependent health insurance are usually exempt from federal income tax. Generally, if you can claim an individual as a Dependent for purposes of federal income tax, then the premium for that Dependent's health insurance coverage will not be taxable to you as income. However, in the rare instance that you cover an individual under your health insurance who does not meet the federal definition of a Dependent, the premium may be taxable to you as income. If you have questions concerning your specific situation, you should consult your own tax consultant or attorney.

FDRL7

## Coverage for Maternity Hospital Stay

Group health plans and health insurance issuers offering group health insurance coverage generally may not, under a federal law known as the "Newborns' and Mothers' Health Protection Act": restrict benefits for any Hospital length of stay in connection with childbirth for the mother or newborn child to less than 48 hours following a vaginal delivery, or less than 96 hours following a cesarean section; or require that a provider obtain authorization from the plan or insurance issuer for prescribing a length of stay not in excess of the above periods. The law generally does not prohibit an attending provider of the mother or newborn, in consultation with the mother, from discharging the mother or newborn earlier than 48 or 96 hours, as applicable.

Please review this Plan for further details on the specific coverage available to you and your Dependents.

FDRL8

## Women's Health and Cancer Rights Act (WHCRA)

Do you know that your plan, as required by the Women's Health and Cancer Rights Act of 1998, provides benefits for mastectomy-related services including all stages of reconstruction and surgery to achieve symmetry between the breasts, prostheses, and complications resulting from a mastectomy, including lymphedema? Call Member Services at the toll free number listed on your ID card for more information.

FDRL51



**CIGNA HealthCare**

## Group Plan Coverage Instead of Medicaid

If your income does not exceed 100% of the official poverty line and your liquid resources are at or below twice the Social Security income level, the state may decide to pay premiums for this coverage instead of for Medicaid, if it is cost effective. This includes premiums for continuation coverage required by federal law.

FDRL10

## Obtaining a Certificate of Creditable Coverage Under This Plan

Upon loss of coverage under this Plan, a Certificate of Creditable Coverage will be mailed to each terminating individual at the last address on file. You or your dependent may also request a Certificate of Creditable Coverage, without charge, at any time while enrolled in the Plan and for 24 months following termination of coverage. You may need this document as evidence of your prior coverage to reduce any pre-existing condition limitation period under another plan, to help you get special enrollment in another plan, or to obtain certain types of individual health coverage even if you have health problems. To obtain a Certificate of Creditable Coverage, contact the Plan Administrator or call the toll-free customer service number on the back of your ID card.

FDRL50

## Claim Determination Procedures Under ERISA

**The following complies with federal law effective July 1, 2002. Provisions of the laws of your state may supersede.**

**Procedures Regarding Medical Necessity Determinations**

In general, health services and benefits must be Medically Necessary to be covered under the plan. The procedures for determining Medical Necessity vary, according to the type of service or benefit requested, and the type of health plan. Medical Necessity determinations are made on either a preservice, concurrent, or postservice basis, as described below:

Certain services require prior authorization in order to be covered. This prior authorization is called a "preservice medical necessity determination." The Certificate describes who is responsible for obtaining this review. You or your authorized representative (typically, your health care provider) must request Medical Necessity determinations according to the procedures described below, in the Certificate, and in your provider's network participation documents as applicable.

When services or benefits are determined to be not Medically Necessary, you or your representative will receive a written description of the adverse determination, and may appeal the determination. Appeal procedures are described in the Certificate, in your provider's network participation documents, and in the determination notices.

**Preservice Medical Necessity Determinations**

When you or your representative request a required Medical Necessity determination prior to care, CG will notify you or your representative of the determination within 15 days after receiving the request. However, if more time is needed due to matters beyond CG's control, CG will notify you or your representative within 15 days after receiving your request. This notice will include the date a determination can be expected, which will be no more than 30 days after receipt of the request. If more time is needed because necessary information is missing from the request, the notice will also specify what information is needed, and you or your representative must provide the specified information to CG within 45 days after receiving the notice. The determination period will be suspended on the date CG sends such a notice of missing information, and the determination period will resume on the date you or your representative responds to the notice.

If the determination periods above would (a) seriously jeopardize your life or health, your ability to regain maximum function, or (b) in the opinion of a Physician with knowledge of your health condition, cause you severe pain which cannot be managed without the requested services, CG will make the preservice determination on an expedited basis. CG's Physician reviewer, in consultation with the treating Physician, will decide if an expedited appeal is necessary. CG will notify you or your representative of an expedited determination within 72 hours after receiving the request.

FDRL15

However, if necessary information is missing from the request, CG will notify you or your representative within 24 hours after receiving the request to specify what information is needed. You or your representative must provide the specified information to CG within 48 hours after receiving the notice. CG will notify you or your representative of the expedited benefit determination within 48 hours after you or your representative responds to the notice. Expedited determinations may be provided orally, followed within 3 days by written or electronic notification.

If you or your representative fails to follow CG's procedures for requesting a required preservice medical necessity determination, CG will notify you or your representative of the failure and describe the proper procedures for filing within 5 days (or 24 hours, if an expedited determination is required,



**CIGNA HealthCare**

as described above) after receiving the request. This notice may be provided orally, unless you or your representative requests written notification.

**Concurrent Medical Necessity Determinations**

When an ongoing course of treatment has been approved for you and you wish to extend the approval, you or your representative must request a required concurrent Medical Necessity determination at least 24 hours prior to the expiration of the approved period of time or number of treatments. When you or your representative requests such a determination, CG will notify you or your representative of the determination within 24 hours after receiving the request.

**Postservice Medical Necessity Determinations**

When you or your representative requests a Medical Necessity determination after services have been rendered, CG will notify you or your representative of the determination within 30 days after receiving the request. However, if more time is needed to make a determination due to matters beyond CG's control CG will notify you or your representative within 30 days after receiving the request. This notice will include the date a determination can be expected, which will be no more than 45 days after receipt of the request.

If more time is needed because necessary information is missing from the request, the notice will also specify what information is needed, and you or your representative must provide the specified information to CG within 45 days after receiving the notice. The determination period will be suspended on the date CG sends such a notice of missing information, and the determination period will resume on the date you or your representative responds to the notice.

FDRL42

**Postservice Claim Determinations**

When you or your representative requests payment for services which have been rendered, CG will notify you of the claim payment determination within 30 days after receiving the request. However, if more time is needed to make a determination due to matters beyond CG's control, CG will notify you or your representative within 30 days after receiving the request. This notice will include the date a determination can be expected, which will be no more than 45 days after receipt of the request. If more time is needed because necessary information is missing from the request, the notice will also specify what information is needed, and you or your representative must provide the specified information within 45 days after receiving the notice. The determination period will be suspended on the date CG sends such a notice of missing information, and resume on the date you or your representative responds to the notice.

**Notice of Adverse Determination**

Every notice of an adverse benefit determination will be provided in writing or electronically, and will include all of the following that pertain to the determination: (1) the specific reason or reasons for the adverse determination; (2) reference to the specific plan provisions on which the determination is based; (3) a description of any additional material or information necessary to perfect the claim and an explanation of why such material or information is necessary; (4) a description of the plan's review procedures and the time limits applicable, including a statement of a claimant's rights to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on appeal; (5) upon request and free of charge, a copy of any internal rule, guideline, protocol or other similar criterion that was relied upon in making the adverse determination regarding your claim, and an explanation of the scientific or clinical judgment for a determination that is based on a Medical Necessity, experimental treatment or other similar exclusion or limit; and (6) in the case of a claim involving urgent care, a description of the expedited review process applicable to such claim.

FDRL36

## When You Have a Complaint or an Appeal

For the purposes of this section, any reference to "you," "your," or "Member" also refers to a representative or provider designated by you to act on your behalf, unless otherwise noted.

"Physician Reviewers" are licensed Physicians depending on the care, service or treatment under review.

We want you to be completely satisfied with the care you receive. That is why we have established a process for addressing your concerns and solving your problems.

**Start With Member Services**

We are here to listen and help. If you have a concern regarding a person, a service, the quality of care, or contractual benefits, you may call the toll-free number on your Benefit Identification card; explanation of benefits, or claim form and explain your concern to one of our Member Services representatives. You may also express that concern in writing.

We will do our best to resolve the matter on your initial contact. If we need more time to review or investigate your concern, we will get back to you as soon as possible, but in any case within 30 days. If you are not satisfied with the results of a coverage decision, you may start the appeals procedure.

**Appeals Procedure**

CG has a two-step appeals procedure for coverage decisions. To initiate an appeal, you must submit a request for an appeal in writing to CG within 365 days of receipt of a denial notice. You should state the reason why you feel your appeal should be approved and include any information supporting your



**CIGNA HealthCare**

appeal. If you are unable or choose not to write, you may ask CG to register your appeal by telephone. Call or write us at the toll-free number on your Benefit Identification card, explanation of benefits, or claim form.

