# EXHIBIT A

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (the "Agreement") is made and entered into between and among **(1)** Frank Hargrove Jr. and Richard White (the "Plaintiff Representatives"), acting on behalf of themselves and other persons similarly-situated as class representatives of the certified Class (defined below); **(2)** the UAW; **(3)** Wolverine Advanced Materials, LLC ("Wolverine"), successor by contract to EaglePicher Corporation a/k/a EP Management Corporation a/k/a EaglePicher Management Company ("EaglePicher"); and **(4)** EaglePicher. Wolverine, EaglePicher, and UAW, and Plaintiff Representatives acting on behalf of themselves and others similarly-situated as class representatives, are referred to together as the "Settling Parties."

## Recitals

A.     WHEREAS, the Plaintiff Representatives and UAW are plaintiffs in the class action entitled *Hargrove, et al. v. EaglePicher Corp.*, U.S.D.C., E.D. Mich., Case No. 10-cv-10946 and U.S. Ct. App. 6th Cir. Case No. 12-1555 (the "Action").

B.     WHEREAS, the Action was originally filed on March 9, 2010.

C.     WHEREAS, the Action addresses defendant EaglePicher's modification and reduction of certain collectively-bargained lifetime retiree healthcare benefits.

D.     WHEREAS, the two individual plaintiffs are retirees acting for themselves and the Class of approximately 21 retirees, surviving spouses, and other eligible dependents; the retirees worked in the UAW-represented collective bargaining unit at EaglePicher's now-closed Wolverine Gasket Plant in Inkster, Michigan; and their retiree healthcare benefits are governed by collective bargaining agreements ("CBAs") between UAW, Local 690, and EaglePicher.

E.     WHEREAS, effective January 1, 2010, EaglePicher modified and reduced certain of the retiree healthcare benefits and in the Action plaintiffs asked, among other things, that the District Court direct EaglePicher to reinstate and maintain the retiree healthcare benefits as they existed prior to January 1, 2010.

F.     WHEREAS, on April 4, 2012, the District Court entered an Order Certifying Class Action, certified the class, approved the individual plaintiffs as Class Representatives, and approved class counsel (Docket 34, the "Class Certification Order") and, in paragraph 5 of the Class Certification Order, the Court defined the certified class as consisting of:

> All former EaglePicher/Wolverine Gasket employees who were members of the UAW-represented Collective Bargaining Unit at EaglePicher's now-closed Wolverine Gasket Plant in Inkster, Michigan who are eligible under collective bargaining agreements and welfare benefit plans for

company-provided retirement healthcare, and all eligible surviving spouses and other eligible dependents of those retirees.

G.        WHEREAS, also on April 4, 2012, the District Court entered an Order Granting Summary Judgment and Permanent Injunction (Docket 35, the "Injunction Order") in favor of the plaintiffs and against EaglePicher, reported as *Hargrove, et al. v. EaglePicher Corp.*, 852 F.Supp.2d 851 (E.D. Mich. 2012), and also entered the Final Judgment and Permanent Injunction in favor of the plaintiffs and against EaglePicher (Docket 36, the "Final Judgment").

H.        WHEREAS, EaglePicher appealed the District Court's Injunction Order and Final Judgment to the Sixth Circuit Court of Appeals.

I.        WHEREAS, EaglePicher and Wolverine represent that in an Asset Purchase Agreement between them, Wolverine, by contract between them, agreed to assume EaglePicher's responsibility for the retiree healthcare benefits at issue in the Action.

J.        WHEREAS, the Settling Parties have incurred substantial attorneys' fees and expenses thus far in connection with the Action, and expect to incur additional, substantial attorneys' fees and expenses if the Action proceeds any further.

K.        WHEREAS, the Settling Parties desire to avoid the additional cost, time, effort, and uncertainties of continued litigation of the Action, and desire to enter into this Agreement.

L.        WHEREAS, the Settling Parties and their legal counsel believe that the settlement of the Action pursuant to this Agreement constitutes a fair, reasonable, and prudent disposition of the claims raised in the Action and released pursuant to this Agreement and is in the best interests of the Class.

M.        NOW, THEREFORE, in consideration of the mutual promises and consideration set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by all Settling Parties, the Settling Parties enter into this Settlement Agreement and Release (the "Agreement").

## **Defined Terms**

A.        "Action" means the lawsuit entitled *Hargrove, et al. v. EaglePicher Corp.*, U.S.D.C., E.D. Mich., Case No. 10-cv-10946 and U.S. Ct. App., 6th Cir. Case No. 12-1555.

B.        "Agreement" means this Settlement Agreement and Release and all exhibits hereto.

C.        The "Healthcare Program" means the retiree healthcare insurance benefits and coverages, including prescription drug benefits and coverages, provided immediately before the changes challenged in the Action, subject to the specific modifications set out in this Agreement. The Healthcare Program is intended to have the net effect of providing 100% company-payment for all covered healthcare through the combination of insurance at current levels and

reimbursement, including 100% company-payment of expenses incurred by retirees not covered by Medicare, subject only to $2 per-prescription retiree co-payments.

D.      "Claims Released as to Plaintiffs-Releasees" means any and all causes of action, claims, damages, equitable, legal, and/or administrative relief, interest, demands or rights related to the collectively bargained retirement healthcare that is the subject of this Action, against a Plaintiff-Releasee, including without limitation, claims for any and all damages of any kind against a Plaintiff-Releasee related to that healthcare, whether based on federal, state or local law, statute, ordinance, regulation, contract, common law, or any other source, that have been, could have been, may be, or could be alleged or asserted now or in the future by any party against a Plaintiff-Releasee or any of them in any other court action or proceeding before any administrative body, tribunal, arbitration panel, or other adjudicatory body relating to the Action.

E.      "Class" or "Class Members" means the following individuals:

> All former EaglePicher/Wolverine Gasket employees who were members of the UAW-represented Collective Bargaining Unit at EaglePicher's now-closed Wolverine Gasket plant in Inkster, Michigan who are eligible under Collective Bargaining Agreements and Welfare Benefit Plans for Company-provided retirement healthcare, and all eligible surviving spouses and other eligible dependents of those retirees.

F.      "Class Counsel" means Stuart M. Israel of Legghio & Israel, P.C.

G.      "Costs" means all reasonable litigation expenses and costs incurred by Class Counsel, the Plaintiff Representatives, or any Class Member in connection with the Action, as approved by the Court pursuant to Rule 23 and this Agreement.

H.      "EaglePicher" means defendant EaglePicher Corporation, also known as EP Management Corporation and EaglePicher Management Company.

I.      "Effective Date of Agreement" means the date that the Agreement is signed by or on behalf of all the Settling Parties.

J.      "Exhibit(s)" means any document attached hereto and labeled as an Exhibit. All Exhibits are incorporated in the body of the Settlement Agreement by reference, as if specifically set forth therein.

K.      "Fees" means all Class Counsel's reasonable attorneys' fees in connection with the Action, as approved by the Court pursuant to Rule 23 and this Agreement.

L.      "Final Judgment" means the district court's April 4, 2012 Final Judgment and Permanent Injunction (Docket 36).

M.      "Final Settlement Date" means the date on which the Order Approving Settlement becomes final. For purposes of this Agreement:

1.   If no appeal has been taken from the Order Approving Settlement, Final Settlement Date means the date on which the time to appeal therefrom has expired; or

2.   If any appeal has been taken from the Order Approving Settlement, Final Settlement Date means the date on which all appeals therefrom, including petitions for re-hearing or re-argument, petitions for re-hearing *en banc* and petitions for *certiorari* or any other form of review, have been finally disposed of in a manner that affirms the Order and Final Judgment.

3.   Wolverine shall implement and maintain the healthcare summarized in Exhibit 1 during the pendency of any appeals and review proceedings.

N.   "Injunction Order" means the District Court's April 4, 2012 Order Granting Summary Judgment and Permanent Injunction (Docket 35), reported as *Hargrove, et al. v. EaglePicher Corp.*, 852 F.Supp.2d 851 (E.D. Mich. 2012).

O.   "Plaintiff Representatives" means Frank Hargrove Jr. and Richard White, plaintiffs and class representatives in the Action.

P.   "Plaintiffs-Releasees" means Class Representatives, Class Members, Class Counsel, the UAW, and their officers, directors, employees, attorneys, and agents.

Q.   "Notice" means the written notice to each Class Member, substantially in the form attached to the Agreement as Exhibit 2.

R.   "Order Approving Settlement" means the order approving settlement and final judgment to be presented to the District Court pursuant to Fed. R. Civ. P. 23 for approval, substantially in the form attached as Exhibit 3.

S.   "Released Claims" means any and all causes of action, claims, damages, equitable, legal and/or administrative relief, interest, demands or rights related to the collectively-bargained retirement healthcare that is the subject of this Action, against Releasees, including, without limitation, claims for any and all damages of any kind against Releasees related to that healthcare, whether based on federal, state or local law, statute, ordinance, regulation, contract, common law, or any other source, that have been, could have been, may be or could be alleged or asserted now or in the future by Plaintiff Representatives, UAW, or any Class Member against the Releasees or any of them in any other court action or proceeding before any administrative body, tribunal, arbitration panel, or other adjudicatory body relating to the Action.

T.   "Releasees" means Wolverine.   While Wolverine has undertaken the responsibilities set out in this Agreement, nothing in this Agreement or otherwise is intended to, or does, release EaglePicher from its responsibilities under the CBAs and April 4, 2012 Injunction Order and Final Judgment issued and entered by the District Court, provided that plaintiffs will not seek to enforce the April 4, 2012 Injunction Order and Final Judgment against

EaglePicher so long as Wolverine fully complies with, and remains in full compliance with, its responsibilities under this Agreement once approved by the Court pursuant to Rule 23.

U. "Settling Parties" means the Plaintiff Representatives, acting on behalf of themselves and all others similarly-situated as class representatives of the certified Class, UAW, Wolverine, and EaglePicher.

V. "UAW" means the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America on its own behalf and as successor to Local 690.

W. "Wolverine" means Wolverine Advanced Materials, LLC.

## Settlement Agreement and Release Terms

**Article 1.   Compliance With the Injunction Order and Other District Court Directives.**

Wolverine shall fully comply with the district court's April 4, 2012 Injunction Order (Docket 35), reported as 852 F.Supp.2d 851 (E.D. Mich. 2012), with the district court's April 4, 2012 Final Judgment (Docket 36), and with the district court's Opinion and Order Granting Class Representatives' April 11, 2012 Motion for Attorney Fees and Expenses, reported as 2012 WL 1668152 (E.D. Mich. 2012) (Docket 45), and with this Settlement Agreement. Full compliance with the Settlement Agreement with regard to the healthcare coverages summarized in Exhibit 1, to the extent that the Settlement Agreement and the healthcare coverages summarized in Exhibit 1 do not precisely restore the *status quo ante* as directed by the district court, shall be deemed to satisfy the Injunction Order and Final Judgment.

Wolverine's assumption of EaglePicher's obligations under the Injunction Order and Final Judgment in no way negates or alters the Injunction Order, the Final Judgment, or other court orders, and the Injunction Order and Final Judgment and other court orders remain in place and binding on EaglePicher to be enforced if at any time Wolverine is unwilling or unable to or otherwise does not fully comply with, and remain in compliance with, this Agreement.

**Article 2.   Healthcare Coverage.**

As soon as practicable, if it has not already done so, Wolverine shall provide Class Members with the Healthcare Program benefits and coverages, fully-paid by Wolverine, with no premium costs charged to Class Members, for the lifetime of each class member. This healthcare insurance and coverage shall be provided and maintained for the lifetime of each class member at the levels summarized in Exhibit 1.

**Article 3.   Prescription Drug Coverage.**

As part of the Healthcare Program, Wolverine shall continue to provide the current prescription drug insurance and coverage, with $2 per-prescription co-payments, summarized in Exhibit 1. This insurance and coverage, too, will be fully-paid by Wolverine, with no premium

costs or deductibles or increased co-payments charged to Class Members, for the lifetime of each class member.

## Article 4.   Deductibles/Out-of-Pocket Expenses Reimbursement.

As soon as practicable, if it has not already done so, Wolverine will implement a procedure to reimburse Class Members for deductibles and out-of-pocket expenses incurred by Class Members under the Healthcare Program summarized in Exhibit 1.  That Program provides 100% payment of deductibles and expenses for medical services not paid by Medicare.  That Program requires Class Members to pay annual Medicare Part B deductibles and to pay expenses not covered by Medicare under Part B, up to an annual out-of-pocket maximum of $1,500 per person, after which the insurance provides 100% coverage.  Wolverine will reimburse Class Members for all such deductible amounts and expenses paid by Class Members, having the net effect of providing 100% coverage for all covered healthcare services through the combination of insurance and reimbursement.