**Level-One Appeal**

Your appeal will be reviewed and the decision made by someone not involved in the initial decision. Appeals involving Medical Necessity or clinical appropriateness will be considered by a health care professional.

For level-one appeals, we will respond in writing with a decision within 15 calendar days after we receive an appeal for a required preservice or concurrent care coverage determination, and within 30 calendar days after we received an appeal for a postservice coverage determination. If more time or information is needed to make the determination, we will notify you in writing to request an extension of up to 15 calendar days and to specify any additional information needed to complete the review.

You may request that the appeal process be expedited if, (a) the time frames under this process would seriously jeopardize your life, health or ability to regain maximum functionality or in the opinion of your Physician would cause you severe pain which cannot be managed without the requested services; or (b) your appeal involves nonauthorization of an admission or continuing inpatient Hospital stay. CG's Physician reviewer, in consultation with the treating Physician, will decide if an expedited appeal is necessary. When an appeal is expedited, CG will respond orally with a decision within 72 hours, followed up in writing.

FDRL37

**Level-Two Appeal**

If you are dissatisfied with our level-one appeal decision, you may request a second review. To initiate a level-two appeal, follow the same process required for a level-one appeal.

Most requests for a second review will be conducted by the Committee, which consists of a minimum of three people. Anyone involved in the prior decision may not vote on the Committee. For appeals involving Medical Necessity or clinical appropriateness the Committee will consult with at least one Physician in the same or similar specialty as the care under consideration, as determined by CG's Physician reviewer. You may present your situation to the Committee in person or by conference call.

For level-two appeals we will acknowledge in writing that we have received your request and schedule a Committee review. For required preservice and concurrent care coverage determinations the Committee review will be completed within 15 calendar days and for post service claims, the Committee review will be completed within 30 calendar days. If more time or information is needed to make the

determination, we will notify you in writing to request an extension of up to 15 calendar days and to specify any additional information needed by the Committee to complete the review. You will be notified in writing of the Committee's decision within 5 business days after the Committee meeting, and within the Committee review time frames above if the Committee does not approve the requested coverage.

You may request that the appeal process be expedited if, (a) the time frames under this process would seriously jeopardize your life, health or ability to regain maximum functionality or in the opinion of your Physician, would cause you severe pain which cannot be managed without the requested services; or (b) your appeal involves nonauthorization of an admission or continuing inpatient Hospital stay. CG's Physician reviewer, in consultation with the treating Physician, will decide if an expedited appeal is necessary. When an appeal is expedited, CG will respond orally with a decision within 72 hours, followed up in writing.

**Independent Review Procedure**

If you are not fully satisfied with the decision of CG's level-two appeal review regarding your Medical Necessity or clinical appropriateness issue, you may request that your appeal be referred to an Independent Review Organization. The Independent Review Organization is composed of persons who are not employed by CIGNA HealthCare, or any of its affiliates. A decision to use the voluntary level of appeal will not affect the claimant's rights to any other benefits under the plan.

There is no charge for you to initiate this Independent Review Process. CG will abide by the decision of the Independent Review Organization.

In order to request a referral to an Independent Review Organization, the reason for the denial must be based on a Medical Necessity or clinical appropriateness determination by CG. Administrative, eligibility or benefit coverage limits or exclusions are not eligible for appeal under this process.

FDRL38

To request a review, you must notify the Appeals Coordinator within 180 days of your receipt of CG's level-two appeal review denial. CG will then forward the file to the Independent Review organization. The Independent Review Organization will render an opinion within 30 days. When requested and when a delay would be detrimental to your medical condition, as determined by CG's Physician reviewer, the review shall be completed within 3 days. The Independent Review Program is a voluntary program arranged by CG.

**Notice of Benefit Determination on Appeal**

Every notice of a determination on appeal will be provided in writing or electronically and, if an adverse determination, will include: (1) the specific reason or reasons for the adverse



**CIGNA HealthCare**

determination; (2) reference to the specific plan provisions on which the determination is based; (3) a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to and copies of all documents, records, and other Relevant Information as defined; (4) a statement describing any voluntary appeal procedures offered by the plan and the claimant's right to bring an action under ERISA section 502(a); (5) upon request and free of charge, a copy of any internal rule, guideline, protocol or other similar criterion that was relied upon in making the adverse determination regarding your appeal, and an explanation of the scientific or clinical judgment for a determination that is based on a Medical Necessity, experimental treatment or other similar exclusion or limit.

You also have the right to bring a civil action under Section 502(a) of ERISA if you are not satisfied with the decision on review. You or your plan may have other voluntary alternative dispute resolution options such as Mediation. One way to find out what may be available is to contact your local U.S. Department of Labor office and your State insurance regulatory agency. You may also contact the Plan Administrator.

**Relevant Information**
Relevant information is any document, record or other information which: (a) was relied upon in making the benefit determination; (b) was submitted, considered or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination; (c) demonstrates compliance with the administrative processes and safeguards required by federal law in making the benefit determination; or (d) constitutes a statement of policy or guidance with respect to the plan concerning the denied treatment option or benefit for the claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination.

**Legal Action**
If your plan is governed by ERISA, you have the right to bring a civil action under section 502(a) of ERISA if you are not satisfied with the outcome of the Appeals Procedure. In most instances, you may not initiate a legal action against CG until you have completed the Level-One and Level-Two appeal processes. If your appeal is expedited, there is no need to complete the Level-Two process prior to bringing legal action.

FDRL40

**Arbitration**
This provision does not apply to dental plans.

To the extent permitted by law, any controversy between CG

and the Group, or an insured (including any legal representative acting on behalf of a Member), arising out of or in connection with this Certificate may be submitted to arbitration upon written notice by one party to another. Such arbitration shall be governed by the provisions of the Commercial Arbitration Rules of the American Arbitration Association, to the extent that such provisions are not inconsistent with the provisions of this section.

If the parties cannot agree upon a single arbitrator within 30 days of the effective date of written notice of arbitration, each party shall choose one arbitrator within 15 working days after the expiration of such 30-day period and the two arbitrators so chosen shall choose a third arbitrator, who shall be an attorney duly licensed to practice law in the applicable state. If either party refuses or otherwise fails to choose an arbitrator within such 15-working-day-period, the arbitrator chosen shall choose a third arbitrator in accordance with these requirements.

The arbitration hearing shall be held within 30 days following appointment of the third arbitrator, unless otherwise agreed to by the parties. If either party refuses to or otherwise fails to participate in such arbitration hearing, such hearing shall proceed and shall be fully effective in accordance with this section, notwithstanding the absence of such party.

The arbitrator(s) shall render his (their) decision within 30 days after the termination of the arbitration hearing. To the extent permitted by law, the decision of the arbitrator, or the decision of any two arbitrators if there are three arbitrators, shall be binding upon both parties conclusive of the controversy in question, and enforceable in any court of competent jurisdiction.

No party to this Certificate shall have a right to cease performance of services or otherwise refuse to carry out its obligations under this Certificate pending the outcome of arbitration in accordance with this section, except as otherwise specifically provided under this Certificate.

FDRL41

## COBRA Continuation Rights Under Federal Law

**For You and Your Dependents**
**What is COBRA Continuation Coverage**
Under federal law, you and/or your Dependents must be given the opportunity to continue health insurance when there is a "qualifying event" that would result in loss of coverage under the Plan. You and/or your Dependents will be permitted to continue the same coverage under which you or your Dependents were covered on the day before the qualifying event occurred, unless you move out of that plan's coverage



**CIGNA HealthCare**

area or the plan is no longer available. You and/or your Dependents cannot change coverage options until the next open enrollment period.

**When is COBRA Continuation Available**

For you and your Dependents, COBRA continuation is available for up to 18 months from the date of the qualifying event if the event would result in a loss of coverage under the Plan termination for any reason, other than gross misconduct prior to 18 months from the date you retire.

For your Dependents, COBRA continuation coverage is available for up to 36 months from the date of the following qualifying events if the event would result in a loss of coverage under the Plan:

- your death;
- your divorce or legal separation; or
- for a Dependent child, failure to continue to qualify as a Dependent under the Plan.

**Who is Entitled to COBRA Continuation**

Only a "qualified beneficiary" (as defined by federal law) may elect to continue health insurance coverage. A qualified beneficiary may include the following individuals who were covered by the Plan on the day the qualifying event occurred: you, your spouse, and your Dependent children. Each qualified beneficiary has their own right to elect or decline COBRA continuation coverage even if you decline or are not eligible for COBRA continuation.

The following individuals are not qualified beneficiaries for purposes of COBRA continuation: domestic partners, same sex spouses, grandchildren (unless adopted by you), stepchildren (unless adopted by you). Although these individuals do not have an independent right to elect COBRA continuation coverage, if you elect COBRA continuation coverage for yourself, you may also cover your Dependents even if they are not considered qualified beneficiaries under COBRA. However, such individuals' coverage will terminate when your COBRA continuation coverage terminates. The sections below titled "Secondary Qualifying Events" and "Medicare Extension for Your Dependents" are not applicable to these individuals.