The procedures and protocol for Class Members to obtain reimbursement of their out-of-pocket expenditures shall be as follows:  Class Members shall submit to Wolverine **(A)** a reimbursement claims form substantially in the form attached hereto as Exhibit 4 along with **(B)** an Explanation of Benefits ("EOB") form from Medicare and/or the carrier showing amounts paid, an actual bill from the medical service provider to the Class Member, and/or other reasonable proof of actual payment by the Class Member.  Reimbursement payments will be made by Wolverine quarterly, in April, July, October, and January of each year.  Each quarterly reimbursement will cover deductibles and expenses paid or applied for by Class Members during the preceding quarter.  Class Members must apply for reimbursement within 60 days of paying the reimbursable expense.  Reimbursements for any calendar year will be limited to the $1,500 annual out-of-pocket maximum payable in a calendar year under the Healthcare Program, because after a class member has paid a total of $1,500 out-of-pocket expenses in a calendar year, the Healthcare Program will provide 100% payment of expenses not covered by Medicare. Reimbursement will not apply to the $2 per-prescription co-payment expenses paid by Class Members for prescription drugs after the $2 per-prescription coverage is restored as required by Article 3.

All reimbursements and "make whole" payments addressed in Articles 4 and 5 shall be made so as to comply with the requirements under the Internal Revenue Code and any other governing requirements applicable to health reimbursement arrangements to ensure tax-protected status.

## Article 5.   The "Make Whole" Remedy.

Wolverine will "make whole" Class Members as follows.  Wolverine shall reimburse Class Members or their estates for the amounts specified on the attached list (Exhibit 5), reflecting certain "make whole" amounts identified by Class Members for expenses paid through April 2012 in response to a mail survey undertaken by Class Counsel.  Other "make whole" and out-of-pocket expenses paid by Class Members—including prescription drug expenses above $2 per-prescription incurred before restoration of the $2 per-prescription coverage—shall be reimbursed through the reimbursement process described in Article 4.

**Article 6.   Temporary Continuation of Current Healthcare and Prescription Coverages.**

Until the healthcare and prescription drug coverages required by Articles 2 and 3 are implemented, Wolverine shall maintain the current coverages, fully-paid by Wolverine, with no premium costs to Class Members, subject to the "make whole" terms described in Articles 4 and 5 and to the terms regarding the two pre-Medicare Class Members set out in Article 13. The healthcare and prescription drug coverages required by Articles 2 and 3 shall each be implemented as soon as practicable, if not already implemented; implementation of one shall not be delayed by a longer timetable necessary to implementing the other.

**Article 7.   Attorney Fees, Costs, and Expenses.**

Wolverine will comply with the district court's May 10, 2012 order (Docket 45) directing payment of fees, costs, and expenses incurred by Class Counsel for the period November 2009 through March 2012.  Wolverine also will pay Class Counsel's fees, costs, and expenses incurred during the period April through June 2012, as itemized in Exhibit 6, at the rates set by the District Court's May 10, 2012 order.  These payments shall be made on the Final Settlement Date.  In addition, Class Counsel will specify, and when the Settlement Agreement is approved in the Rule 23 process Wolverine will pay, Class Counsel's fees, costs, and expenses incurred after June 2012 in the course of resolving the Action and completing the Settlement Agreement, at the rates set by the District Court's May 10, 2012 order.  Any disputes over the reasonableness of the work hours expended by class counsel for which fees are requested for the period after June 2012 shall be subject to resolution by the Court pursuant to Rule 23(h).  Class Counsel may in addition request fees, costs, and expenses from Wolverine by application to the Court for any work connected to implementation and enforcement of the Settlement Agreement and the Order Approving Settlement.

**Article 8.   Future Modification Proposals.**

Under the governing CBAs, as summarized in paragraphs 19 and 21 of the district court's April 4, 2012 Injunction Order (Docket 35), retirement healthcare and prescription coverages for Class Members are "for life" and at "no premium cost" to retirees and dependents and surviving spouses and are not to be "terminated, modified, etc. without union consent."  In keeping with these terms, if at any time in the future Wolverine proposes modification of the healthcare and prescription drug insurance, benefits, coverages, reimbursement rights, and related procedures required by this Settlement Agreement—whether to comply with governing law or to adjust to insurance circumstances or to reflect the evolution of healthcare or otherwise—Wolverine will communicate its proposal in writing to the UAW at least 90 days in advance of the date that Wolverine proposes to implement the proposed modification and Wolverine will not implement any modification absent written consent of UAW.  All parties acknowledge that, under the terms of the CBAs, the UAW has authority to consent to modifications, in the union's sole discretion.  Any request for union consent must be delivered to the UAW General Counsel.  His present address is Solidarity House, 8000 E. Jefferson Ave., Detroit, MI 48214.  The UAW, including its officers, directors, employees, attorneys, and agents, shall incur no liability to any class member, EaglePicher, or Wolverine as a result of or arising out of any decision to consent to or decline to consent to any modifications to the Healthcare Program.  The UAW, including its officers, directors, employees, attorneys and agents, will not incur any liability to any Class

Representative, Class Member, Wolverine, EaglePicher, or any other person or entity as a result of or arising out of the UAW's decision to consent to or decline to consent to any modifications to the Healthcare Program provided for in this Article, or as a result of its participation in the negotiation, execution, and implementation of this Settlement Agreement.

**Article 9.   Rule 23 Approval.**

Upon the Effective Date, the Settling Parties and EaglePicher will request the Sixth Circuit to remand the Action to the district court.  After remand, the Settling Parties promptly will submit this Settlement Agreement, and the proposed Notice to Class Members in a mutually-acceptable form substantially as reflected in Exhibit 2, for district court approval under Rule 23, and will thereafter take the action necessary to approval of this Agreement pursuant to Rule 23.

**Article 10.   Notice to Class Members.**

The proposed Notice to Class Members submitted for district court approval under Rule 23 will be substantially in the form of Exhibit 2, subject to any modification that may be directed by the district court during the preliminary approval process.  Wolverine shall pay all expenses associated with the production and mailing of the approved Notice to Class Members and with the Rule 23 approval process, and will provide current contact information to facilitate any Class Counsel and UAW communications with Class Members.

**Article 11.   Retention of Jurisdiction.**

The Settling Parties shall ask the district court to include in its Order Approving Settlement, approving the settlement under Rule 23, confirmation that the district court will retain jurisdiction to enforce the Settlement Agreement and the Injunction Order and Final Judgment and other court orders, and to resolve any disputes that may arise out of the Settlement Agreement or the settlement after completion of the Rule 23 approval process.

**Article 12.   Binding Agreement.**

The Settlement Agreement and the settlement in this Action shall be binding on the UAW and its successors, on the Plaintiff Representatives and on the Class as defined in the district court's April 4, 2012 Order Certifying Class Action (Docket 34), on Wolverine, and on EaglePicher.

**Article 13.   Class Members Recently Covered By Medicare.**

Wolverine informed Class Counsel that there were two Class Members not covered by Medicare at the time of the negotiation of the terms of this Agreement, one who began Medicare coverage on or about November 26, 2012, and the other who began Medicare coverage on or about February 23, 2013.  Each were transferred to the healthcare and prescription drug coverages called for by this Settlement Agreement, which require Medicare participation, at the time her Medicare coverage began.  Before then, Wolverine continued their pre-Medicare coverages, which are subject to the "make whole" and expense reimbursement process described in Articles 4 and 5.

**Article 14.   Commitment to Resolving Unanticipated Issues.**

The Settling Parties recognize that unanticipated issues may arise in the Rule 23 approval process.  The Settling Parties will endeavor to resolve any such issues in a mutually-beneficial way, conditioned on final approval of the district court through the Rule 23 process.

**Article 15.   Notice to Class and Joint Motions for Approval.**

The Settling Parties will prepare and file in the district court joint motions for preliminary and final approvals under Rule 23.  One joint motion shall seek preliminary district court approval of this Agreement and approval of the mailing of written notice to Class Members substantially in the form attached as Exhibit 2.

The Settling Parties, once the preliminary approval process is complete, will file another joint motion, and use their best efforts, to obtain final approval by the district court of this Agreement in a fairness hearing to be jointly requested by the Settling Parties and to be scheduled by the Court pursuant to Rule 23.  On or before the date set by the district court for the hearing on final approval of this Agreement, Settling Parties will serve and file responses to objections by Class Members, if any, on any timetable prescribed by the district court.  The Settling Parties agree to cooperate and use their best efforts to obtain the Court's approval of the Order Approving Settlement, substantially in the form attached as Exhibit 3.

**Article 16.   Fees and Costs.**

Class Counsel's receipt from Wolverine of the fees and costs in the amounts approved by the district court pursuant to this Agreement shall forever and fully release and discharge Wolverine from any and all obligations to compensate Class Counsel for attorneys' fees, expenses and/or costs incurred in connection with the Action for the time periods covered and approved by the district court.  Class Counsel agrees that this Agreement shall be construed to be, and is, a covenant not to sue or institute other legal, equitable, or administrative proceedings against Wolverine, with respect to Class Counsel's attorneys' fees, expenses and/or costs incurred in connection with this Action, provided that Wolverine pays and Class Counsel receives the fees, expenses, and costs from Wolverine in the amounts approved by the Court. This Article is subject to Article 7 and nothing in this Article or Agreement is intended to limit Class Counsel's efforts to enforce this Agreement or any court order, or right to seek court approval of fees and costs for doing so or for other work related to this Agreement or Action.

**Article 17.   Release of All Claims.**

A.      **Release of Releasees.**   Plaintiff Representatives on behalf of themselves and the Class, all Class Members (including any respective heirs, executors, administrators, representatives, agents, successors, and assigns of each Plaintiff Representative and each Class Member), and UAW for itself, upon, and in consideration of, Wolverine's performance of its obligations under this Agreement, shall have fully and forever released and discharged Wolverine from the Released Claims, including without limitation:

(a)    Any or all of the acts, omissions, facts, matters, transactions or occurrences that were directly or indirectly alleged, asserted, described, set forth or referred to in the Action; and

(b)    Any or all of the acts, omissions, facts, matters, transactions or occurrences made in connection with or directly or indirectly relating to the Released Claims.

Without in any way limiting the scope of the Release, this Release covers, without limitation, subject to the specific terms of this Agreement, any and all claims for fees or costs incurred by Class Counsel or any other counsel representing UAW, the Plaintiff Representatives or any Class Member, or by Plaintiff Representatives or any Class Member themselves in connection with or related in any manner to the Action, the settlement of the Action, the administration of such settlement and/or the Released Claims except to the extent otherwise specified in this Agreement.  However, nothing in this Release shall preclude any action to enforce the terms of this Agreement, and nothing in this Release shall diminish or release EaglePicher from its obligations under the Injunction Order and Final Judgment and any and all other district court orders, which shall remain in place, as addressed in Article 1.

In connection with this Release, Plaintiff Representatives, the Class Members, and UAW for itself, acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true with respect to the matters released herein.  Nevertheless, it is the intention of Plaintiff Representatives and UAW in executing this Agreement and Release to fully, finally, and forever settle and release all such matters, and all claims relating thereto, which exist, hereafter may exist, or might have existed (whether or not previously or currently asserted in any action) relating to the Released Claims. **This is intended to be a full and complete release of the "Released Claims" against Wolverine and to bar action against EaglePicher so long as Wolverine fully complies with, and remains in compliance with, this Agreement.**

**B.    Release of Plaintiffs-Releasees.**  Wolverine and EaglePicher, and their heirs, executors, administrators, representatives, agents, successors, and assigns, for consideration provided by this Settlement Agreement, shall have fully and forever released and discharged Plaintiffs-Releasees from the Claims Released as to Plaintiffs-Releasees, including without limitation:

(a)    Any or all of the acts, omissions, facts, matters, transactions or occurrences that were directly or indirectly alleged, asserted, described, set forth or referred to in the Action; and

(b)    Any or all of the acts, omissions, facts, matters, transactions or occurrences made in connection with or directly or indirectly relating to the Released Claims.