FDRL20 M

**Secondary Qualifying Events**

If, as a result of your termination of employment or reduction in work hours, your Dependent(s) have elected COBRA continuation coverage and one or more Dependents experience another COBRA qualifying event, the affected Dependent(s) may elect to extend their COBRA continuation coverage for an additional 18 months (7 months if the secondary event occurs within the disability extension period) for a maximum of 36 months from the initial qualifying event. The second

qualifying event must occur before the end of the initial 18 months of COBRA continuation coverage or within the disability extension period discussed below. Under no circumstances will COBRA continuation coverage be available for more than 36 months from the initial qualifying event. Secondary qualifying events are: your death; your divorce or legal separation; or, for a Dependent child, failure to continue to qualify as a Dependent under the Plan.

**Disability Extension**

If, after electing COBRA continuation coverage due to your termination of employment or reduction in work hours, you or one of your Dependents is determined by the Social Security Administration (SSA) to be totally disabled under title II or XVI of the SSA, you and all of your Dependents who have elected COBRA continuation coverage may extend such continuation for an additional 11 months, for a maximum of 29 months from the initial qualifying event.

To qualify for the disability extension, all of the following requirements must be satisfied:

1. SSA must determine that the disability occurred prior to or within 60 days after the disabled individual elected COBRA continuation coverage; and

2. A copy of the written SSA determination must be provided to the Plan Administrator within 60 calendar days after the date the SSA determination is made AND before the end of the initial 18-month continuation period.

If the SSA later determines that the individual is no longer disabled, you must notify the Plan Administrator within 30 days after the date the final determination is made by SSA. The 11-month disability extension will terminate for all covered persons on the first day of the month that is more than 30 days after the date the SSA makes a final determination that the disabled individual is no longer disabled.

All causes for "Termination of COBRA Continuation" listed below will also apply to the period of disability extension.

FDRL21 M

**Termination of COBRA Continuation**

COBRA continuation coverage will be terminated upon the occurrence of any of the following:

- The balance of 18 months from the date you retire;
- upon cancellation of the retiree plan, the balance of 18 months from the date you retire if your former Employer provides coverage for Active Employees;
- the end of the COBRA continuation period of 29 or 36 months from the date you retire, as applicable;
- failure to pay the required premium within 30 calendar days after the due date;
- cancellation of the Employer's policy with CIGNA;



**CIGNA HealthCare**

- after electing COBRA continuation coverage, a qualified beneficiary enrolls in Medicare (Part A, Part B, or both);

- after electing COBRA continuation coverage, a qualified beneficiary becomes covered under another group health plan, unless the qualified beneficiary has a condition for which the new plan limits or excludes coverage under a pre-existing condition provision. In such case coverage will continue until the earliest of: (a) the end of the applicable maximum period; (b) the date the pre-existing condition provision is no longer applicable; or (c) the occurrence of an event described in one of the first three bullets above; or

- any reason the Plan would terminate coverage of a participant or beneficiary who is not receiving continuation coverage (e.g., fraud).

FDRL22 M

**Employer's Notification Requirements**

Your former Employer is required to provide you and/or your Dependents with the following notices:

- An initial notification of COBRA continuation rights must be provided within 90 days after your (or your spouse's) coverage under the Plan begins (or the Plan first becomes subject to COBRA continuation requirements, if later). If you and/or your Dependents experience a qualifying event before the end of that 90-day period, the initial notice must be provided within the time frame required for the COBRA continuation coverage election notice as explained below.

- A COBRA continuation coverage election notice must be provided to you and/or your Dependents within the following timeframes:

    (a) if the Plan provides that COBRA continuation coverage and the period within which an Employer must notify the Plan Administrator of a qualifying event starts upon the loss of coverage, 44 days after loss of coverage under the Plan;

    (b) if the Plan provides that COBRA continuation coverage and the period within which an Employer must notify the Plan Administrator of a qualifying event starts upon the occurrence of a qualifying event, 44 days after the qualifying event occurs; or

    (c) in the case of a multi-employer plan, no later than 14 days after the end of the period in which Employers must provide notice of a qualifying event to the Plan Administrator.

**How to Elect COBRA Continuation Coverage**

The COBRA coverage election notice will list the individuals who are eligible for COBRA continuation coverage and inform you of the applicable premium. The notice will also include instructions for electing COBRA continuation coverage. You must notify the Plan Administrator of your election no later than the due date stated on the COBRA election notice. If a written election notice is required, it must be post-marked no later than the due date stated on the COBRA election notice. If you do not make proper notification by the due date shown on the notice, you and your Dependents will lose the right to elect COBRA continuation coverage. If you reject COBRA continuation coverage before the due date, you may change your mind as long as you furnish a completed election form before the due date.

Each qualified beneficiary has an independent right to elect COBRA continuation coverage. Continuation coverage may be elected for only one, several, or for all Dependents who are qualified beneficiaries. Parents may elect to continue coverage on behalf of their Dependent children. You or your spouse may elect continuation coverage on behalf of all the qualified beneficiaries. You are not required to elect COBRA continuation coverage in order for your Dependents to elect COBRA continuation.

FDRL23 M

**How Much Does COBRA Continuation Coverage Cost**

Each qualified beneficiary may be required to pay the entire cost of continuation coverage. The amount may not exceed 102% of the cost to the group health plan (including both Employer and Employee contributions) for coverage of a similarly situated active Employee or family member. The premium during the 11-month disability extension may not exceed 150% of the cost to the group health plan (including both employer and employee contributions) for coverage of a similarly situated active Employee or family member. For example:

- If the retiree alone elects COBRA continuation coverage, the retiree will be charged 102% (or 150%) of the active Employee premium.

- If the spouse or one Dependent child alone elects COBRA continuation coverage, they will be charged 102% (or 150%) of the active Employee premium.

- If more than one qualified beneficiary elects COBRA continuation coverage, they will be charged 102% (or 150%) of the applicable family premium.

**When and How to Pay COBRA Premiums**

*First payment for COBRA continuation*

If you elect COBRA continuation coverage, you do not have to send any payment with the election form. However, you must make your first payment no later than 45 calendar days after the date of your election. (This is the date the Election Notice is postmarked, if mailed.) If you do not make your first payment within that 45 days, you will lose all COBRA



**CIGNA HealthCare**

continuation rights under the Plan.

*Subsequent payments*

After you make your first payment for COBRA continuation coverage, you will be required to make subsequent payments of the required premium for each additional month of coverage. Payment is due on the first day of each month. If you make a payment on or before its due date, your coverage under the Plan will continue for that coverage period without any break.

*Grace periods for subsequent payments*

Although subsequent payments are due by the first day of the month, you will be given a grace period of 30 days after the first day of the coverage period to make each monthly payment. Your COBRA continuation coverage will be provided for each coverage period as long as payment for that coverage period is made before the end of the grace period for that payment. However, if your payment is received after the due date, your coverage under the Plan may be suspended during this time. Any providers who contact the Plan to confirm coverage during this time may be informed that coverage has been suspended. If payment is received before the end of the grace period, your coverage will be reinstated back to the beginning of the coverage period. This means that any claim you submit for benefits while your coverage is suspended may be denied and may have to be resubmitted once your coverage is reinstated. If you fail to make a payment before the end of the grace period for that coverage period, you will lose all rights to COBRA continuation coverage under the Plan.

FDRL24 M

**You Must Give Notice of Certain Qualifying Events**

If you or your Dependent(s) experience one of the following qualifying events, you must notify the Plan Administrator within 60 calendar days after the later of the date the qualifying event occurs or the date coverage would cease as a result of the qualifying event:

- Your divorce or legal separation;
- Your child ceases to qualify as a Dependent under the Plan; or
- The occurrence of a secondary qualifying event as discussed under "Secondary Qualifying Events" above (this notice must be received prior to the end of the initial 18- or 29-month COBRA period).

(Also refer to the section titled "Disability Extension" for additional notice requirements.)

Notice must be made in writing and must include: the name of the Plan, name and address of the Employee covered under the Plan, name and address(es) of the qualified beneficiaries affected by the qualifying event; the qualifying event; the date

the qualifying event occurred; and supporting documentation (e.g., divorce decree, birth certificate, disability determination, etc.).

**Newly Acquired Dependents**

If you acquire a new Dependent through marriage, birth, adoption or placement for adoption while your coverage is being continued, you may cover such Dependent under your COBRA continuation coverage. However, only your newborn or adopted Dependent child is a qualified beneficiary and may continue COBRA continuation coverage for the remainder of the coverage period following your early termination of COBRA coverage or due to a secondary qualifying event. COBRA coverage for your Dependent spouse and any Dependent children who are not your children (e.g., stepchildren or grandchildren) will cease on the date your COBRA coverage ceases and they are not eligible for a secondary qualifying event.