Without in any way limiting the scope of this Release, this Release covers, without limitation, subject to the specific terms of this Agreement, any and all claims for fees or costs incurred by Wolverine and EaglePicher in connection with or related in any manner to the Action, the settlement of the Action, the administration of such settlement and/or the Claims Released as to Plaintiffs-Releasees released by Wolverine and EaglePicher except to the extent otherwise specified in this Agreement. However, nothing in this Release shall preclude any action to enforce the terms of this Agreement.

In connection with this Release, Wolverine and EaglePicher acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those that which they now know or believe to be true with respect to the matters released herein. Nevertheless, it is the intention of Wolverine and EaglePicher in executing this Agreement and Release to fully, finally, and forever settle and release all such matters, and all claims relating thereto, which exist, hereafter may exist, or might have existed (whether or not previously or currently asserted in any action) relating to the Claims Released as to Plaintiffs-Releasees released by Wolverine and EaglePicher. This is intended to be a full and complete release of the Claims Released as to Plaintiffs-Releasees released by Wolverine and EaglePicher and to bar action against the Plaintiffs-Releasees to the extent set forth herein.

**C.    Mutual Release of Plaintiffs-Releasees.** Plaintiffs-Releasees, for consideration provided by this Settlement Agreement, shall have fully and forever released and discharged each other from the Claims Released as to Plaintiffs-Releasees, including without limitation:

(a)    Any or all of the acts, omissions, facts, matters, transactions or occurrences that were directly or indirectly alleged, asserted, described, set forth or referred to in the Action; and

(b)    Any or all of the acts, omissions, facts, matters, transactions or occurrences made in connection with or directly or indirectly relating to the Released Claims.

Without in any way limiting the scope of this Release, this Release covers, without limitation, subject to the specific terms of this Agreement, any and all claims for fees or costs incurred by a Plaintiff-Releasee in connection with or related in any manner to the Action, the settlement of the Action, the administration of such settlement and/or the Claims Released as to Plaintiffs-Releasees.

In connection with this Release, the Plaintiffs-Releasees acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those that which they now know or believe to be true with respect to the matters released herein. Nevertheless the Plaintiffs-Releasees fully, finally, and forever settle and release all such matters with respect to each other, and all claims relating thereto, which exist, hereafter may exist, or might have existed (whether or not previously or currently asserted in any action) relating to the Claims Released as to Plaintiffs-Releasees. This is intended to be a full and complete release of the Claims Released by Plaintiffs-Releasees as to each other and to bar action against the Plaintiffs-Releasees to the extent set forth herein. Nothing in this mutual release, however, shall eliminate or diminish the obligations of class counsel under the court's orders or the Rules of Professional Conduct.

**Article 18.   Disclaimer of Liability; No Admissions.**

Settling Parties understand and agree that, by entering into this Settlement Agreement, Wolverine and EaglePicher in no way admit any violation of law or breach of fiduciary duty or any liability whatsoever to the UAW, Plaintiff Representatives and/or to the Class, all such liability being expressly denied. Rather, Settling Parties, having consulted with their respective legal counsel and having evaluated their respective positions, enter into this Settlement Agreement to avoid further litigation in this Action and to resolve and settle all disputes between them concerning the Released Claims. Settling Parties further understand and agree that neither this Settlement Agreement nor the negotiations that preceded it shall be used as evidence with respect to the merits of the claims asserted in this Action or otherwise.

**Article 19.   No Further Actions.**

The UAW, Plaintiff Representatives and the Class agree that, except as permitted by this Agreement, they will not commence or prosecute, either as a group or individually, any action on behalf of themselves or any other person, asserting claims against Wolverine that have been or could have been asserted in this Action regarding the collectively-bargained healthcare that is the subject of this Action.

**Article 20.   Agency Notifications.**

Wolverine will serve a copy of the Notice and this Settlement Agreement on the appropriate offices of all agencies, if any, that are by law entitled to such service, including the Internal Revenue Service ("IRS") and the Department of Labor ("DOL") if they are entitled to notice, at the same time that the Notice is mailed to Class Members or on any other timetable that may be required by law or court order.

**Article 21.   Conditions Precedent for Agreement.**

This Settlement Agreement shall not be effective until all Settling Parties have executed and acknowledged the Agreement.

The settlement provided for in this Agreement is specifically conditioned upon and subject to the entry of an Order Approving Settlement, substantially in the form attached as Exhibit 3 to this Agreement, and the time for any appeal of that judgment has lapsed, without any appeal being taken, or after that judgment is affirmed on appeal.  Should any of those conditions fail to occur, Settling Parties shall undertake reasonable and good faith efforts to renegotiate the terms of this Agreement in an effort to reach a new settlement agreement that is acceptable to Settling Parties and to the Court.  Moreover, if any of the conditions fail to occur, and Settling Parties are unable to enter into a new settlement agreement acceptable to Settling Parties and to the Court: **(1)** this Agreement shall become null and void; **(2)** Settling Parties will be restored to their respective positions as existed prior to the execution of this Agreement; **(3)** no right, claim, obligation, liability, or defense of any Settling Party, if any, shall be affected as to such party by the negotiation or execution of the Agreement or any related documents; **(4)** Settling Parties will jointly move the Court to vacate any and all orders entered pursuant to this Agreement; and **(5)** no Settling Party shall attempt to introduce evidence of, refer to, discuss, or otherwise use, in any way, in connection with the Action or other disputes or litigation:  **(a)** the fact that this Agreement was signed; **(b)** this Agreement; **(c)** any exhibits to this Agreement; **(d)** any documents related to this Agreement; and **(e)** any discussions leading to this Agreement, to affect the merits of the Action, which shall revert to the *status quo ante* predating this Agreement.

## Article 22.   Reliance on Information.

Each Settling Party has conducted and is relying upon his, her or its own investigation, legal counsel, and advisors in entering into this Agreement and otherwise.

## Article 23.   Entire Agreement.

This Agreement and its Exhibits set forth the entire agreement and understanding among Settling Parties as to the subject matter hereof and merge and supersede all prior discussions, agreements and understandings of every kind and nature among them regarding the subject matter hereof.  No Settling Party shall be bound by any condition, definition, warranty or representation, other than as expressly set forth or provided for in this Agreement and its Exhibits.

## Article 24.   Binding Effect.

This Agreement shall be binding upon and to the benefit of the Settling Parties and all Class Members, as well as their respective heirs, executors, administrators, representatives, agents, attorneys, successors, and assigns, including the Plaintiff Representatives and each Class Member.

## Article 25.   Invalidity.

In the event that any one or more of the provisions of this Agreement shall for any reason be held invalid, illegal, or unenforceable in any respect, Settling Parties shall reasonably cooperate to renegotiate the terms of this Agreement in a manner that is acceptable to Settling Parties and the Court, taking into account the effect of the invalid, illegal, or unenforceable provision(s).

**Article 26.   Expenses.**

Each Settling Party shall bear his, her or its own expenses in connection with the Action, except as otherwise provided in this Agreement or any amendment adopted in compliance with Article 28 or any court order.

**Article 27.   Further Action.**

Should any additional actions or instruments be necessary or desirable to confirm and accomplish effectively the purposes of this Agreement, or to establish the rights or discharge the obligations of any Settling Party hereunder, Settling Parties shall reasonably cooperate in undertaking such actions and obtaining and finalizing such additional instruments, including without limitation, any documents necessary to finalize the Order Approving Settlement.

**Article 28.   Amendment.**

This Agreement may not be amended or modified except by a writing signed by each Settling Party and, where required, by court approval.

**Article 29.   Construction of Agreement.**

Each Settling Party, and their respective attorneys, participated in the drafting and preparation of this Agreement, including all attachments to it.  Therefore, neither this Agreement nor any attachment to it shall be construed in favor of or against any Settling Party on the basis that the Settling Party did or did not author this Agreement and/or any attachment related to it.

All terms of this Agreement are contractual and not merely recitals.  Each Settling Party represents that he, she or it has read this Agreement, and warrants that he, she or it has the authority to execute this Agreement.  This Agreement is executed voluntarily and with full knowledge of its significance after consultation with legal counsel.

**Article 30.   Continuing Jurisdiction.**

The District Court will retain jurisdiction with respect to the enforcement of the terms of this Agreement and all court orders in the Action.  Wolverine and EaglePicher may present the Agreement and assert it as a bar to any other litigation as may be warranted by law, in the forum in which that litigation, if any, is brought or is pending.

**Article 31.   Counterparts.**

This Agreement may be executed in multiple counterparts, and it shall not be necessary that the signatures of each Settling Party be contained on any one counterpart hereof; each counterpart shall be deemed an original, all of which together shall constitute one and the same instrument.  The execution of this Agreement may be transmitted by facsimile or by *pdf* electronic transmission.

AGREED TO:

_____          _____
Frank Hargrove Jr., on behalf of himself          Date
and the class


_____          _____
Richard White, on behalf of himself          Date
and the class


_____          _____
Stuart M. Israel, Class Counsel          Date
Legghio & Israel, P.C.
306 S. Washington, Suite 600
Royal Oak, MI 48067


_____          _____
[Name], [Title]          Date
International Union, United Automobile,
Aerospace, And Agricultural Implement
Workers of America (UAW)


_____          _____
Howard E. Kochell          Date
Legal Counsel for Wolverine and EaglePicher
Barnes & Thornburg LLP
11 South Meridian Street
Indianapolis, IN 46204


_____          _____
[Name], [Title]          Date
Wolverine Advanced Materials, LLC and
   EaglePicher Corporation


_____          _____
[Name], [Title]          Date
EP Management Corporation f/k/a
   EaglePicher Corporation f/k/a EaglePicher

4/1/13

AGREED TO:

_____          _____
Frank Hargrove Jr., on behalf of himself          Date
and the class


_____          _____
Richard White, on behalf of himself          Date
and the class


_____          _____
Stuart M. Israel, Class Counsel          Date
Legghio & Israel, P.C.
306 S. Washington, Suite 600
Royal Oak, MI 48067


_____          _____
[Name], [Title]          Date
International Union, United Automobile,
Aerospace, And Agricultural Implement
Workers of America (UAW)

_____          _____
Howard E. Kochell          Date
Legal Counsel for Wolverine and EaglePicher
Barnes & Thornburg LLP          4/13/13
11 South Meridian Street
Indianapolis, IN 46204

_____          _____
[Name], [Title]          Date
Wolverine Advanced Materials, LLC and
  EaglePicher Corporation          April 8, 2013

X_____          _____
Rajeev Antara, Vice President          Date
EP Management Corporation f/k/a
  EaglePicher Corporation f/k/a EaglePicher          4/12/13

Page 15 of 16

AGREED TO:

_Frank Hargrove Jr._ _(signature)_

Frank Hargrove Jr., on behalf of himself
and the class

4-24-13
_____
Date


_____
Richard White, on behalf of himself
and the class

_____
Date


_Stuart M. Israel_ _(signature)_

Stuart M. Israel, Class Counsel
Legghio & Israel, P.C.
306 S. Washington, Suite 600
Royal Oak, MI 48067

4/23/13
_____
Date


_Cindy Estrada_ _(signature)_

Cindy Estrada, Vice President
International Union, United Automobile,
Aerospace, And Agricultural Implement
Workers of America (UAW)

4-23-13
_____
Date


_____
Howard E. Kochell
Legal Counsel for Wolverine and EaglePicher
Barnes & Thornburg LLP
11 South Meridian Street
Indianapolis, IN 46204

_____
Date


_____
[Name], [Title]
Wolverine Advanced Materials, LLC and
  EaglePicher Corporation

_____
Date


_____
[Name], [Title]
EP Management Corporation f/k/a
  EaglePicher Corporation f/k/a EaglePicher

_____
Date

AGREED TO:

_____          _____
Frank Hargrove Jr., on behalf of himself          Date
and the class


_____          4-24-2013
Richard White, on behalf of himself          Date
and the class


_____          4/23/13
Stuart M. Israel, Class Counsel          Date
Legghio & Israel, P.C.
306 S. Washington, Suite 600
Royal Oak, MI 48067


_____          4-23-13
Cindy Estrada, Vice President          Date
International Union, United Automobile,
Aerospace, And Agricultural Implement
Workers of America (UAW)


_____          _____
Howard E. Kochell          Date
Legal Counsel for Wolverine and EaglePicher
Barnes & Thornburg LLP
11 South Meridian Street
Indianapolis, IN 46204


_____          _____
[Name], [Title]          Date
Wolverine Advanced Materials, LLC and
    EaglePicher Corporation


_____          _____
[Name], [Title]          Date
EP Management Corporation f/k/a
    EaglePicher Corporation f/k/a EaglePicher

4/1/13

**ATTACHMENTS TO SETTLEMENT AGREEMENT AND RELEASE**

1.    Retiree Healthcare and Prescription Drug Program Summary

2.    Important Notice About Health Benefits for EaglePicher/Wolverine Gasket Retirees and Their Families

3.    Order Approving Settlement

4.    Class Member reimbursement claims form

5.    Class Members' Healthcare and Prescription "Make Whole" Amounts for the Period January 2010 through April 2012

6.    Summary of Class Counsel's Fees, Expenses, and Costs April 2012-June 2012

# EXHIBIT 1

## Retiree Healthcare and Prescription Drug Program Summary

  This is a summary of retirement healthcare and prescription drug insurance, benefits, coverages, reimbursement rights, and related procedures, all intended to fully restore the coverage levels in effect before the changes implemented in 2010, subject to the modified procedures summarized here and detailed in the Settlement Agreement resolving the class action lawsuit titled *Hargrove, et al. v. EaglePicher Corporation*, U.S.D.C., E.D. Mich. case no. 10-cv-10946. Currently the insurance is administered by AmWINS and insured by United American. The coverages and benefits are for retirees, spouses and other eligible family members, and surviving spouses included in the class action lawsuit all of whom are age 65 or over or otherwise eligible for Medicare or Medicaid healthcare. In this summary, all eligible persons are referred to as "you" or "retirees." The Healthcare Program is intended to have the net effect of providing 100% company-payment for all covered healthcare through the combination of insurance and reimbursement, including 100% company-payment of expenses incurred by retirees not covered by Medicare, subject only to $2 per-prescription retiree co-payments.