**COBRA Continuation for Retirees Following Employer's Bankruptcy**

If you are covered as a retiree, and a proceeding in bankruptcy is filed with respect to the Employer under Title 11 of the United States Code, you may be entitled to COBRA continuation coverage. If the bankruptcy results in a loss of coverage for you, your Dependents or your surviving spouse within one year before or after such proceeding, you and your covered Dependents will become COBRA qualified beneficiaries with respect to the bankruptcy. You will be entitled to COBRA continuation coverage until your death. Your surviving spouse and covered Dependent children will be entitled to COBRA continuation coverage for up to 36 months following your death. However, COBRA continuation coverage will cease upon the occurrence of any of the events listed under "Termination of COBRA Continuation" above.

FDRL25

**Trade Act of 2002**

The Trade Act of 2002 created a new tax credit for certain individuals who become eligible for trade adjustment assistance and for certain retired Employees who are receiving pension payments from the Pension Benefit Guaranty Corporation (PBGC) (eligible individuals). Under the new tax provisions, eligible individuals can either take a tax credit or get advance payment of 65% of premiums paid for qualified health insurance, including continuation coverage. If you have questions about these new tax provisions, you may call the Health Coverage Tax Credit Customer Contact Center toll-free at 1-866-628-4282. TDD/TYY callers may call toll-free at 1-866-626-4282. More information about the Trade Act is also available at www.doleta.gov/tradeact/2002act_index.asp.

In addition, if you initially declined COBRA continuation



**CIGNA HealthCare**

coverage and, within 60 days after your loss of coverage under the Plan, you are deemed eligible by the U.S. Department of Labor or a state labor agency for trade adjustment assistance (TAA) benefits and the tax credit, you may be eligible for a special 60 day COBRA election period. The special election period begins on the first day of the month that you become TAA-eligible. If you elect COBRA coverage during this special election period, COBRA coverage will be effective on the first day of the special election period and will continue for 18 months, unless you experience one of the events discussed under "Termination of COBRA Continuation" above. Coverage will not be retroactive to the initial loss of coverage. If you receive a determination that you are TAA-eligible, you must notify the Plan Administrator immediately.

**Interaction With Other Continuation Benefits**
You may be eligible for other continuation benefits under state law. Refer to the Termination section for any other continuation benefits.

FDRL26

## ERISA Required Information
The name of the Plan is:

    Eagle-Picher Medical Plan

The name, address, ZIP code and business telephone number of the sponsor of the Plan is:

    Eagle-Picher Industries, Inc
    3402 E University Drive
    Phoenix, AZ 85034
    (602)923-7200

| Employer Identification Number (EIN) | Plan Number |
|---|---|
| 204511764 | 580 |

The name, address, ZIP code and business telephone number of the Plan Administrator is:

    Employer named above

The name, address and ZIP code of the person designated as agent for the service of legal process is:

    Employer named above

The office designated to consider the appeal of denied claims is:

    The CG Claim Office responsible for this Plan

The cost of the Plan is shared by Employee and Employer.

The Plan's fiscal year ends on 08/31

The preceding pages set forth the eligibility requirements and benefits provided for you under this Plan.

**Plan Trustees**
A list of any Trustees of the Plan, which includes name, title and address, is available upon request to the Plan Administrator.

**Plan Type**
The plan is a healthcare benefit plan.

**Collective Bargaining Agreements**
You may contact the Plan Administrator to determine whether the Plan is maintained pursuant to one or more collective bargaining agreements and if a particular Employer is a sponsor. A copy is available for examination from the Plan Administrator upon written request.

FDRL27

**Plan Modification, Amendment and Termination**
The Employer as Plan Sponsor reserves the right to, at any time, change or terminate benefits under the Plan, to change or terminate the eligibility of classes of employees to be covered by the Plan, to amend or eliminate any other plan term or condition, and to terminate the whole plan or any part of it. The procedure by which benefits may be changed or terminated, by the which the eligibility of classes of employees may be changed or terminated, or by which part of all of the Plan may be terminated, is contained in the Employer's Plan Document, which is available for inspection and copying from the Plan Administrator designated by the Employer. No consent of any participant is required to terminate, modify, amend or change the Plan.

Termination of the Plan together with termination of the insurance policy(s) which funds the Plan benefits will have no adverse effect on any benefits to be paid under the policy(s) for any covered medical expenses incurred prior to the date that policy(s) terminates. Likewise, any extension of benefits under the policy(s) due to you or your Dependent's total disability which began prior to and has continued beyond the date the policy(s) terminates will not be affected by the Plan termination. Rights to purchase limited amounts of life and medical insurance to replace part of the benefits lost because the policy(s) terminated may arise under the terms of the policy(s). A subsequent Plan termination will not affect the extension of benefits and rights under the policy(s).

Your coverage under the Plan's insurance policy(s) will end on the earliest of the following dates:

- the date you leave Active Service;
- the date you are no longer in an eligible class;
- if the Plan is contributory, the date you cease to contribute;
- the date the policy(s) terminates.

See your Plan Administrator to determine if any extension of benefits or rights are available to you or your Dependents


**CIGNA HealthCare**

under this policy(s). No extension of benefits or rights will be available solely because the Plan terminates.

**Statement of Rights**

As a participant in the plan you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all plan participants shall be entitled to:

FDRL28

**Receive Information About Your Plan and Benefits**

- examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites and union halls, all documents governing the plan, including insurance contracts and collective bargaining agreements and copy of the latest annual report (Form 5500 Series) filed by the plan with the U.S. Department of Labor and available at the Public Disclosure room of the Employee Benefits Security Administration.

- obtain, upon written request to the Plan Administrator, copies of documents governing the Plan, including insurance contracts and collective bargaining agreements, and a copy of the latest annual report (Form 5500 Series) and updated summary plan description. The administrator may make a reasonable charge for the copies.

- receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each person under the Plan with a copy of this summary financial report.

**Continue Group Health Plan Coverage**

- continue health care coverage for yourself, your spouse or Dependents if there is a loss of coverage under the Plan as a result of a qualifying event. You or your Dependents may have to pay for such coverage. Review this summary plan description and the documents governing the Plan on the rules governing your federal continuation coverage rights.

- reduction or elimination of exclusionary periods of coverage for preexisting conditions under your group health plan, if you have creditable coverage from another plan. You should be provided a certificate of creditable coverage, free of charge, from your group health plan or health insurance issuer when you lose coverage under the plan, when you become entitled to elect federal continuation coverage, when your federal continuation coverage ceases, if you request it before losing coverage, or if you request it up to 24 months after losing coverage. Without evidence of creditable coverage, you may be subject to a preexisting condition exclusion for 12 months (18 months for late enrollees) after your enrollment date in your coverage.

**Prudent Actions by Plan Fiduciaries**

In addition to creating rights for plan participants, ERISA

imposes duties upon the people responsible for the operation of the employee benefit plan. The people who operate your plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer, your union, or any other person may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA. If you claim for a welfare benefit is denied or ignored you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

FDRL29

**Enforce Your Rights**

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of plan documents or the latest annual report from the plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the plan administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court.

In addition, If you disagree with the plan's decision or lack thereof concerning the qualified status of a domestic relations order or a medical child support order, you may file suit in federal court. If it should happen that plan fiduciaries misuse the plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example if it finds your claim is frivolous.

FDRL30

# Definitions

**Basic Benefits**

The term Basic Benefits means all Medical Expense Insurance provided under the policy except Major Medical Benefits

DFS3



**CIGNA HealthCare**

**Bed and Board**

The term Bed and Board includes all charges made by a Hospital on its own behalf for room and meals and for all general services and activities needed for the care of registered bed patients.

DFS14

**Custodial Services**

Any services that are of a sheltering, protective, or safeguarding nature. Such services may include a stay in an institutional setting, at-home care, or nursing services to care for someone because of age or mental or physical condition. This service primarily helps the person in daily living. Custodial care also can provide medical services, given mainly to maintain the person's current state of health. These services cannot be intended to greatly improve a medical condition; they are intended to provide care while the patient cannot care for himself or herself. Custodial Services include but are not limited to:

- Services related to watching or protecting a person;
- Services related to performing or assisting a person in performing any activities of daily living, such as: (a) walking, (b) grooming, (c) bathing, (d) dressing, (e) getting in or out of bed, (f) toileting, (g) eating, (h) preparing foods, or (i) taking medications that can be self administered, and
- Services not required to be performed by trained or skilled medical or paramedical personnel.