### I. Medicare (Part A) Hospital Services

| Services | Medicare Pays | Insurance Pays | You Initially Pay, and get reimbursement |
|---|---|---|---|
| **Hospitalization (per benefit period)**[1] | | | |
| Semiprivate room and board, general nursing and miscellaneous services and supplies: | | | |
| First 60 days | All but $1184 | $1184 (Part A Deductible)[2] | **$0** |
| 61st through 90th day | All but $296 per day | $296 per day | **$0** |
| 91st day and after: | | | |
| While using 60 lifetime reserve days | All but $592 per day | $592 per day | **$0** |
| Once lifetime reserve days are used: | | | |
| Additional 365 days | $0 | 100% of Medicare eligible expenses | **$0** |
| Beyond the additional 365 days | $0 | $0 | **All costs**[3] |
| **Skilled Nursing Facility Care** | | | |
| You must meet Medicare's requirements, including having been in a hospital for at least 3 days and entered a Medicare-approved facility within 30 days after leaving the hospital: | | | |
| First 20 days | All approved amounts | $0 | **$0** |
| 21st through 100th day | All but $148 per day | Up to $148 per day | **$0** |
| | | | |
| 101st day and after | $0 | $0 | **All costs**[3] |
| **Blood** | | | |
| First 3 pints | $0 | 100% | **$0** |
| Additional amounts | 100% | $0 | **$0** |

[1] A benefit period begins on the first day you receive service as an in-patient in a hospital and ends after you have been out of the hospital and have not received skilled care in any other facility for 60 days in a row.

[2] Medicare deductibles are set annually by Medicare and are subject to change from year-to-year. The number above is the 2013 Medicare Part A deductible amount and is used as an example only.

[3] Additional hospitalization, and skilled nursing facility costs for the 101st through the 365th day, will be reimbursed as described in Section IV of this summary.

## I.  Medicare (Part A) Hospital Services (cont.)

| Services | Medicare Pays | Insurance Pays | You Initially Pay, and get reimbursement |
|---|---|---|---|
| **Hospice Care** | | | |
| Available as long as your doctor certifies that you are terminally ill and you elect to receive these services. | All but $5 per-prescription copays and 5% for inpatient respite care[3] | $0 | **Balance[4]** |
| **Home Health Care** | | | |
| Medicare-approved services: | | | |
| Medically necessary skilled care services and medical supplies | 100% | $0 | **$0** |

## II.  Medicare (Part B) Medical Services

| Services | Medicare Pays | Insurance Pays | You Initially Pay, and get reimbursement |
|---|---|---|---|
| **Medical Expenses – In or Out of the Hospital and Out-patient Hospital Treatment**, such as physician's services, in-patient and out-patient medical and surgical services and supplies, physical and speech therapy, diagnostic tests, and durable medical equipment. | | | |
| Medicare Part B Deductible[5] | $0 | $0 | **$147[5]** |
| Remainder of Medicare-approved amounts | Generally 80% | $0 | **20% up to $1,500 including the Medicare Part B Deductible[5]** |
| After payment of the standard Part B Deductible and an additional amount out-of-pocket, totaling $1,500 annually, the insurance pays 20% of Medicare-eligible Part B expenses.[5] | Generally 80% | 20% | **$0** |
| **Blood** | | | |
| First 3 pints | $0 | All costs | **$0** |
| Medicare Part B Deductible[5] | $0 | $0 | **$147[5]** |
| Remainder of Medicare-approved amounts | Generally 80% | $0 | **20% up to $1,500 including the Medicare Part B Deductible[5]** |
| After payment of the standard Part B Deductible and an additional amount out-of-pocket, totaling $1,500 annually, the insurance pays 20% of Medicare-eligible Part B expenses.[5] | Generally 80% | 20% | **$0** |

---

[4] Medicare standards are subject to change from year-to-year.  The numbers above are for 2013 and are used as examples only. Retiree-paid Part A hospice expenses will be reimbursed as described in Section IV of this summary.

[5] Medicare deductibles are set annually by Medicare and are subject to change from year-to-year.  The number above is the 2013 Medicare Part B deductible amount and is used as an example only.  Retiree-paid Part B deductibles and other retiree-paid out-of-pocket expenses will be reimbursed as described in Section IV of this summary.

## II. Medicare (Part B) Medical Services (cont.)

| Services | Medicare Pays | Insurance Pays | You Initially Pay, and get reimbursement |
|---|---|---|---|
| **Clinical Laboratory Services** | | | |
| Blood tests for Diagnostic Services | 100% | $0 | **$0** |
| **Home Health Care** | | | |
| Durable medical equipment: | | | |
| Medicare Part B Deductible[5] | $0 | $0 | **$147[5]** |
| Remainder of Medicare-approved amounts | Generally 80% | $0 | **20% up to $1,500 including the Medicare Part B Deductible[5]** |
| After payment of the standard Part B Deductible and an additional amount out-of-pocket, totaling $1,500 annually, the insurance pays 20% of Medicare-eligible Part B expenses.[5] | Generally 80% | 20% | **$0** |
| **Excess Charges** | | | |
| Part B Excess Charges (Above Medicare-approved amounts) | $0 | 100% | **$0** |

## III. Plan Benefits Not Covered By Medicare

| Services | Medicare Pays | Insurance Pays | You Initially Pay, and get reimbursement |
|---|---|---|---|
| **Foreign Travel** | | | |
| Medically necessary emergency care services beginning during the first 60 days of each trip outside the USA: | | | |
| First $250 each calendar year | $0 | $0 | **$250[6]** |
| Remainder of charges | $0 | 80% to a lifetime maximum of $50,000 | **20% and amounts over the $50,000 lifetime maximum[6]** |

---

[6] Retiree-paid out-of-pocket expenses incurred during foreign travel will be reimbursed as described in Section IV of this summary.

## IV.  Reimbursement For Out-of-Pocket Expenses

The company will reimburse your out-of-pocket expenses under the Healthcare Program.  Once you have paid $1,500 out-of-pocket in expenses in a calendar year (including the Part B deductible), the Healthcare Program will pay 100% for covered services.  To get reimbursement for out-of-pocket expenses, you will have to timely submit your request to the company in writing along with proof that the provider billed you and you paid the expense.  Reimbursements will be processed on a quarterly basis at the end of September, December, March, and June.  You will be provided forms and instructions for seeking reimbursement.

## V.  Prescription Coverage

|  | 30 Day Retail | 90 Day Retail/Mail Order |
|---|---|---|
| **Tier 1** | **$2 Co-pay** | **$6 Co-pay** |
| Tier 1 includes most generics and certain low cost, brand name drugs. | | |
| **Tier 2** | **$2 Co-pay** | **$6 Co-pay** |
| Tier 2 includes some preferred brand name and high cost generics. | | |
| **Tier 3** | **$2 Co-pay** | **$6 Co-pay** |
| Tier 3 includes non-preferred brand name drugs and specialty | | |

# EXHIBIT 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRANK HARGROVE, JR. and RICHARD WHITE,
for themselves and others similarly-situated, and
INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE,
AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA (UAW),

                Case No. 2:10-cv-10946

       Plaintiffs,           Class Action

v.                       U.S. District Judge Arthur J. Tarnow

EAGLEPICHER CORPORATION also known as
EP MANAGEMENT CORPORATION and as
EAGLEPICHER MANAGEMENT COMPANY,

       Defendant.
_____/


**IMPORTANT NOTICE ABOUT HEALTH BENEFITS FOR
EAGLEPICHER/WOLVERINE GASKET
RETIREES AND THEIR FAMILIES**

Please read this notice carefully if:

1.    You worked at the EaglePicher/Wolverine Gasket plant in Inkster, Michigan; *and*
2.    You were an hourly employee in the  UAW-represented unit at the plant, *and*
3.    You are retired and entitled to health benefits under applicable collective bargaining agreements *or* you are the spouse, surviving spouse, or dependent of a retiree and entitled to such health benefits.

      This notice is an official communication from a federal court.  This notice is about the proposed settlement of a class action lawsuit that may affect your legal rights.  This notice includes information about the proposed settlement, retiree health benefits, a settlement fairness hearing scheduled by the Court, proposed attorneys' fees, and the process for being heard by the Court if you choose to do so.

## I.     THE PURPOSE OF THIS NOTICE

This is an official notice from the United States District Court for the Eastern District of Michigan. A class action lawsuit is pending in the Court. The Court has been asked to approve a proposed settlement of that lawsuit. The lawsuit and the proposed settlement affect certain EaglePicher/Wolverine Gasket retirees and their family members. If you are among those described above and in Section II of this notice, you likely are part of the class covered by the lawsuit. If so, the proposed settlement addresses your retirement health benefits.

The Court has preliminarily approved the proposed settlement. The Court will hold a hearing on _____, 2013. At the hearing class members can present their views on the proposed settlement, if they choose to do so. At the hearing, the Court will consider giving final approval to the proposed settlement. The Court will only give final approval if, after considering all viewpoints presented by the parties to the lawsuit and class members, the Court decides that the proposed settlement is fair, reasonable, and adequate under all the circumstances.

The terms of the proposed settlement are set out in the Settlement Agreement attached to this notice. This notice summarizes those terms. You can use the information in the Settlement Agreement and in this notice to assess the proposed settlement.

*If you approve of the proposed settlement, or if you do not wish to be heard, you do not need to take any action. If you want to object to the proposed settlement and ask that the Court not approve it, you must follow the objection procedure explained in Section VI of this notice. Again, if you do not object to the proposed settlement, you do not need to contact the Court or take any other action.*

## II.     THE LAWSUIT

The lawsuit—titled *Hargrove, et al. v. EaglePicher Corp.*, U.S.D.C., E.D. Mich., Case No. 10-cv-10946 and U.S. Ct. App. 6th Cir. Case No. 12-1555—was filed on March 9, 2010 in response to defendant EaglePicher's modification and reduction of certain collectively-bargained lifetime retiree healthcare benefits.

The lawsuit was brought by the UAW—the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America—and by two former UAW-represented hourly retirees who were employed at, and retired from, the Inkster plant: **(1)** Frank Hargrove Jr. and **(2)** Richard White. Frank Hargrove Jr. and Richard White are the "class representatives." They sued for themselves and on behalf of approximately 21 retirees and the retirees' spouses and dependents and surviving spouses.

The UAW, the two class representatives, and the class are collectively called the "plaintiffs." The plaintiffs sued EaglePicher Corporation a/k/a EP Management Corporation and EaglePicher Management Company, collectively called the "defendant."

The plaintiffs are represented by attorney Stuart M. Israel and others at the Legghio & Israel, P.C. law firm in Royal Oak, Michigan. UAW is also represented by attorney Michael F. Saggau and others within UAW's legal department. Stuart M. Israel and his law firm are

collectively called "class counsel." The defendant is represented by lawyers from Barnes & Thornburg LLP in Indianapolis, Indiana and other cities and states.