DFS1812

**Dependent**

Dependents are:

- your lawful spouse; and
- any unmarried child of yours who is
  - less than 19 years old;
  - 19 years but less than 23 years old, enrolled in school as a full-time student and primarily supported by you;
  - 19 or more years old and primarily supported by you and incapable of self-sustaining employment by reason of mental or physical handicap. Proof of the child's condition and dependence must be submitted to CG within 31 days after the date the child ceases to qualify above. During the next two years CG may, from time to time, require proof of the continuation of such condition and dependence. After that, CG may require proof no more than once a year.

A child includes a legally adopted child. It also includes a stepchild who lives with you and a child for whom you are the legal guardian.

Benefits for a Dependent child or student will continue until the last day before your Dependent's birthday, in the year in which the limiting age is reached.

Anyone who is eligible as an Employee will not be considered as a Dependent.

No one may be considered as a Dependent of more than one Employee.

DFS97M

**Emergency Services**

Emergency services are medical, psychiatric, surgical, Hospital and related health care services and testing, including ambulance service, which are required to treat a sudden, unexpected onset of a bodily Injury or serious Sickness which could reasonably be expected by a prudent layperson to result in serious medical complications, loss of life or permanent impairment to bodily functions in the absence of immediate medical attention. Examples of emergency situations include uncontrolled bleeding, seizures or loss of consciousness, shortness of breath, chest pains or severe squeezing sensations in the chest, suspected overdose of medication or poisoning, sudden paralysis or slurred speech, burns, cuts and broken bones. The symptoms that led you to believe you needed emergency care, as coded by the provider and recorded by the Hospital on the UB92 claim form, or its successor, or the final diagnosis, whichever reasonably indicated an emergency medical condition, will be the basis for the determination of coverage, provided such symptoms reasonably indicate an emergency.

DFS1533



CIGNA HealthCare

**Employee**

The term Employee means a retired employee.

DFS1427 M

**Employer**

The term Employer means the plan sponsor self-insuring the benefits described in this booklet, on whose behalf CG is providing claim administration services.

DFS1595

**Expense Incurred**

An expense is incurred when the service or the supply for which it is incurred is provided.

DFS60

**Free-Standing Surgical Facility**

The term Free-standing Surgical Facility means an institution which meets all of the following requirements:

- it has a medical staff of Physicians, Nurses and licensed anesthesiologists;
- it maintains at least two operating rooms and one recovery room;
- it maintains diagnostic laboratory and x-ray facilities;
- it has equipment for emergency care;
- it has a blood supply;
- it maintains medical records;
- it has agreements with Hospitals for immediate acceptance of patients who need Hospital Confinement on an inpatient basis; and
- it is licensed in accordance with the laws of the appropriate legally authorized agency.

DFS682

**Hospice Care Program**

The term Hospice Care Program means:

- a coordinated, interdisciplinary program to meet the physical, psychological, spiritual and social needs of dying persons and their families;

- a program that provides palliative and supportive medical, nursing and other health services through home or inpatient care during the illness;
- a program for persons who have a Terminal Illness and for the families of those persons.

DFS70

**Hospice Care Services**

The term Hospice Care Services means any services provided by: (a) a Hospital, (b) a Skilled Nursing Facility or a similar institution, (c) a Home Health Care Agency, (d) a Hospice Facility, or (e) any other licensed facility or agency under a Hospice Care Program.

DFS599

**Hospice Facility**

The term Hospice Facility means an institution or part of it which:

- primarily provides care for Terminally Ill patients;
- is accredited by the National Hospice Organization;
- meets standards established by CG; and
- fulfills any licensing requirements of the state or locality in which it operates.

DFS72

**Hospital**

The term Hospital means:

- an institution licensed as a hospital, which: (a) maintains, on the premises, all facilities necessary for medical and surgical treatment; (b) provides such treatment on an inpatient basis, for compensation, under the supervision of Physicians; and (c) provides 24-hour service by Registered Graduate Nurses;
- an institution which qualifies as a hospital, a psychiatric hospital or a tuberculosis hospital, and a provider of services under Medicare, if such institution is accredited as a hospital by the Joint Commission on the Accreditation of Healthcare Organizations; or
- an institution which: (a) specializes in treatment of Mental Health and Substance Abuse or other related illness; (b) provides residential treatment programs; and (c) is licensed in accordance with the laws of the appropriate legally authorized agency.

The term Hospital will not include an institution which is primarily a place for rest, a place for the aged, or a nursing home.

DFS1693



**CIGNA HealthCare**

**Hospital Confinement or Confined in a Hospital**

A person will be considered Confined in a Hospital if he is:

- a registered bed patient in a Hospital upon the recommendation of a Physician;
- receiving treatment for Mental Health and Substance Abuse Services in a Partial Hospitalization program;
- receiving treatment for Mental Health and Substance Abuse Services in a Mental Health or Substance Abuse Residential Treatment Center.

DFS1815

**Injury**

The term Injury means an accidental bodily injury.

DFS147

**Maximum Reimbursable Charge**

The Maximum Reimbursable Charge is the lesser of:

1. the provider's normal charge for a similar service or supply; or
2. the policyholder-selected percentile of all charges made by providers of such service or supply in the geographic area where it is received.

To determine if a charge exceeds the Maximum Reimbursable Charge, the nature and severity of the Injury or Sickness may be considered.

CG uses the Ingenix Prevailing Health Care System database to determine the charges made by providers in an area. The database is updated semiannually.

The percentile used to determine the Maximum Reimbursable Charge is listed in The Schedule.

Additional information about the Maximum Reimbursable Charge is available upon request.

GM6000 DFS1814V1 (DEN)

**Medicaid**

The term Medicaid means a state program of medical aid for needy persons established under Title XIX of the Social Security Act of 1965 as amended.

DFS192

**Medically Necessary/Medical Necessity**

Medically Necessary Covered Services and Supplies are those determined by the Medical Director to be:

- required to diagnose or treat an illness, injury, disease or its symptoms;
- in accordance with generally accepted standards of medical practice;
- clinically appropriate in terms of type, frequency, extent, site and duration;
- not primarily for the convenience of the patient, Physician or other health care provider; and
- rendered in the least intensive setting that is appropriate for the delivery of the services and supplies. Where applicable, the Medical Director may compare the cost-effectiveness of alternative services, settings or supplies when determining least intensive setting.

DFS1813

**Medicare**

The term Medicare means the program of medical care benefits provided under Title XVIII of the Social Security Act of 1965 as amended.

DFS149

**Necessary Services and Supplies**

The term Necessary Services and Supplies includes:

- any charges, except charges for Bed and Board, made by a Hospital on its own behalf for medical services and supplies actually used during Hospital Confinement;
- any charges, by whomever made, for licensed ambulance service to or from the nearest Hospital where the needed medical care and treatment can be provided; and
- any charges, by whomever made, for the administration of anesthetics during Hospital Confinement.

The term Necessary Services and Supplies will not include any charges for special nursing fees, dental fees or medical fees.

DFS151

**Nurse**

The term Nurse means a Registered Graduate Nurse, a Licensed Practical Nurse or a Licensed Vocational Nurse who has the right to use the abbreviation "R.N.," "L.P.N." or "L.V.N."

DFS155

**Other Health Care Facility**

The term Other Health Care Facility means a facility other

43


**CIGNA HealthCare**

than a Hospital or hospice facility. Examples of Other Health Care Facilities include, but are not limited to, licensed skilled nursing facilities, rehabilitation Hospitals and subacute facilities.

DFS1686

### Other Health Professional

The term Other Health Professional means an individual other than a Physician who is licensed or otherwise authorized under the applicable state law to deliver medical services and supplies. Other Health Professionals include, but are not limited to physical therapists, registered nurses and licensed practical nurses.

DFS1685

### Participating Pharmacy

The term Participating Pharmacy means a retail pharmacy with which Connecticut General Life Insurance Company has contracted to provide prescription services to insureds.

DFS1937

### Pharmacy

The term Pharmacy means a retail pharmacy.

DFS1934

### Physician

The term Physician means a licensed medical practitioner who is practicing within the scope of his license and who is licensed to prescribe and administer drugs or to perform surgery. It will also include any other licensed medical practitioner whose services are required to be covered by law in the locality where the policy is issued if he is:

- operating within the scope of his license; and
- performing a service for which benefits are provided under this plan when performed by a Physician.

DFS164

### Prescription Drug

Prescription Drug means; (a) a drug which has been approved by the Food and Drug Administration for safety and efficacy; (b) certain drugs approved under the Drug Efficacy Study Implementation review; or (c) drugs marketed prior to 1938 and not subject to review, and which can, under federal or state law, be dispensed only pursuant to a Prescription Order.

DFS1708

### Prescription Order

Prescription Order means the lawful authorization for a Prescription Drug or Related Supply by a Physician who is duly licensed to make such authorization within the course of such Physician's professional practice or each authorized refill thereof.