The Court certified the class on April 4, 2012, appointed Frank Hargrove Jr. and Richard White as class representatives, and appointed attorney Stuart M. Israel as class counsel. The certified class consists of:

> All former EaglePicher/Wolverine Gasket employees who were members of the UAW-represented Collective Bargaining Unit at EaglePicher's now-closed Wolverine Gasket Plant in Inkster, Michigan who are eligible under collective bargaining agreements and welfare benefit plans for company-provided retirement healthcare, and all eligible surviving spouses and other eligible dependents of those retirees.

The Court found that the class is so numerous that joinder of all members as individual plaintiffs is impracticable, that there were questions of law and fact common to the class, that retirees Hargrove and White and class counsel will fairly and adequately represent the class, and that the requirements for class action status set out in Federal Rule of Civil Procedure 23 are otherwise satisfied. The Court's order is Docket 34.

## III.   THE CLAIMS AND SETTLEMENT NEGOTIATIONS

### A.   Plaintiffs' Claims

In the lawsuit, plaintiffs claimed that the defendant promised in various collective bargaining agreements ("CBAs") to provide hourly retirees and dependents with lifetime health benefits. Plaintiffs claimed that defendant broke these promises beginning in 2010 by modifying and reducing certain health benefits for class members unilaterally and without UAW written consent.

Plaintiffs sued for breach of CBAs under Section 301 of the Labor-Management Relations Act, 29 U.S.C. §185. In addition, the class sued under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §1001 *et seq*. Plaintiffs claimed that defendant breached the CBAs and violated ERISA by increasing co-pays, deductibles, and out-of-pocket maximums, by shifting costs to retirees and other class members, and by declaring the prerogative to make additional unilateral modifications and reductions in the future.

Plaintiffs asked the Court to direct defendant to reinstate benefits for class members at the levels that existed prior to January 1, 2010; to "make whole" those class members who had out-of-pocket costs for healthcare above what they would have paid before the benefits were modified; and to otherwise meet contractual and legal obligations under the CBAs and ERISA.

### B.   Defendant's Responses

In response, defendant claimed that it did not promise lifetime health benefits in CBAs; that its obligations to provide retiree health benefits ended with the expiration of each CBA; that the Inkster plant was closed and sold and there are no current CBAs providing for continued retiree health benefits; that defendant had the legal right to reduce or make reasonable modifications to retiree health benefits and properly did so in 2010 and later and has the right to do so into the future; that the class of retirees is no longer part of a bargaining unit represented by UAW, such that consent by the UAW could not be given to bind the class members; and that it has no obligation under any CBA or ERISA to restore or provide retiree health benefits at the levels that existed prior to January 1, 2010.

Defendant asked that the Court determine that it did not breach any CBA or otherwise broke any promises. Defendant asked that the Court dismiss the lawsuit.

### C.   The District Court Litigation and the Appeal

The federal district court, on April 4, 2012, granted plaintiffs' motion for summary judgment and permanent injunction and issued its final judgment and permanent injunction. (Docket 35 and 36).  The Court ordered, in part (Docket 35, ¶¶27-28):

> Defendant shall comply with its CBA obligations regarding retirement healthcare. Defendant shall promptly restore the *status quo ante* and provide class members with the healthcare benefits in force for the more than 20 years preceding January 1, 2010, and shall continue to provide these healthcare benefits, at no premium cost to class members, for the lifetime of each class member. Defendant shall promptly take such action as necessary to identify, and make whole class members for, the expenses incurred by class members due to the defendant's unilateral changes imposed on the class members during the period from January 1, 2010 until the date that the *status quo ante* is restored.
>
> A judgment and permanent injunction implementing this opinion shall issue. The Court shall administratively close this action, but shall retain jurisdiction over any post-judgment matters and issues of implementation and enforcement of this order, the judgment, and the permanent injunction.

The district court decision is reported as *Hargrove, et al. v. EaglePicher Corp.*, 852 F.Supp.2d 85 (E.D. Mich. 2012) (Tarnow, J.).

EaglePicher appealed to the United States Court of Appeals for the Sixth Circuit.

### D.   Settlement Negotiations

While the case was pending on appeal, the parties engaged in settlement discussions in the Sixth Circuit mediation process.  The parties had a number of mediation conferences and communications under the direction of and with the participation of a Sixth Circuit mediator. The parties reached the settlement that is the subject of this notice.  They did so to avoid the additional cost, time, effort, and uncertainties that would result from continued litigation

regardless of the outcome, and to finally resolve their dispute. Because the stakes and the litigation uncertainties are substantial, the parties engaged in mediation and negotiations and reached the mutually-acceptable compromise reflected in the Settlement Agreement attached to this notice.

## IV.    THE PROPOSED SETTLEMENT

The parties agreed to settlement on the terms described in the Settlement Agreement and its Exhibits, attached to this notice. If the settlement is approved by the Court, the lawsuit will end and all class members will be bound by the terms of the Settlement Agreement. Please read the Settlement Agreement carefully. To help you understand it, this notice summarizes the proposed settlement.

### A.    The Settlement Terms

#### 1.    Compliance with the injunction and other orders

In an Asset Purchase Agreement between Wolverine Advance Materials, LLC ("Wolverine") and EaglePicher, by contract Wolverine agreed to assume responsibility for the retiree healthcare benefits at issue in this lawsuit and to undertake responsibility for EaglePicher's obligations under the district court's orders and decisions. Under the Settlement Agreement, Wolverine shall fully comply with the district court's April 4, 2012 Order Granting Summary Judgment and Permanent Injunction (Docket 35, "Injunction Order"), with the district court's April 4, 2012 Final Judgment and Permanent Injunction (Docket 36, "Final Judgment"), with the district court's Opinion and Order Granting Class Representatives' Motion for Attorney Fees and Expenses (Docket 45), reported as 2012 WL 1668152 (E.D. Mich. 2012), and with the terms of the Settlement Agreement. Full compliance with the Settlement Agreement and with regard to healthcare insurance and coverage summarized in Exhibits to the Settlement Agreement, to the extent that the Settlement Agreement does not precisely restore the *status quo ante* as directed by the district court, shall be deemed to satisfy the Injunction Order and Final Judgment. Wolverine's assumption of EaglePicher's obligations under the Injunction Order in no way negates or alters the Injunction Order, the Final Judgment, or other court orders, all of which remain in place and binding on EaglePicher to be enforced if Wolverine is unwilling or unable to or otherwise does not fully comply with, and remain in compliance with, the Settlement Agreement.

#### 2.    Healthcare coverage

As soon as practicable, if it has not already done so, Wolverine shall provide class members with healthcare insurance and coverage under the Healthcare Program, fully-paid by Wolverine, with no premium costs charged to class members, for the lifetime of each class member. This healthcare insurance and coverage shall be provided and maintained under the Healthcare Program described in the Settlement Agreement and summarized in Exhibit 1 to the Settlement Agreement.

### 3.     Prescription drug coverage

As soon as practicable, it if has not already done so, Wolverine shall provide and maintain the prescription drug insurance and coverage, with $2 per-prescription co-payments, under the Healthcare Program described in the Settlement Agreement summarized in Exhibit 1 to the Settlement Agreement.  This insurance and coverage, too, will be fully-paid by Wolverine, with no premium costs or deductibles or increased co-payments charged to class members, for the lifetime of each class member.

### 4.     Deductibles/out-of-pocket expenses reimbursement

As soon as practicable, if it has not already done so, Wolverine shall implement a procedure to reimburse class members for deductibles and out-of-pocket expenses incurred by class members under the Healthcare Program described in the Settlement Agreement and summarized in Exhibit 1 to the Settlement Agreement.

That Program provides 100% coverage of Medicare Part A deductibles and expenses for medical services not paid by Medicare.  That Program requires class members to pay annual Medicare Part B deductibles and to pay expenses not covered by Medicare under Part B, up to an annual out-of-pocket maximum of $1,500 per person, after which the Healthcare Program provides 100% payment.  Wolverine will reimburse class members for all such deductible amounts and expenses paid by class members, having the net effect of providing 100% coverage for all covered healthcare services under the Healthcare Program through the combination of insurance and reimbursement.  Reimbursements shall be made so as to comply with the requirements under the Internal Revenue Code and any other governing requirements applicable to health reimbursement arrangements to ensure tax-protected status.  The procedures and protocol for class members to obtain reimbursement of their out-of-pocket expenditures are set forth in Article 4 of the Settlement Agreement.

Reimbursement payments will be made by Wolverine quarterly, in April, July, October, and January of each year.  Each quarterly reimbursement will cover deductibles and expenses paid or applied for by class members during the preceding quarter.  Class members must apply for reimbursement within 60 days of paying the reimbursable expense.  Reimbursements for any calendar year will be limited to the $1,500 annual out-of-pocket maximum payable in a calendar year under the Healthcare Program, because after a class member has paid a total of $1,500 out-of-pocket expenses in a calendar year, the Healthcare Program will provide 100% payment of expenses not covered by Medicare.  Reimbursement will not apply to the $2 per-prescription co-payment expenses paid by class members for prescription drugs after the $2 per-prescription coverage is restored.

### 5.     The "make whole" remedy

Wolverine shall reimburse class members or their estates for the amounts specified on the list attached as Exhibit 5 to the Settlement Agreement, reflecting certain "make whole" amounts identified by class members for expenses paid through April 2012 in response to a mail survey undertaken by class counsel.  Other "make whole" and out-of-pocket expenses paid by class members—including prescription drug expenses above $2 per-prescription incurred before

restoration of the $2 per-prescription coverage—shall be reimbursed through the reimbursement process described in paragraphs 4 and 5 of the Settlement Agreement.

> **6.     Temporary continuation of current healthcare and prescription coverages**

Until the healthcare and prescription drug coverages required above are implemented, if not already implemented, Wolverine shall maintain the current coverages, fully-paid by Wolverine, with no premium costs to class members, subject to the reimbursement and "make whole" terms described in paragraphs 4 and 5 and to the terms regarding the two pre-Medicare class members set out in paragraph 7.  The healthcare and prescription drug coverages required by paragraphs 2 and 3 shall each be implemented as soon as practicable, if not already implemented; implementation of one shall not be delayed by a longer timetable necessary to implementing the other.

> **7.     Class members recently covered by Medicare**

Wolverine informed class counsel that there were two class members not covered by Medicare at the time of the negotiation of the terms of the Agreement, one began Medicare coverage on or about November 26, 2012, and the other began Medicare coverage on or about February 23, 2013.  Each were transferred to the healthcare and prescription drug coverages called for by the Settlement Agreement, which require Medicare participation, at the time their Medicare coverage began.  Before then, Wolverine continued their pre-Medicare coverages, which are subject to the "make whole" and expense reimbursement process described in paragraphs 4 and 5 of the Settlement Agreement.

> **B.     Attorney Fees and Expenses**

Wolverine will comply with the district court's May 10, 2012 order directing payment of fees, costs, and expenses incurred by class counsel for the period November 2009 through March 2012.  (Docket 45).  Wolverine also will pay class counsel's fees, costs, and expenses incurred during the period April through June 2012, as itemized in Exhibit 6 to the Settlement Agreement, at the rates set by the district court's May 10, 2012 order.  In addition, Class Counsel will specify, and if and when the Settlement Agreement is approved by the Court, Wolverine will pay, class counsel's fees, costs, and expenses incurred after June 30, 2012 in the course of resolving the lawsuit and completing the Settlement Agreement, at the rates set by the district court's May 10, 2012 order.  Any disputes over the reasonableness of the work hours expended by class counsel for which fees are requested for the period after June 2012 shall be subject to resolution by the Court pursuant to Rule 23(h).  Class counsel may in addition request fees, costs, and expenses from Wolverine by application to the Court for any work connected to implementation and enforcement of the Settlement Agreement and the judgment approving the settlement.  These attorney fees, costs, and expenses do not diminish the reimbursements available to class members or otherwise effect the healthcare required under the Settlement Agreement.

## V.     THE REASONS FOR THE PROPOSED SETTLEMENT

The class representatives, the UAW, and class counsel concluded that the settlement described in the Settlement Agreement is in the best interests of class members.  Without the settlement the appeal would continue, subjecting each side to further delay, expense, and uncertainty.

Class representatives, class counsel, and UAW counsel believe that the settlement provides a combination of insurance and reimbursement in a Healthcare Program that will provide lifetime comprehensive, healthcare highly beneficial to class members, provides a reasonable "make whole" remedy, and appropriately provides for Wolverine payment of fees, expenses, and costs.  In addition, the settlement will resolve the appeal, avoid further delay, and eliminate uncertainty.  While the settlement involves some compromise, it has the net effect of providing 100% company-paid healthcare under the Healthcare Program through the combination of insurance and reimbursement and is a favorable resolution of the litigation.