DFS1711

### Psychologist

The term Psychologist means a person who is licensed or certified as a clinical psychologist. Where no licensure or certification exists, the term Psychologist means a person who is considered qualified as a clinical psychologist by a recognized psychological association. It will also include any other licensed counseling practitioner whose services are required to be covered by law in the locality where the policy is issued if he is:

- operating within the scope of his license; and
- performing a service for which benefits are provided under this plan when performed by a Psychologist.

DFS170

### Related Supplies

Related Supplies means diabetic supplies (insulin needles and syringes, lancets and glucose test strips), needles and syringes for injectables covered under the pharmacy plan, and spacers for use with oral inhalers.

DFS1710

### Review Organization

The term Review Organization refers to an affiliate of CG or another entity to which CG has delegated responsibility for performing utilization review services. The Review Organization is an organization with a staff of clinicians which may include Physicians, Registered Graduate Nurses, licensed mental health and substance abuse professionals, and other trained staff members who perform utilization review services.

DFS1688

### Sickness – For Medical Insurance

The term Sickness means a physical or mental illness. It also includes pregnancy. Expenses incurred for routine Hospital and pediatric care of a newborn child prior to discharge from the Hospital nursery will be considered to be incurred as a



**CIGNA HealthCare**

result of Sickness.

DFS531

**Skilled Nursing Facility**

The term Skilled Nursing Facility means a licensed institution (other than a Hospital, as defined) which specializes in:

- physical rehabilitation on an inpatient basis; or
- skilled nursing and medical care on an inpatient basis;

but only if that institution: (a) maintains on the premises all facilities necessary for medical treatment; (b) provides such treatment, for compensation, under the supervision of Physicians; and (c) provides Nurses' services.

DFS193

**Terminal Illness**

A Terminal Illness will be considered to exist if a person becomes terminally ill with a prognosis of six months or less to live, as diagnosed by a Physician.

DFS197

**Urgent Care**

Urgent Care is medical, surgical, Hospital or related health care services and testing which are not Emergency Services, but which are determined by CG, in accordance with generally accepted medical standards, to have been necessary to treat a condition requiring prompt medical attention. This does not include care that could have been foreseen before leaving the immediate area where you ordinarily receive and/or were scheduled to receive services. Such care includes, but is not limited to, dialysis, scheduled medical treatments or therapy, or care received after a Physician's recommendation that the insured should not travel due to any medical condition.

DFS1534

*This is a summary of benefits for your Base/Major Medical Indemnity plan. CIGNA Pharmacy plan deductibles, out-of-pocket maximums, copays and annual maximums do not integrate with the employer medical program.*

## CIGNA HealthCare Benefit Summary
## Eagle-Picher BASE - Wolverine Hrly - Closed Retiree Plan
## Base Medical Indemnity Plan

| BENEFIT HIGHLIGHTS | BASIC | MAJOR MEDICAL |
|---|---|---|
| *Lifetime Maximum* | Unlimited | No Coverage |
| *Coordination of Benefit Administration* | Full Standard COB; with Birthday Rule | |
| *Coinsurance Levels* | 100% of Reasonable and Customary | No Coverage |
| *Calendar Year Deductible*<br>  *Individual*<br>  *Family Maximum*<br>  *Aggregate* | Not Applicable | No Coverage |
| *Annual Out-of-Pocket Maximum*<br>  *Includes Deductible*<br>  *Individual*<br>  *Family Maximum*<br>  *Aggregate*<br>  *Does not apply to:*<br><br>Benefits for accident or sickness (excludes mental health, alcohol and drug abuse benefits) are paid at 100% of charges once an individual's out-of-pocket has been reached. | Not Applicable | No Coverage |
| *Physician's Services*<br>  *Primary Care Physician's Office visit*<br>  *Specialty Care Physician's Office Visit*<br>    *Office Visits*<br>      *Consultant and Referral Physician's Services*<br>  *Surgery Performed In the Physician's Office*<br>  *Allergy Treatment/Injections* | Not Applicable | No Coverage<br><br><br><br><br><br>No Coverage |
| *Preventive Care*<br>  *Routine Preventive Care for children through age 2 (including immunization)*<br>    *Immunizations:* | Not Applicable | No Coverage |
| *Routine Mammograms, PSA, Pap Smear* | Not Applicable | No Coverage |
| *Second Opinions*<br>*(Services will be provided on a voluntary basis)* | Not Applicable | No Coverage |



| BENEFIT HIGHLIGHTS | BASIC | MAJOR MEDICAL |
|---|---|---|
| **Outpatient Pre-Admission Testing** | | |
| *Primary Care Physician's Office Visit* | 100% | No Coverage |
| *Specialist Physician's Office Visit* | 100% | No Coverage |
| *Outpatient Facility* | 100% | No Coverage |
| **Inpatient Hospital - Facility Services** | 365 days maximum per calendar year | |
| *Semi-Private/PrivateRoom* | 100% | No Coverage |
| *Intensive Care Unit* | 100% | No Coverage |
| *Necessary Services and Supplies (Hospital Extras Maximum)* | Unlimited (coverage moves to Major Medical expense when room & board coverage moves to Major Medical) | No Coverage |
| **Outpatient Facility Services** | 100% | No Coverage |
| *Operating Room, Recovery Room, Procedure Room and Treatment Room* | | |
| **Inpatient Hospital Physician's Visits/Consultations** | 100% up to 365 days per year | No Coverage |
| **Inpatient Hospital Professional Services** | 100% | No Coverage |
| *Surgeon* | | |
| *Radiologist* | | |
| *Pathologist* | | |
| *Anesthesiologist* | | |
| **Multiple Surgical Reduction** | Multiple surgeries performed during one operating session result in payment reduction of 50% of charges to the surgery of lesser charge. The most expensive procedure is paid as any other surgery. | |
| **Outpatient Professional Services** | 100% | No Coverage |
| *Surgeon* | | |
| *Radiologist* | | |
| *Pathologist* | | |
| *Anesthesiologist* | | |
| **Emergency and Urgent Care Services** | | |
| *Physician's Office* | 100% | No Coverage |
| *Hospital Emergency Room* | 100% | No Coverage |
| *Urgent Care Facility or Outpatient Facility* | 100% | No Coverage |
| *Ambulance* | Not Applicable | No Coverage |
| **Inpatient Services at Other Health Care Facilities** | 100% up to 365 days per year | No Coverage |
| *Includes Skilled Nursing Facility, Rehabilitation Hospital and Sub-Acute Facilities* | | |
| *Unlimited days maximum per calendar year* | | |
| **Laboratory and Radiology Services** | 100% | No Coverage |
| *MRIs, CAT Scans and PET Scans* | | No Coverage |
| *Other Laboratory and Radiology Services (All charges billed by independent facility)* | | |
| *Diagnostic Lab & X-ray combined calendar year maximum* | Unlimited | Not Applicable |



| BENEFIT HIGHLIGHTS | BASIC | MAJOR MEDICAL |
|---|---|---|
| *Outpatient Short-Term Rehabilitative Therapy and Chiropractic Services* | | |
| Unlimited maximum per calendar year --Includes: | 100% | No Coverage |
|    Cardiac Rehab, Physical Therapy, | | |
|    Speech Therapy | 100% | No Coverage |
|    Occupational Therapy | | |
|    Chiropractic Therapy (includes Chiropractors) | | |
| *Radiation Therapy, Chemotherapy* | 100% | Not applicable |
| *Home Health Care* | 100% | Not applicable |
| | Unlimited maximum per calendar year | |
| *Hospice* | | |
|    Inpatient Services | 100% | No Coverage |
|    Outpatient Services | 100% | No Coverage |
| *Bereavement Counseling* | Not Applicable | No Coverage |
| *Maternity Care Services* | | |
|    *Initial Visit to Confirm Pregnancy* | Not Applicable | No Coverage |
|    *All Subsequent Prenatal Visits, Postnatal Visits, and Delivery* | 100% | No Coverage |
|    *Delivery (Inpatient Hospital, Birthing Center)* | 100% | No Coverage |
| *Abortion* | Not Applicable | No Coverage |
| Elective and non-elective procedures | | |
| *Family Planning Services* | | |
|    *Office Visits (tests, counseling)* | Not Applicable | No Coverage |
|    *Surgical Sterilization* Procedure | | |
|       for Vasectomy/Tubal Ligation (excludes reversals) | | |
| *Infertility Treatment* | Not Applicable | No Coverage |
| Services No Coverage include: | | |
| • Testing performed specifically to determine the cause of infertility. | | |
| • Treatment and/or procedures performed specifically to restore fertility (e.g. procedures to correct an infertility condition). | | |
| • Artificial means of becoming pregnant are (e.g. Artificial Insemination, In-vitro, GIFT, ZIFT, etc). | | |
| Note:  Coverage will be provided for the treatment of an underlying medical condition up to the point an infertility condition is diagnosed.  Services will be covered as any other illness. | | |
| *Organ Transplant* | | |
| Includes all medically appropriate, non-experimental transplants | | |
|    *Office Visit* | Not Applicable | No Coverage |
|    *Inpatient Facility* | 100% | No Coverage |
|    *Physician's Services* | 100% | No Coverage |