Again, please read the Settlement Agreement carefully.  If approved, its terms will bind all class members.

## VI.    OBJECTIONS AND HEARING

The Court has scheduled a hearing at the Theodore Levin United States Courthouse, 231 W. Lafayette Boulevard, Courtroom 124, Detroit, Michigan 48226.  The hearing will take place beginning at ___ o'clock __.m. on _____, 2103.  The purpose of the hearing is to help the Court determine whether the proposed settlement on the terms set out in the Settlement Agreement is fair, reasonable, and adequate and in the best interests of the class, and whether to give final approval to the settlement.  The settlement will not be effective unless and until it is approved by the Court.

*You do not have to attend the hearing*.  Class counsel will attend the hearing on behalf of the class.  You may attend the hearing.  You may attend with or without your personal lawyer.  Whether or not they attend the hearing, all class members will be bound by the settlement if it is approved.  No class member will be individually excluded from the Settlement Agreement if it is approved.  *Any class member may object to the settlement by filing a written objection in compliance with the procedure described in the next paragraph.  If you file a written objection, you or your personal lawyer will have the opportunity to address the Court at the hearing to explain your objection and tell the Court why you do not believe that the proposed settlement should be approved.  You or your personal lawyer will not have the right to address the Court at the hearing, however, unless you file a written objection postmarked on or before _____, 2013.*

If you want to object to the proposed settlement, you must **(1)** mail your written objection to the Court *and* **(2)** at the same time mail copies to the parties' lawyers.  Any objection should have the following heading at the top:  "*Hargrove, et al. v. Eaglepicher Corp.*, U.S.D.C., E.D. Mich. Case No. 2:10-cv-10946."  Any objection should be titled:  "Objection to Proposed Settlement."  Any objection should be mailed, postmarked on or before _____, 2013, to Clerk of the Court, United States District Court for the Eastern District of Michigan, Southern

Division, Theodore Levin United States Courthouse, 231 W. Lafayette Boulevard, Detroit, Michigan 48226.  At the same time that any objection is mailed to the Clerk, a photocopy of that objection must be mailed to *each* of the following:  **(1)** Stuart M. Israel, attorney for plaintiffs, Legghio & Israel, P.C., 306 South Washington, Suite 600, Royal Oak, Michigan 48067; and **(2)** Howard E. Kochell, attorney for defendant, Barnes & Thornburg LLP, 11 South Meridian Street, Indianapolis, Indiana 46204.

If, after any objections are considered and after the hearing the Court determines that the proposed Settlement Agreement is fair, reasonable, and adequate and is in the best interests of class members, the Court will issue a judgment approving the settlement.  Once the judgment is final, the settlement will be binding on defendant and all plaintiffs and class members, including class members who filed objections and those who did not.  If the settlement is not approved, the Settlement Agreement will have no effect.

*Again, if you do not object to the proposed settlement, you do not need to do anything.*

## VII.    MORE INFORMATION

This notice and a copy of the Settlement Agreement have been sent to all known class members at their last known addresses.  The notice and Settlement Agreement and other papers associated with this case are also available **(1)** in the court file, during regular business hours, at the office of the Clerk of the Court, United States District Court for the Eastern District of Michigan, Southern Division, Theodore Levin United States Courthouse, 231 W. Lafayette Boulevard, Detroit, Michigan 48226 and **(2)** through the federal court electronic filing system, PACER, located at http://pacer.psc.uscourts.gov.

If you are aware of others who should have received this notice but did not, please ask them to write to Mr. Israel and Mr. Kochell providing their contact information and requesting copies.  If you would like to change your address or other contact information, please notify Mr. Israel and Mr. Kochell in writing at the addresses set out in Section VI.

If you want additional information about the litigation, the proposed settlement, or the procedure described in this notice, you may contact class counsel Stuart M. Israel by writing to him at Legghio & Israel, P.C., 306 South Washington, Suite 600, Royal Oak, Michigan 48067 or by telephoning him at 248-398-5900, ext. 1161.

Arthur J. Tarnow
United States District Judge
Date:  _____, 2013

## ATTACHMENTS TO NOTICE

1.      Settlement Agreement and Release with Exhibits 1-6

# EXHIBIT 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRANK HARGROVE, JR. and RICHARD WHITE,
for themselves and others similarly-situated, and
INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE,
AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA (UAW),

|  |  |
|---|---|
|                    Plaintiffs, | Case No. 2:10-cv-10946 |
|  | Class Action |
| v. | U.S. District Judge Arthur J. Tarnow |

EAGLEPICHER CORPORATION also known as
EP MANAGEMENT CORPORATION and as
EAGLEPICHER MANAGEMENT COMPANY,

                    Defendant.
_____/

## ORDER APPROVING SETTLEMENT

This matter came before the Court on the joint motion of (**1**) plaintiffs Frank Hargrove Jr. and Richard White, for themselves and on behalf of the certified class; (**2**) plaintiff International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW); and (**3**) defendant EaglePicher Corporation, also known as EP Management Corporation and EaglePicher Management Company, pursuant to Fed.R.Civ.P. 23(e), for approval of the parties' Settlement Agreement to fully and finally resolve this class action.

The Court, having held a fairness hearing and considered the presentations and arguments of the parties, is satisfied that all the requirements of Rule 23(e) have been met and hereby APPROVES the class settlement.

The Court preliminarily approved the Settlement Agreement on _____, 2013 and approved a notice to class members which described the settlement, set the objection deadline, and scheduled the fairness hearing. (Docket __). The notice and settlement documents were mailed to class members. The Court conducted the fairness hearing on _____, 2013. Based on the hearing and on the submissions to the Court, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

**The Parties and the Class.**

1.      The individual plaintiffs and representatives of the certified class are retirees Frank Hargrove Jr. and Richard White. The union plaintiff is the UAW.

2.      The defendant is EaglePicher Corporation, also known as EP Management Corporation and EaglePicher Management Company ("EaglePicher").

3.      The Court certified the class, approved the individual plaintiffs as class representatives, and approved class counsel on April 4, 2012. (Docket 34). The certified class consists of:

> All former EaglePicher Wolverine/Gasket employees who were members of the UAW-represented Collective Bargaining Unit at EaglePicher's now-closed Wolverine Gasket Plant in Inkster, Michigan who are eligible under collective bargaining agreements and welfare benefit plans for company-provided retirement healthcare, and all eligible surviving spouses and other eligible dependents of those retirees.

4.      The retirees in the class worked in the UAW-represented collective bargaining unit at EaglePicher's Wolverine Gasket plant in Inkster, Michigan. The class members retired under various collective bargaining agreements ("CBAs") governing the unit. The retirees and other class members are participants and beneficiaries in ERISA-regulated welfare benefit plans

created, sponsored, and operated by EaglePicher to provide health benefits for the retirees and their eligible dependents and surviving spouses.

**The Claims and Defenses.**

    **5.**    The individual plaintiffs sued for themselves and the class under Section 301 of the Labor-Management Relations Act (LMRA), 29 U.S.C. §185, and the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §1001 *et seq.*  UAW sued under LMRA Section 301. Plaintiffs claimed that defendant breached promises made in various CBAs to provide hourly retirees and their dependents and surviving spouses with lifetime health benefits.  Plaintiffs claimed that defendant broke those promises beginning in 2010 by modifying and reducing health benefits for class members unilaterally and without UAW written consent.  Plaintiffs asked the Court to direct defendants to reinstate the health benefits for class members at the levels that existed prior to January 1, 2010; to "make whole" class members for out-of-pocket healthcare expenses above what they would have paid if the benefits were not modified; and to otherwise meet contractual and legal obligations under the CBAs and ERISA.

    **6.**    EaglePicher responded that it did not promise lifetime health benefits in CBAs; that its obligations to provide retiree health benefits ended with the expiration of each CBA; that the Inkster plant was closed and sold and there are no current CBAs providing for continued retiree health benefits; that the class of retirees is no longer part of a bargaining unit represented by UAW, such that consent by the UAW could not be given to bind the class members; that EaglePicher had the legal right to reduce or make reasonable modifications to retiree health benefits and properly did so in 2010 and later, and has the right to do so into the future; and that EaglePicher had no obligation under any CBA or ERISA to restore or provide retiree health benefits at the levels that existed prior to January 1, 2010.  EaglePicher asked the Court to

determine that it did not breach any CBA or otherwise break any promises.  EaglePicher asked

the Court to dismiss the lawsuit.

**The Litigation in the District Court.**

7.     This Court, on April 4, 2012, granted summary judgment in plaintiffs' favor and

issued its permanent injunction.  The Court ordered:

> Defendant shall comply with its CBA obligations regarding retirement
> healthcare. Defendant shall promptly restore the status quo ante and
> provide class members with the healthcare benefits in force for the more
> than 20 years preceding January 1, 2010, and shall continue to provide
> these healthcare benefits, at no premium cost to class members, for the
> lifetime of each class member. Defendant shall promptly take such action
> as necessary to identify, and make whole class members for, the expenses
> incurred by class members due to the defendant's unilateral changes
> imposed on the class members during the period from January 1, 2010
> until the date that the status quo ante is restored.
>
> A judgment and permanent injunction implementing this opinion shall
> issue. The Court shall administratively close this action, but shall retain
> jurisdiction over any post-judgment matters and issues of implementation
> and enforcement of this order, the judgment, and the permanent
> injunction.

Docket 35 at 10, reported as *Hargrove, et al. v. EaglePicher Corp.*, 852 F.Supp.2d 85 (E.D.

Mich. 2012 (the "Injunction Order").     On April 4, 2012, this Court also entered its Final

Judgment and Permanent Injunction (Docket 36, the "Final Judgment") in favor of the plaintiffs

and against EaglePicher.   On May 10, 2012, this Court awarded attorney fees, costs, and

expenses for class counsel, payable by EaglePicher, for the period November 14, 2009 through

March 31, 2012.  (Docket 45).

**The Appeal, Mediation, and Settlement.**

8.     EaglePicher appealed to the United States Court of Appeals for the Sixth Circuit.

In the course of the Sixth Circuit mediation process, the parties reached settlement resolving the

appeal and intended to fully resolve this litigation.   The parties desire to avoid the additional

4

cost, time, effort, and uncertainties that would result from continued appeal regardless of the outcome, and desire to enter into the settlement reflected in their Settlement Agreement, attached to this order.  Because the stakes are high and the uncertainties substantial, the parties reached the mutually-acceptable compromise described in the Settlement Agreement.

9.      The Sixth Circuit remanded to this Court and the parties sought this Court's approval of the settlement and their Settlement Agreement through the procedures prescribed by Fed.R.Civ.P. 23.  As discussed ahead, the parties' settlement and their Settlement Agreement is approved.

**The Settlement Terms.**

10.     In an asset purchase agreement between EaglePicher and Wolverine Advanced Materials, LLC ("Wolverine"), Wolverine agreed by contract with EaglePicher to assume EaglePicher's responsibility for the retirement healthcare benefits addressed in this litigation. Under the Settlement Agreement, to which Wolverine is a party, Wolverine will undertake all the obligations imposed on EaglePicher by the Injunction Order and Final Judgment.  Under the Settlement Agreement, EaglePicher retains those responsibilities and obligations, but Wolverine will fully satisfy those responsibilities and obligations and in doing so will be deemed to satisfy EaglePicher's responsibilities and obligations under the Injunction Order and Final Judgment.

11.     The Settlement Agreement and its Exhibits are attached to this order.  In general, they require that Wolverine, through a Healthcare Program that includes a combination of insurance and reimbursement, will provide class members with 100%-Wolverine-paid lifetime retirement healthcare and prescription coverages.  The insurance and coverages provided by the Healthcare Program are described in the Settlement Agreement and its Exhibits.  In addition, the Settlement Agreement requires that Wolverine will provide "make whole" reimbursement to

class members for out-of-pocket expenses incurred by them during the period of, and as a result of, the reduced insurance and coverages.

12.     The Settlement Agreement also provides for reimbursement of later out-of-pocket expenses, so that the net effect of the Healthcare Program provided in the Settlement Agreement will be, combining insurance and the reimbursement, 100% Wolverine-paid healthcare for all class members.   The Settlement Agreement also provides for Wolverine payment of attorney fees, costs, and expenses and the costs and expenses of the Rule 23 approval process.