CIGNA HealthCare

| BENEFIT HIGHLIGHTS | BASIC | MAJOR MEDICAL |
|---|---|---|
| *Durable Medical Equipment* <br> Unlimited maximum per calendar year | Not Applicable | No Coverage |
| *External Prosthetic Appliances* <br> Unlimited maximum per calendar year | Not Applicable | No Coverage |
| *Miscellaneous Medical Covered Items:* <br> Injections, orthotics, Allergy care(injections & extract), <br> Contact lenses after cataract surg.,IV therapy, <br> Pulmonary Function Test, Special Eye Test, | Not Applicable | No Coverage |
| *RN & LPN services-Outpt* | 75% | No Coverage |
| *Medical Records Reimbursement* | 100% | No Coverage |
| *Dental Care* <br> *Limited to charges made for a continuous course of* <br> *dental treatment started within six months of an injury* <br> *to sound, natural teeth.* | Not Applicable | No Coverage |
| *TMJ - Non-surgical (excludes appliances and* <br> *orthodontic treatment)* | Not Applicable | No Coverage |
| *Routine Foot Disorders* | Not Applicable | No Coverage |
| *Mental Health and Substance Abuse* | | No Coverage |
| Inpatient (MH & SA Combined) <br> *Up to 20 days per calendar year; Up to 40 days* <br> *per lifetime* | 100% up to 365 days per year; | |
| Outpatient | Not applicable | |
| *Outpatient Group Therapy (Two group therapy* <br> *sessions equal one individual therapy session)* | Not applicable | |

| BENEFIT HIGHLIGHTS | BASIC | MAJOR MEDICAL |
|---|---|---|
| *Pre-existing Condition Limitation (PCL)* | Does not Apply | |
| *Pre-Admission Certification - Continued Stay Review.* | Does not Apply | |
| *Case Management* | Does not Apply | |

| BENEFIT HIGHLIGHTS | IN-NETWORK | OUT-OF-NETWORK |
|---|---|---|
| *Prescription Drugs* <br> *CIGNA Pharmacy Retail Drug Program* <br> *DAW-Generic Requirement, Open Formulary Plan* <br><br> *Includes prescription vitamins; oral contraceptives and* <br> *contraceptive devices* | $2 per 30-day supply for <br> prescription drugs | In-network coverage only |
| *CIGNA Tel-Drug Mail Order Drug Program* | Not Applicable | Not Applicable |

**Benefit Exclusions** (*by way of example but not limited to*):

Your plan provides coverage for medically necessary services. Your plan does not provide coverage for the following except as required by law:

1. Services that are not medically necessary;
2. Charges which the person is not legally required to pay;
3. Charges made by a hospital owned by or performing services for the U.S. government if the charges are directly related to a sickness or injury connected to military service;
4. Custodial services not intended primarily to treat a specific injury or sickness, or any education or training;
5. Experimental or investigational procedures and treatments;



*Better solutions for your health.*<sup>SM</sup>

6.  Cosmetic surgery or therapy performed to improve appearance or self esteem unless: (a) a person receives an injury which results in bodily damage requiring surgery; (b) it qualifies as reconstructive surgery performed on a person following surgery, and both the surgery and the reconstructive surgery are essential and medically necessary; (c) it qualifies as reconstructive surgery following a mastectomy, includes surgery and reconstruction of the other breast to achieve symmetry.

7.  Reports, evaluations, examinations, or hospitalizations not required for health reasons, such as employment, insurance or government licenses and court ordered forensic or custodial evaluations.

8.  Treatment of the teeth or periodontium, unless such expenses are incurred for: (a) charges made for a continuous course of dental treatment started within six months of an injury to sound natural teeth; (b) charges made by a Hospital for Bed and Board or Necessary Services and Supplies; or (c) charges made by the outpatient department of a Hospital in connection with surgery.

9.  Reversal of voluntary sterilization procedures, and certain infertility services;

10. Transsexual surgery and related services;

11. Treatment for erectile dysfunction. However, penile implants are covered when an established medical condition is the cause of erectile dysfunction;

12. Therapy to improve general physical condition;

13. Personal or comfort items such as personal care kits, television, and telephone rental in hospitals;

14. Eyeglasses, hearing aids or examinations and prescription fitting, except as provided in the Certificate;

15. Certain internal or external prostheses, or replacement of external prostheses due to wear and tear, loss, theft or destruction;

16. Surgical treatment for correction of refractive errors, includes radial keratotomy;

17. Prescription and non-prescription drugs, except as provided in the benefits section of the Certificate;

18. Routine foot care;

19. Amniocentesis, ultrasound, or any other procedures requested solely for sex determination of a fetus, unless medically necessary to determine the existence of a sex-linked genetic disorder;

20. Any injury resulting from, or in the course of, any employment for wage or profit;

21. Any sickness which is covered under any workers' compensation or similar law.

22. Charges for over the counter disposable or consumable supplies, includes orthotic devices.

23. Charges in excess of reasonable and customary limitations;

24. Charges for medical and surgical services intended primarily for the treatment or control of obesity which are not Medically Necessary. Excluded services include, but are not limited to, weight reduction procedures designed to restrict your ability to assimilate food, such as gastric bypass, gastric balloons, jaw wiring, stomach stapling and jejunal bypass.

25. Certain Durable Medical Equipment (DME).

26. Non-medical ancillary services, including but not limited to vocational rehabilitation, behavioral training, biofeedback, neurofeedback, hypnosis, sleep therapy, employment counseling, back school, work hardening, driving safety and services, training, educational therapy or other non-medical ancillary services for learning disabilities, developmental delays, autism or mental retardation.

27. Cosmetics, dietary supplements, helath and beauty aids, and nutritional formulae.

**This Benefit Summary highlights some of the benefits available under your plan. A complete description regarding the terms of coverage, exclusions and limitations, includes legislated benefits, will be provided in your insurance certificate or plan description.**

**Benefits are insured and/or administered by Connecticut General Life Insurance Company.**

*"CIGNA HealthCare" refers to various operating subsidiaries of CIGNA Corporation. Products and services are provided by these subsidiaries and not by CIGNA Corporation. These subsidiaries include Connecticut General Life Insurance Company, CIGNA Vision Care, Inc., Tel-Drug, Inc., and its affiliates, CIGNA Behavioral Health, Inc., Intracorp, and HMO or service company subsidiaries of CIGNA Health Corporation and CIGNA Dental Health, Inc. "CIGNA Tel-Drug" refers to Tel-Drug, Inc. and Tel-Drug of Pennsylvania, L.L.C., which are also operating subsidiaries of CIGNA Corporation.*



**CIGNA HealthCare**

Deborah Roberson
National Account Executive

A

October 19, 2010

Routing  790-F1
1000 Corporate Centre
Drive
Suite 500
Franklin, TN 37067
Telephone  615.595.3275
Facsimile  615.595.3363
debbie.roberson@cigna.com

Teri M. Hoctor
Corporate Director, Employee Benefits
EP Management Corporation
P.O. Box 181568
Fairfield, OH  45018

RE:  Wolverine Closed Hourly Retirees   (WCHR )

Dear Teri:

CIGNA received a request from Laurus Strategies on behalf of EP
Management Corporation to self-insure the Wolverine Closed Hourly
Retirees.  There are currently 22 covered retirees in this group, of
which 20 are post- 65 and 2 are pre-65 retirees.

Unfortunately, CIGNA is unable to underwrite and self-insure a small
group of this size.

Please let me know if I can assist you in any other way.

Sincerely,


Deborah Roberson
National Account Executive


cc:  Joanne Noonan, Laurus Strategies





**EP** Management Corporation

November 15, 2010

Virginia A. Van Koughnet

*Redacted Personal Information*

Dear Ms. Van Koughnet:

As an EP Management Corporation retiree, we'd like you to know about an important change in your health care coverage. The Centers for Medicare & Medicaid Services (CMS) has mandated that, in 2011, all Medicare Advantage Plans offered through employer groups must be network based. How will this change impact you? You'll continue to receive the comprehensive benefits that you have with your current plan, along with a few changes.

You will continue to receive this coverage at no cost.  You will not be required to contribute towards the premium cost for 2011.

What's different?
- Your new plan will be the Aetna Medicare$^{SM}$ Plan (PPO) with Extended Service Area (ESA). This Medicare Advantage PPO with ESA plan allows you the option to use Aetna Medicare network or non-network providers and pay the same low cost share or copay.

- Unlike other Medicare Advantage PPO plans that limit enrollment within a specified geographical service area, your new plan will be offered nationwide.