13.     The Settlement Agreement also preserves the enforceability against EaglePicher of the Court's Injunction Order and Final Judgment, except that the Agreement provides that Wolverine's full compliance with the terms of the Settlement Agreement, to the extent that those terms do not precisely restore the *status quo ante* as directed by the Court in Docket 35 and 36, shall be deemed to satisfy the obligations set out Docket 35 and 36.  Again, the settlement terms are detailed in the Settlement Agreement and its Exhibits, attached to this order.

14.     The parties reached this settlement to avoid the expense, delay, and uncertainties of continuing the appeal and have advised the Court that they consider its terms to be a mutually-beneficial resolution of their dispute and an end to this litigation.

**Class Counsel's Assessment.**

15.     Class counsel and UAW counsel conclude that this settlement is in the best interests of the class and both concur that the settlement terms embodied in the Settlement Agreement are fair, reasonable, adequate, and beneficial to the Class.

16.     Class counsel identified a number of factors that led to his conclusion that the settlement is fair, reasonable, adequate, and beneficial to the Class.  Class counsel considered the uncertainties and delay involved in continued litigation of the pending appeal. He analyzed the governing law, the CBAs, and other pertinent documents and evidence.   While class counsel

concluded that plaintiffs have a substantial case on appeal, he also recognized that continued litigation would be vigorously contested by EaglePicher, that the final outcome of any appeal is uncertain, and that whatever the outcome, continued litigation would entail additional delay in the final resolution of the parties' dispute.  He recognized, too, that settlement would provide prompt and certain and substantial and positive relief for the class members.

17.     In addition, class counsel considered that the Settlement Agreement terms, through the Healthcare Program's combination of Wolverine-paid insurance and reimbursement, would have the net effect of providing class members with lifetime, fully-paid retirement healthcare, the core objective sought in the litigation.  In addition, he considered that the Settlement Agreement provides appropriate "make whole" relief and for Wolverine payment of attorney fees, costs, and expenses of litigation and the expenses of the Rule 23 approval process. He considered, too, that the settlement terms obligate Wolverine's compliance without diminishing EaglePicher's continued responsibilities and obligations under this Court's Injunction Order and Final Judgment, providing retirees with additional security.

18.     Based on these factors, class counsel, in consultation with the class representatives and the UAW, UAW legal counsel, and various class members, concluded that the terms of the Settlement Agreement are fair, reasonable, and beneficial to the class.

**Defense Counsel's Assessment.**

19.     Defense counsel concurs that the settlement is fair, reasonable, and adequate and is a mutually-beneficial and positive resolution of the parties' dispute, bringing certainty, avoiding more delay, and providing salutary and valuable benefits to retirees and the retirees' eligible dependents and surviving spouses.

**Notice to the Class.**

20.     The class notice—titled "Important Notice About Health Benefits For EaglePicher/Wolverine Gasket Retirees And Their Families" (Docket __, Ex. 2)—was approved by the Court on _____, 2013 (Docket __).  Wolverine sent the notice by first class mail to all class members at their last known addresses.

21.     The class notice summarized the litigation, the settlement, and the approval process.  The notice was mailed to class members, with each notice accompanied by a complete copy of the Settlement Agreement and its Exhibits (Docket __, Ex. 2).

22.     The class notice outlined its purpose and summarized the lawsuit, identified the parties and the lawyers, defined the certified class, outlined the parties' claims and defenses, and summarized the litigation history.  The notice described the mediated negotiations and summarized the settlement terms.  The class notice outlined the parties' reasons for settlement, specified that the settlement entails compromise, and described the procedure for objecting to the settlement.  The class notice advised class members that access to all court filings is available at the courthouse and through PACER and invited class members to request additional information about the litigation, the settlement, or the procedure from class counsel by mail or telephone. (Docket __, Ex. 2).

**The Approval Process.**

23.     Pursuant to the Court's Preliminary Order approving the settlement, (Docket __), the Court held a fairness hearing on _____, 2013.  No class member made a written objection to the settlement and no class member appeared at the hearing to present an objection.

24.     As discussed next in more detail, the Court concludes that the parties' settlement, concurred in by all parties and their counsel, and reached under the auspices of the Sixth Circuit mediation process, is the product of reasoned informed "arm's length" negotiations which

produced a mutually-beneficial settlement that eliminates uncertainty, avoids further delay, and is consistent with the public interest, and, that in these circumstances, is fair, reasonable, and adequate under Rule 23(e)(2).

## CONCLUSIONS OF LAW

1.     This Court has jurisdiction under LMRA Section 301, 29 U.S.C. §185, and ERISA Sections 502(3)(1) and (f), 29 U.S.C. §§1132(e)(1) and (f).

2.     This is a certified class action under Fed.R.Civ.P. 23(a) and (b)(1) and (2) and (g) as decided by the Court on April 4, 2010 in the order certifying this class action and approving class representatives Frank Hargrove Jr. and Richard White and class counsel Stuart M. Israel. (Docket 34).

**The Legal Standards.**

3.     The law favors the settlement of class action litigation.  See *UAW v. General Motors Corp.*, 497 F.3d 615, 632 (6th Cir. 2007) (noting "the federal policy favoring settlement of class actions"); *IUE-CWA v. General Motors Corp.*, 238 F.R.D. 583, 593 (E.D. Mich. 2006) (noting "the general federal policy favoring the settlement of class actions"); and *Steiner v. Fruehauf corp.*, 121 F.R.D. 304, 305 (E.D. Mich. 1988), *aff'd sub nom Priddy v. Edelman*, 883 F.2d 438, 447 (6th Cir. 1989) ("case law favors the voluntary settlement of class actions").

4.     "The claims, issues, or defenses of a certified class may be settled...only with the court's approval." Fed. R. Civ. P. 23(e).

5.     To warrant district court approval, a class action settlement must be "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  See *UAW v. General Motors*, 497 F.3d at 631 ("Before approving a settlement, the district court must conclude that it is 'fair, reasonable, and adequate.'"); *In re Cardizem CD Antitrust Litigation*, 218 F.R.D. 508, 522 (E.D. Mich. 2003) (citations omitted), *appeal dismissed* 391 F.3d 812 (6th Cir. 2004), *cert. denied* 544 U.S.

9

1049, 125 S. Ct. 2297, 161 L. Ed. 2d 1089 (2005) ("In deciding whether to grant final approval of the Proposed Settlement, this Court must determine, after holding a fairness hearing, whether the settlement is 'fair, adequate and reasonable'").

6.      "The evaluation and approval of a class settlement is committed to the sound discretion of the district court."  *IUE-CWA*, 238 F.R.D. at 594, citing, *inter alia*, *Clark Equip. Co. v. Allied Industrial Workers*, 803 F.2d 878, 880 (6th Cir. 1986), *cert. denied* 480 U.S. 934, 107 S. Ct. 1574, 94 L. Ed. 2d 765 (1987).  The district court "should approve a class settlement if, following a hearing, the court determines that the settlement 'is fair, reasonable, and adequate.'"  *IUE-CWA*, 238 F.R.D. at 593.

7.      The district court's "role in passing upon the propriety of a class action settlement is limited to a determination of whether the terms proposed are fair and reasonable to those affected."  *Steiner*, 121 F.R.D. at 305, citing, *inter alia, Williams v. Vukovich*, 720 F.2d 909 (6th Cir. 1983).  The district court's evaluation of a class action settlement "must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned."  *Clark Equip. Co.*, 803 F.2d at 880 (citation omitted).  Accord: *IUE-CWA*, 238 F.R.D. at 594.

8.      The district court is to assess a proposed settlement based on a "range of reasonableness" which "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion."  *IUE-CWA*, 238 F.R.D. at 594 (citations omitted).   See also *Cardizem*, 218 F.R.D. at 523 (applying a "range of reasonableness" measure).  The district court is to consider "whether the interests of the class as a whole are better served if the litigation is resolved by the settlement

rather than pursued." *Cardizem*, 218 F.R.D. at 522 (citation omitted). In assessing a proposed settlement, the district court "should not substitute its judgment for that of the parties." *Steiner*, 121 F.R.D. at 306. See also *IUE-CWA*, 238 F.R.D. at 594 (citations and quotations marks omitted) (the court "must respect the parties' compromise" and "may not substitute his or her judgment for that of the litigants and their counsel").

9.      Before conducting a fairness hearing, a district court must "direct notice in a reasonable manner to all class members who would be bound" by the settlement. Fed.R.Civ.P. 23(e)(1). The notice should be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *UAW v. General Motors*, 497 F.3d at 629, citing, *inter alia*, *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 94 L. Ed. 865 (1950).

10.      The Court finds that the class notice and related documents approved by the Court and sent to all class members satisfied Rule 23(e)(1) notice requirements. In particular, the notice set out the litigation history, explained the settlement, set out the objection procedure and deadline, provided a mechanism for class members to seek further information, and was accompanied by the salient documents—the Settlement Agreement and its Exhibits. See *UAW v. General Motors*, 497 F.3d at 630 (upholding notice which "clearly explained its purpose, discussed the nature of the pending suit and proposed class and accurately summarized the 76-page settlement agreement and incorporated exhibits" and which also enclosed a "copy of the settlement agreement, ensuring that retirees would have full access to the very document the district court would examine at the fairness hearing").

11.      The purpose of the fairness hearing is to provide "procedural safeguards" giving class members the opportunity to present objections on the record and giving the parties the

opportunity to present "sufficient evidence to allow the district court to review the terms and legitimacy of the settlement." *UAW v. General Motors*, 497 F.3d at 635.  "In satisfying these requirements, a district court has wide latitude." *Id*.  The court may "limit the fairness hearing to whatever is necessary to aid it in reaching an informed, just and reasoned decision." *Id*. (citations omitted).  The fairness hearing need not "entail the entire panoply of protections afforded by a full-blown trial on the merits."  Rather, the district court has "the discretion to limit the fairness hearing" to whatever is "consistent with the ultimate goal of determining whether the proposed settlement is fair, adequate and reasonable." *Tennessee Ass'n of HMOs, Inc. v. Grier*, 262 F.3d 559, 567, *reh. en banc denied* (6th Cir. 2001).

      **12.**     The Sixth Circuit identified seven "factors" that "guide the inquiry" undertaken by the district court:  "(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest." *UAW v. General Motors*, 497 F.3d at 631, citing *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992) and *Williams v. Vukovich*, 720 F.2d 909, 922-923 (6th Cir. 1983).  See also *IUE-CWA*, 238 F.R.D. at 594; *Cardizem*, 218 F.R.D. at 522; and *Steiner*, 121 F.R.D. at 305-306.  In considering the seven factors, the district court may choose to "consider only those factors that are relevant to the settlement and may weigh particular factors according to the demands of the case." *IUE-CWA*, 238 F.R.D. at 594-595, citing, *inter alia*, *Granada*, 962 F.2d at 1205-1206.  Here, as detailed ahead, considering the pertinent factors, the Court concludes settlement is fair, reasonable, and adequate under Rule 23(e)(2).

**Assessing the Dispute and Weighing Continued Litigation Against Settlement.**

**13.**     The fairness of a class action settlement "turns in large part on the bona fides of the parties' legal dispute." *UAW v. General Motors*, 497 F.3d at 631.  In assessing the parties' legal dispute, the district court's task "is not to decide whether one side is right or even whether one side has the better of these arguments....The question rather is whether the parties are using settlement to resolve a legitimate legal and factual legal disagreement." *Id.* at 632 (finding a legitimate dispute over whether "collective bargaining agreements vest former union workers with their healthcare benefits upon retirement"). *Id.* at 631.

**14.**     Here, consideration of this factor leads to the conclusion that there is indeed a legitimate dispute and that resolution of this lawsuit by the settlement better serves the class than continued litigation.

**15.**     The core of the parties' dispute is whether the retiree health benefits at issue are, under the series of governing CBAs, vested, unalterable, lifetime benefits, or whether they are not, and, if they are, whether they may be modified unilaterally at defendant's discretion.  The parties' views on this question are diametrically opposed.  Resolution of this core question would involve adjudication of sharply-contested disagreements on appeal.  Here, the Court finds that the parties' dispute on appeal was genuine, that continued litigation would carry substantial expense, that the outcome is uncertain for all sides, and that, in particular, class members would bear the risk that continued litigation would leave them with future uncertainty and lesser benefits than those offered by the settlement.  These circumstances, the Court finds, favor the settlement that ends uncertainty, avoids further delay, promptly ameliorates hardship, and is beneficial to each side and to the class as a whole.