What stays the same?
- You will continue to receive additional benefits beyond Original Medicare

- The flexibility to visit doctors and hospitals of your choice, as long as they are licensed and eligible to receive payment from Original Medicare

- No referrals for covered services

- Preventive care services with no copay

- Discounts on health-related products and services



EXHIBIT

C

PENGAD 800-631-6989

How do I enroll in the new Aetna Medicare$^{SM}$ Plan (PPO) with Extended Service Area (ESA)?
You don't have to take any action. You will automatically be enrolled.

**What you should know**
As a retiree in our Aetna Medicare$^{SM}$ Plan (PPO) with ESA, you will have access to providers participating in our Aetna Medicare network and non-network providers. And you will not have to pay higher cost sharing when utilizing providers who are not participating in the Aetna Medicare network. That means you may go to any provider that is licensed, eligible to receive payment from Original Medicare.  If you need assistance locating a provider that accepts the plan, please contact AETNA member services at the number located on the back of your ID card before becoming a member.

Be sure to carefully review this letter and the enrollment package being sent separately from Aetna.

**What if I do not want to be enrolled in the new plan?**
Enrollment into Aetna Medicare$^{SM}$ Plan (PPO) with Extended Service Area plan is voluntary.   To decline your coverage contact Margie Neufarth with EP Management Corporation by December 20th at 513-898-1762.

**Important Note:** If you choose to decline the EP Management Corporation program completely, you will not be eligible to enroll again.

**Who can I call with questions?**
We encourage you, your Medicare eligible dependents or anyone who helps you with your health care decisions to call Aetna at 800-282-5366 with any questions. If you have questions about Medicare, you can visit www.medicare.gov for personalized help, or call (800)-MEDICARE (800 633-4227). TTY users should call (877)-486-2048.

We hope you enjoy using the health benefits offered to you in 2011.

Sincerely,

EP Management Corporation

Benefits coverage is provided by Aetna Health Inc., Aetna Health of California Inc. and/or Aetna Life Insurance Company, which are Medicare Advantage organizations with a Medicare contract. Benefits, limitations, service areas and premiums are subject to change on January 1 of each year. You must be entitled to Medicare Part A and continue to pay your Part B premium and Part A, if applicable.

## Aetna Medicare Plan (PPO) Release

**Be sure to review the information in this section carefully. It includes some of the important information we have already told you, plus more information about the change. Remember if you have any questions, please call the number listed on this letter.**

As an EP Management Corporation retiree being enrolled in a Medicare Advantage plan, I agree to the following:

The Aetna Medicare$^{SM}$ Plan (PPO) is a Medicare Advantage plan with a Medicare contract. I understand I will need to keep my Medicare Parts A and B and can only be enrolled in one Medicare Advantage plan at a time.  I understand that my enrollment in this plan will automatically end my enrollment in another Medicare health plan or private Medicare Part D prescription drug plan.

Enrollment in this plan is generally for the entire year. Once I enroll, I may leave this plan or make changes only at certain times of the year if an enrollment period is available, or under certain special circumstances. Aetna's Medicare Plan (PPO) is available in specific service areas. If I move out of the plan service area, I need to notify the plan. I may also have to disenroll from my existing plan and enroll in a new plan in my new service area. Once I am a member of Aetna's Medicare PPO plan, I have the right to appeal plan decisions about payment or services if I disagree with the plan's decision. I will read the Evidence of Coverage document I receive for my Aetna Medicare Plan (PPO) to understand the plan rules I must follow to receive coverage with this Medicare Advantage plan.

I understand that beginning on the date my plan coverage begins, I must receive all of my health care from my Aetna Medicare Plan (PPO), except for emergency or urgently needed services or out-of-area dialysis services. Services authorized by the Aetna Medicare Plan (PPO) and other services contained in my Aetna Medicare Plan (PPO) Evidence of Coverage document (also known as a member contract or subscriber agreement) will be covered.

Release of Information
By joining this Medicare health plan, I acknowledge that the Medicare health plan will release my information to Medicare and other plans as is necessary for treatment, payment and health care operations. I also acknowledge that Aetna Medicare$^{SM}$ Plan (PPO) will release my information to Medicare, who may release it for research and other purposes which follow all applicable Federal statutes and regulations. The information in this document is correct to the best of my knowledge. I understand that if I intentionally provide false information to the plan, I will be disenrolled from the plan.

GRP 10_53
PPO ESA/ELECTRONIC



November 15, 2010

Richard White

*Redacted Personal Information*

Dear Mr. White:

As an EP Management Corporation retiree, we'd like you to know about an important change in your health care coverage. The Centers for Medicare & Medicaid Services (CMS) has mandated that, in 2011, all Medicare Advantage Plans offered through employer groups must be network based. How will this change impact you? You'll continue to receive the comprehensive benefits that you have with your current plan, along with a few changes.

You will continue to receive this coverage at no cost.  You will not be required to contribute towards the premium cost for 2011.

What's different?
- Your new plan will be the Aetna Medicare$^{SM}$ Plan (PPO). A Medicare Advantage PPO plan allows you to obtain care from network or non-network providers

- Your cost sharing may be higher when receiving covered services from providers that do not participate in the Aetna Medicare network

What stays the same?
- Additional benefits beyond Original Medicare

- The flexibility to visit doctors and hospitals of your choice, as long as they are licensed and eligible to receive payment from Original Medicare

- No referrals for covered services

- Preventive care services with no copay

- Discounts on health-related products and services

> ## How do I enroll in the new Aetna Medicare$^{SM}$ Plan (PPO)?
> You don't have to take any action. You will automatically be enrolled.

What you should know
Please be sure to carefully review this letter and the enrollment package being sent separately from AETNA.

What if I do not want to be enrolled in the new plan?
Enrollment into Aetna Medicare$^{SM}$ Plan (PPO) is voluntary.  To decline your coverage contact Margie Neufarth with EP Management Corporation by December 20th at 513-898-1762.

**Important Note:** If you choose to decline the EP Management Corporation program completely, you will not be eligible to enroll again.

Who can I call with questions?
We encourage you, your Medicare eligible dependents or anyone who helps you with your health care decisions to call Aetna at 800-282-5366 with any questions. If you have questions about Medicare, you can visit www.medicare.gov for personalized help, or call 1-800-MEDICARE (800 633-4227). TTY users should call (877)-486-2048.

We hope you enjoy using the health benefits offered to you in 2011.

Sincerely,

EP Management Corporation

Benefits coverage is provided by Aetna Health Inc., Aetna Health of California Inc., and/or Aetna Life Insurance Company, which are Medicare Advantage organizations with a Medicare contract. Benefits, limitations, service areas and premiums are subject to change on January 1 of each year. You must be entitled to Medicare Part A and continue to pay your Part B premium and Part A, if applicable.

GRP 10-55
PPO/Electronic

## Aetna Medicare Plan (PPO) Release

**Be sure to review the information in this section carefully. It includes some of the important information we have already told you, plus more information about the change. Remember if you have any questions, please call the number listed on this letter.**

As an EP Management Corporation retiree being enrolled in a Medicare Advantage plan, I agree to the following:

The Aetna Medicare$^{SM}$ Plan (PPO) is a Medicare Advantage plan with a Medicare contract. I understand I will need to keep my Medicare Parts A and B and can only be enrolled in one Medicare Advantage plan at a time. I understand that my enrollment in this plan will automatically end my enrollment in another Medicare health plan or private Medicare Part D prescription drug plan.

Enrollment in this plan is generally for the entire year. Once I enroll, I may leave this plan or make changes only at certain times of the year if an enrollment period is available, or under certain special circumstances. Aetna's Medicare Plan (PPO) is available in specific service areas. If I move out of the plan service area, I need to notify the plan. I may also have to disenroll from my existing plan and enroll in a new plan in my new service area. Once I am a member of Aetna's Medicare PPO plan, I have the right to appeal plan decisions about payment or services if I disagree with the plan's decision. I will read the Evidence of Coverage document I receive for my Aetna Medicare Plan (PPO) to understand the plan rules I must follow to receive coverage with this Medicare Advantage plan.

I understand that beginning on the date my plan coverage begins, I must receive all of my health care from my Aetna Medicare Plan (PPO), except for emergency or urgently needed services or out-of-area dialysis services. Services authorized by the Aetna Medicare Plan (PPO) and other services contained in my Aetna Medicare Plan (PPO) Evidence of Coverage document (also known as a member contract or subscriber agreement) will be covered.

Release of Information
By joining this Medicare health plan, I acknowledge that the Medicare health plan will release my information to Medicare and other plans as is necessary for treatment, payment and health care operations. I also acknowledge that Aetna Medicare$^{SM}$ Plan (PPO) will release my information to Medicare, who may release it for research and other purposes which follow all applicable Federal statutes and regulations. The information in this document is correct to the best of my knowledge. I understand that if I intentionally provide false information to the plan, I will be disenrolled from the plan.

GRP 10-55
PPO/Electronic