**16.**     In short, the settlement—reached in the Sixth Circuit mediation process—resolves uncertain and protracted litigation in which the legal merits are the subject of a good faith dispute

and benefits class members.  Accordingly, the Court concludes that the settlement is informed, prudent, and rational, within an appropriate "range of reasonableness," beneficial, and fair, reasonable, and adequate under Rule 23(e)(2).

**The Risk/Delay/Expense Factor.**

17.     Whatever the relative merits of the parties' legal positions, there is no risk-free, expense-free litigation.  *IUE-CWA*, 238 F.R.D. at 596.  In *IUE-CWA*, Judge Hood noted the protracted litigation in two retiree health benefits cases finally decided by the Sixth Circuit: *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998), which after nine years of litigation upheld the employer's right to modify salaried retirees' benefits, and *Bittinger v. Tecumseh Products*, 201 F.3d 440 (6th Cir. 1999), which after eight years of litigation affirmed the employer's right to modify retiree health benefits.  See also *UAW v. General Motors*, 2006 U.S. Dist. LEXIS 14890, 2006 WL 891151 at *17 (E.D. Mich.) ("The obvious costs and uncertainty of such lengthy and complex litigation weigh in favor of settlement"), *consol. and aff'd. UAW v. General Motors*, 497 F.3d 615 (6th Cir. 2007), and *In re Cincinnati Policing*, 209 F.R.D. 395, 400 (S.D. Ohio 2002) (internal quotation marks and citations omitted) ("the trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court. The prospect of such a massive undertaking clearly counsels in favor of settlement.").

In addition, in retiree benefits litigation delay at the least diminishes the value of possible victory at some distant point in the future.  Here, there is an aged group of class members, some who might not benefit at all from a victory that comes only after more years of litigation.  And, again, absent settlement, all class members would be subject to the uncertainty, hardship, and delay attendant to continued litigation on appeal or otherwise.  The "risk/delay/expense" factor,

too, warrants approval of the settlement, which promptly will provide comprehensive health benefits for all class members.

**The Judgment Of Legal Counsel.**

18.    The judgment of the parties' legal counsel that the settlement is in the best interest of the settling parties "is entitled to significant weight, and supports the fairness of the class settlement." *IUE-CWA*, 238 F.R.D. at 597 (citations omitted).  See also *Cardizem*, 218 F.R.D. at 525 ("In approving a proposed settlement, the Court also considers the opinion of experienced counsel as to the merits of the settlement").  Here, as discussed, all parties' legal counsel, the UAW, and the class representatives share the view that the settlement is fair, reasonable, and adequate, and beneficial to class members.

19.    The Court is familiar with legal counsel for both sides from this litigation.  The Court recognizes their experience and diligence and concludes that their endorsement of the litigation and settlement "is entitled to significant weight." *IUE-CWA*, 238 F.R.D. at 597.  Their efforts and analysis, already summarized, displayed an informed, reasoned, practical, and productive approach.  Their universal assessment that the settlement is in the interest of all parties and is fair, reasonable, and adequate is well-supported and is consistent with the Court's views.  See. *IUE-CWA*, 238 F.R.D. at 597 (citations omitted):  "the Court must rely upon the judgment of experienced counsel and, absent fraud, 'should be hesitant to substitute its own judgment for that of counsel.'"  This factor, too, supports approval of the Settlement Agreement.

**The Discovery/Evidence Factor.**

20.    The parties exchanged documents and information and collected the governing CBAs and other documents and evidence relevant to their dispute.  In addition, EaglePicher provided information about the history and status of the health benefits, including the names and locations of retirees, eligible dependents, and surviving spouses, benefits data, and other

information pertinent to both the litigation and the mediated settlement discussions.  Also, in addition to their own internal investigation and information gathering, the parties during the mediation process were aided by Justin Goodwin, EaglePicher's health benefits consultant.  The Court finds that through discovery and cooperative information exchange the parties developed and considered a body of information sufficient to permit their informed assessment of the litigation and the settlement.  The Court concludes that the parties and the Court have sufficient information to conclude that the settlement is a fair, reasonable, and adequate resolution of the parties' dispute. The discovery/evidence factor, too, warrants approval of the settlement under Rule 23(e)(2).

**The Fairness Factor.**

21.     District courts scrutinize settlements to ensure that absent class members have not "lost out in favor of attorneys and named class members."  *IUE-CWA*, 238 F.R.D. at 598 (citations omitted).  There is nothing in the parties' Settlement Agreement that improperly benefits attorneys or that favors the class representatives.  To the contrary, the Court finds that the Settlement Agreement is even-handed in its treatment of class members, that it does not favor the class representatives, and that it reasonably provides for Wolverine payment of class counsel fees, costs, and expenses without diminishing the value of the settlement to the class members.

22.     The named class representatives are given no special consideration or advantage under the Settlement Agreement.  Rather, they are treated the same as all other class members. In addition, the Settlement Agreement provides for class counsel fees to be paid by Wolverine, not out of any settlement fund for the class, and the fees are based on hours worked at reasonable hourly rates, some already approved by the Court in Docket 45, and the rest subject to Court approval.  Again, the treatment of the class members and the class representatives and class

counsel under the Settlement Agreement is fair, reasonable, and adequate.  This factor, too, favors settlement.

**The "Arm's Length" Factor.**

23.     "Courts presume the absence of fraud or collusion in class action settlements unless there is evidence to the contrary."  *IUE-CWA*, 238 F.R.D. at 598 (citations omitted). Here, there is no suggestion of fraud or collusion.  Indeed, since this litigation began in 2010, the parties and their counsel have displayed civil but pronounced and vigorous disagreement over core questions as well as over other issues in dispute in the litigation and in the settlement discussions.  The Sixth Circuit mediator oversaw and participated in the settlement discussions. Counsel for the parties regularly reported to the Sixth Circuit mediator on their struggles over the substance of the settlement and, until the end, on their struggles over the details of the Settlement Agreement and the other documents relating to the settlement.  As in *IUE-CWA*, the Court concludes that the "process was entirely at arm's length, with each party representing and pursuing its own interests, and exercising independent judgment."  238 F.R.D. at 599.  The "arm's length" factor also supports approval of the settlement.

**The Public Interest Factor.**

24.     The Court finds the settlement is in the public interest.  The settlement benefits the parties and simultaneously serves the public interest in the availability of healthcare and in achieving certainty for retirees and for productive businesses that provide employment in this area and elsewhere.  It also serves the public interest in resolving disputes in federal courts with the maximum possible expediency and efficiency.  See *Cardizem*, 218 F.R.D. at 530 (citations omitted) ("[T]here is a strong public interest in encouraging settlement of complex litigation and class action suits because they are 'notoriously difficult and unpredictable' and settlement

conserves judicial resources").   The "public interest" factor, too, favors approval of the settlement.

## CONCLUSION

25.     The Court finds that the Settlement Agreement resolves a genuine legal dispute between the UAW and retirees on one hand, and EaglePicher on the other; it is the product of informed "arm's length" negotiations; it achieves a mutually-beneficial settlement in the absence of fraud and collusion; it binds Wolverine as well as EaglePicher, adding to the retirees' security; it eliminates risk and uncertainty for all sides; it avoids further delay and promptly eliminates hardship; it serves the interests of the class as a whole, presents a better option than continued litigation, and therefore is in compliance with the requirements of Section 302(c)(2) of the Labor-Management Relations Act, 29 U.S.C. §186(c)(2).  See *U.S. v. Mabr*y, 518 F.3d 442, 447 (6th Cir. 2008).   In addition, the Court finds that the Settlement Agreement conserves judicial resources, is consistent with the public interest, has the parties' and counsel endorsements, is within an acceptable "range of reasonableness" and, considering all the circumstances, is fair, reasonable, and adequate under Rule 23(e)(2).

For the foregoing reasons, the Court approves the parties' settlement and the Settlement Agreement in all respects and as to all parties.  The Joint Motion for Order Approving Settlement (Docket __) is GRANTED.  The Court will issue a judgment accordingly.

_____          _____
Dated                                                           Judge, United States District Court
                                                                    Eastern District of Michigan

3/21/13

Distribution:

Stuart M. Israel
Legghio & Israel, P.C.
306 South Washington, Suite 600
Royal Oak, Michigan 48067
248-398-5900
israel@legghioisrael.com

Class Counsel and Attorney for all Plaintiffs

Michael F. Saggau
Associate General Counsel
International Union, UAW
8000 E. Jefferson Avenue
Detroit, MI  48214
313-926-5216
msaggau@uaw.net

Attorney for UAW

Howard E. Kochell
Barnes & Thornburg LLP
11 South Meridian Street
Indianapolis, Indiana 46204
317-236-1313
howard.kochell@btlaw.com

Jeffrey G. Muth
Barnes & Thornburg LLP
171 Monroe Avenue NW, Ste 1000
Grand Rapids, Michigan 49503
616-742-3930
jmuth@btlaw.com

Attorneys for Defendant EaglePicher and
    Wolverine

# EXHIBIT 4



**Healthcare Program
Reimbursement Request**

I request reimbursement for the amount listed below.  Enclosed is documentation to support this request.  Supporting documentation may include **copies** of Explanation of Benefits forms, receipts, and other documents showing payment of the requested amounts.

**Name:** _____

**Mailing Address (please print):**

_____

_____

**Home phone:** _____

**Cell phone:**    _____

**Requested Reimbursement Amount:  $_____**

_____     _____
**Signature**                                                                      **Date**

If you have questions about the reimbursement process, please telephone Wolverine at 313-749-6120.  Mail this form and documentation *promptly*; it must be sent within 60 days of your payment of the requested amounts.  Mail to:

Wolverine Advanced Materials, LLC
5850 Mercury Drive, Suite 250
Dearborn, MI 48126

Reimbursement payments are made by Wolverine quarterly, in April, July, October, and January of each year.
Each quarterly payment will cover reimbursement requests applied for during the preceding quarter.

# EXHIBIT 5

*Hargrove, et al. v. EaglePicher Corporation*
U.S.D.C, E.D. Mich. case no. 10-v-10946
U.S. Ct.App., Sixth Cir. case no. 12-1555

**Class Members' Healthcare and Prescription "Make Whole" Amounts
for the Period January 2010 through April 2012**

| Class member | Healthcare | Prescriptions | Total |
|---|---:|---:|---:|
| Charlotte Armstrong | $2,445.82 | $1,278.99 | $3,724.81 |
| Irvin Armstrong | $882.34 | $926.93 | $1,809.27 |
| John Calhoun* | | | $0.00 |
| Virginia Calhoun | | | $0.00 |
| Sandra Davis | $0.00 | $0.00 | $0.00 |
| Thomas Davis | $0.00 | $120.80 | $120.80 |
| Rosemarie Galecki | $0.00 | $1,261.40 | $1,261.40 |
| Esther Hansen | | | $0.00 |
| Frank Hargrove Jr. | $0.00 | $736.32 | $736.32 |
| Jeanette Kaminski | | $1,996.00 | $1,996.00 |
| Ralph Kaminski | | $3,571.00 | $3,571.00 |
| George Kopchia* | $5,662.62 | $450.00 | $6,112.62 |
| Helen Kopchia | $1,961.03 | $8,303.00 | $10,264.03 |
| Kathryn McDonald | $0.00 | $0.00 | $0.00 |
| Ulla McDonald | $0.00 | $0.00 | $0.00 |
| Theda Perkins | $0.00 | $278.30 | $278.30 |
| Joyce Perry | | | $5,438.00 |
| Theresa Stevens | | | $0.00 |
| Stella Swierczek | | | $0.00 |
| Virginia VanKoughnet | $6,000.00 | $516.87 | $6,516.87 |
| Martha White | | | $0.00 |
| Richard White | | $540.00 | $540.00 |
| | | | |
| **Total** | | | **$42,369.42** |

*We are informed that these individuals are deceased.

03/21/13

# EXHIBIT 6

*Hargrove, et al. v. EaglePicher Corporation*
U.S.D.C., E.D. Mich. case no. 10-cv-10946
U.S. Ct.App., Sixth Cir. case no. 12-1555

**SUMMARY OF CLASS COUNSEL'S FEES, EXPENSES, AND COSTS**
**April 2012 – June 2012**

**Fees:**

| | | | |
|---|---|---|---|
| Stuart M. Israel | 57.75 | @ $475 | $27,431.25 |
| Tammy L. Popchock | 32.75 | @ $125 | $ 4,093.75 |
| Zach Adams | 3.25 | @ $125 | $   406.25 |
| | | | $31,931.25 |

**Costs and expenses:**  $411.31